IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────

MILTON F. LEE,

                         Petitioner,

                                            Civil Action No.
        -v-                                 9:05-CV-1337 (GTS/DEP)

GARY GREENE, Superintendent,

                              Respondent.

─────────────────────────────

APPEARANCES:                           OF COUNSEL:

FOR PLAINTIFF:

MILTON F. LEE, *pro se*
01-B-1928
Coxsackie Correctional Facility
Box 999
Comstock, NY 12051

FOR DEFENDANT:

HON. ANDREW M. CUOMO                   MICHELLE MAEROV, ESQ.
Office of the Attorney General         LISA FLEISCHMANN, ESQ.
120 Broadway
New York, NY 10271

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Petitioner Milton F. Lee, a New York State prison inmate as a result

of a 2001 judgment of conviction for second degree murder entered in Oneida County, has commenced this proceeding pursuant to 28 U.S.C. § 2254 seeking this court's habeas intervention. In his petition Lee asserts four separate grounds for habeas relief, three of which fall under the general heading of due process violations and deprivation of the right to a fair trial, with the remaining claim asserting a Fourth Amendment violation as a result of the admission of certain evidence at trial, including oral and written statements made by the petitioner to law enforcement agents.

In answer to Lee's petition respondent argues that while petitioner's Fourth Amendment claim is fully exhausted, the remaining three claims are not. Respondent adds that those three claims are now properly deemed exhausted but procedurally forfeited, and that in any event all of his claims are legally deficient.

Having carefully considered Lee's petition in light of the parties' respective arguments, and applying the requisite deferential review standard, I find that the grounds set forth in Lee's initial petition are all lacking in merit, and therefore recommend that his request for habeas relief be denied.

I.    BACKGROUND

Petitioner's conviction stems from the October 2000 murder of Tonya Taylor, his live-in girlfriend.  The events leading to petitioner's apprehension and prosecution for that murder were set in motion at approximately 12:45 a.m. on October 26, 2000, when his vehicle was stopped by Montgomery County Deputy Sheriff Anthony Priamo while traveling westbound through the Town of Mohawk.  Trial Transcript ("TT") at 241-43. The basis for the stop was Deputy Priamo's observation that the rear license plate lamp on petitioner's vehicle was not illuminated.  *Id.* at 241.  When asked for his driver's license and registration, petitioner seemed to Deputy Priamo to be nervous and to keep looking over his shoulder at what appeared to be several black garbage bags in the back seat of the car.  TT 245-48.

Montgomery County Sheriff's Sergeant Jeffrey Smith appeared on the scene a short time later, parking his vehicle behind Deputy Priamo's patrol car.  TT 248-49, 273-74.  As Sergeant Smith approached petitioner's vehicle he noticed what appeared to be a human body wrapped in a blanket in the hatchback portion of the car, and passed on to Deputy Priamo his suspicion.  TT 276-78, 297-99.  When Deputy Priamo asked what was in the blanket, Lee replied that it contained personal belongings,

3

later specifying that it was his laundry.  TT 250.  Upon closer observation, Deputy Priamo observed what appeared to be a person positioned on his or her side, wrapped in a blanket, and could see the outline of legs and a knee.  TT 251-52.  Also observed in Lee's vehicle were cleaning materials, including spray cleaner and a rag.  TT 282.

After asking to speak with Sergeant Smith privately, "man-to-man", petitioner was taken to the back seat of Deputy Priamo's car where, after being administered *Miranda*[1] warnings, he acknowledged that he had the body of "a crack whore prostitute named Tonya Taylor", his girlfriend, in his car.  TT 283-86.  Petitioner admitted that after the two became embroiled in an argument, he placed his hands around her neck and strangled her. TT 285-86.  Lee subsequently executed a consent form authorizing a search of his vehicle.  TT 255-56, 287-88.  The search by Sergeant Smith revealed a dead body covered by a blanket.  TT 288-89, 297-99, 301-02. Petitioner was thereafter taken to the Montgomery Sheriff's Department headquarters, and his vehicle was later towed from the scene.  TT 259, 307-09.

At the Montgomery County Sheriff's offices petitioner was

---

[1]        *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966).

interviewed, again after having been administered *Miranda* warnings.  TT 341-45.  Upon questioning by law enforcement officials, petitioner made further admissions to having strangled the victim and detailing the events leading up to that killing.  TT 346-58.

An autopsy of the victim's body was conducted on October 26, 2000 by Dr. Barbara Wolf, a forensic pathologist at the Albany Medical Center. TT 383-84.  Based upon that autopsy Dr. Wolf detected several injuries to the victim likely caused within twenty-four hours prior to her death, and at the trial she stated her opinion that the cause of death was manual strangulation.   TT 387-88, 402.  Dr. Wolf also opined that the injuries and state of the body were consistent with a time of death somewhere between thirty-six and forty-eight hours prior to the autopsy.  TT 404.

II.   PROCEDURAL HISTORY

A.   State Court Proceedings

On December 5, 2000, an Oneida County grand jury returned an indictment charging the petitioner with two counts of second degree murder.[2]  Following the filing of that indictment, two separate pretrial

_____

[2]      The indictment charging Lee is not among the state court records provided to the court by the parties.  From other materials before the court it appears that the indictment accused Lee of both intentional murder and depraved indifference murder, in violation of N.Y. Penal Law §§ 125.25(1) and 125.25(2), respectively.  *See,*

hearings were conducted by the assigned trial judge, Acting Supreme

Court Justice Barry M. Donalty.  The first, held on April 5 and 17, 2001,

addressed petitioner's request for suppression of oral and written

statements provided to law enforcement personnel, as well as of certain

physical evidence seized, all allegedly in violation of his Fourth

Amendment rights.  *See* Suppression Hearing Transcript.  Following that

hearing, on April 27, 2001 Judge Donalty issued a written decision finding

that the challenged evidence was not the product of a Fourth Amendment

violation, and thus denying petitioner's application for suppression.  *See*

State Court Records Exh. J.  In his decision, *inter alia*, Judge Donalty

concluded that law enforcement agents had the authority to make the initial

stop and ask preliminary questions based upon a suspected traffic

infraction, and that their further observations provided reasonable

suspicion authorizing them to further detain and ask preliminary questions

of the petitioner.  *Id.* at 9-10.  Judge Donalty further concluded that the

ensuing statements by Lee concerning his crime and the consent to search

his vehicle were knowing and voluntary, and did not result in infringement

of his constitutional rights, and that based on his confession and

_____

*e.g.*, State Court Records, Exh. D at p. v (Statement Under Rule 5531).

6

observations of what appeared to be a body in his vehicle, law enforcement officials had the requisite probable cause to place Lee under arrest.  *Id.* at 10-18.

The second pretrial hearing, held on May 23, 2001, dealt with petitioner's stated intention to offer the testimony of a psychologist, Dr. Norman Lesswing, in his defense at trial, and was held in response to the prosecution's preclusion motion, based in large part upon the argument that the required notice under New York Criminal Procedure Law ("CPL") § 250.10(2) of defendant's intention to offer such evidence had not been timely provided.  *See* May 23, 2001 Hearing Transcript.  As a result of that hearing, Judge Donalty issued a decision on May 24, 2001 in which he granted the motion for preclusion, rejecting the proffered testimony of Dr. Lesswing both because it would have comprised expert testimony bearing upon issues within the jury's province and competence, and based upon the failure to provide the required notice of intent to offer such testimony at trial.  *See* State Court Records, Exh. K.

A jury trial was commenced on May 30, 2001 before Judge Donalty to address the charges against the petitioner.  Testifying at trial were Officer Priamo; Sergeant Smith; Montgomery County Sheriff's Department

7

Investigator Ernest Sammons; Jeffrey Ulman, a New York State Police

Forensic Investigator; Sergeant Richard Brady, a member of the Utica

Police Department; Dr. Wolf; Utica Police Officer Carl Conte; Yvette Rivers

McCray and Larry McCray, two friends of the victim; Gerald Rescigno, an

acquaintance of the petitioner; Michael Abraham, another of the

petitioner's friends; Joseph Salerno, an acquaintance of the Lee;

Rosemary Padula, petitioner's sister; Sherrie Goldman, an acquaintance of

Lee; David Matrulli, a City of Utica Police Officer; Dennis Padula, another

acquaintance of the petitioner; Dr. Yong-Myun Rho, a retired medical

examiner and forensic pathologist; and petitioner.

After the close of the evidence at trial, the jury returned a verdict on

June 4, 2001, acquitting Lee on the intentional murder count but convicting

him of depraved indifference murder.  TT 858.  Petitioner was

subsequently sentenced on August 16, 2001, based upon that verdict, to

an indeterminate term of incarceration of between twenty-five years and

life.  Petition (Dkt. No. 1) p. 1.

Petitioner appealed his conviction to the New York State Supreme

Court Appellate Division, Fourth Judicial Department ("Fourth

Department").  In that appeal Lee advanced five separate grounds for

reversal, arguing that 1) his Fourth Amendment rights were violated based upon the conduct of law enforcement officials following the initial stop and issuance of a traffic citation; 2) the trial court improperly admitted an excessive quantity of evidence at trial regarding the petitioner's handling of the victim's body, following her death; 3) the trial court erred in refusing to permit him to call Dr. Lesswing as an expert witness; 4) the trial court abused its discretion in permitting the introduction of an excessive number of photographs of the body of the deceased; and 5) the sentence imposed was unduly harsh and severe.  *See* State Court Records, Exh. D (Petitioner's Appellate Brief).

The Fourth Department issued a decision on April 30, 2004, unanimously affirming petitioner's conviction.  *People v. Lee*, 6 A.D.3d 1235, 775 N.Y.S.2d 734 (4th Dep't 2004).  Addressing first petitioner's cornerstone Fourth Amendment argument, the appellate court found that law enforcement officials were initially justified in stopping Lee's vehicle and that the continued detention of Lee was warranted by their observation of what appeared to be a body in plain view in the rear of the vehicle.  6 A.D.2d at 1236, 775 N.Y.S.2d 734.  The Fourth Department also found that the trial court's preclusion of the testimony of Dr. Lesswing was proper,

based upon Lee's failure to comply with the notice requirements of CPL §

250.10, that various other evidentiary rulings made throughout the course

of the trial "were not an abuse of discretion", and that petitioner's sentence

was "neither unduly harsh nor severe." *Id.*  Petitioner's application for

leave to appeal to the New York Court of Appeals was denied on

September 20, 2004.  *See People v. Lee,* 3 N.Y.3d 740, 786 N.Y.S.2d 820

(2004) (Table).

In addition to his direct appeal, petitioner also collaterally challenged

his conviction in the state courts, initially filing a motion to vacate the

judgment of conviction pursuant to New York CPL § 440.10 on October 27,

2003.   *See* State Court Records, Exh. A.  In that motion petitioner argued

that newly discovered evidence revealed that one of the prosecution's

witnesses, Yvette Rivers, was adjudicated a mentally incapacitated person

pursuant to New York CPL § 730.30 a short time after his trial.  *Id.* at ¶ 12.

Petitioner's section 440.10 motion was denied by written decision and

order issued by Judge Donalty on December 9, 2003.  *See id.*, Exh. C.  It

does not appear that an appeal was taken by the petitioner from that

determination.

Petitioner filed a second application pursuant to CPL § 440.10 to

10

vacate his judgment of conviction.[3]  In that second section 440.10 motion

petitioner raised the inconsistency under both the United States and New

York Constitutions of instructing the jury to consider both intentional

murder and depraved indifference murder in the alternative, requesting that

a New York Court of Appeals decision addressing that issue, *People v.*

*Suarez*, 6 N.Y.3d 202, 811 N.Y.S.2d 267 (2005), be applied retroactively to

govern in his case.  That application was denied by Judge Donalty in a

written decision and order issued on March 2, 2007.  *See* Dkt. No. 21.

Judge Donalty's determination was upheld on appeal to the Fourth

Department, which unanimously affirmed the order by decision rendered

on February 6, 2009.  *People v. Lee*, 59 A.D.3d 996, 872 N.Y.S.2d 304

(4th Dep't 2009).  Petitioner's motion for reargument was subsequently

denied by the Appellate Division on April 24, 2009, *see* 61 A.D.3d 1440,

878 N.Y.S.2d 926 (4th Dep't 2009), and leave to appeal that ruling to the

New York Court of Appeals was later denied on August 21, 2009.  *People*

*v. Lee*, 13 N.Y.3d 746, 886 N.Y.S.2d 100 (Aug. 21, 2009) (Table).

---

[3]     Since the respondent has not provided the court with records concerning
the second section 440.10 motion, which is not implicated in the present proceeding, I
am unable to ascertain precisely when that motion was filed.  From other records
submitted by the petitioner, however, it appears that the second section 440.10 motion
was filed in or about May of 2006.  *See, e.g.,* Petitioner's Memorandum for Leave to
Amend (Dkt. No. 47) Exh. E-26.

In or about September of 2009, petitioner filed an application with the Fourth Department seeking a writ of error coram nobis setting aside the previous order of the court affirming his conviction. *See* Dkt. No. 44. In that petition Lee challenged the effectiveness of assistance received from his appellate counsel, focusing on the attorney's failure to press the claim that the evidence at trial did not support his conviction of depraved indifference murder. *See id.* That application was denied by the appellate court on November 13, 2009, *see* Dkt. No. 49, and leave to appeal that ruling was subsequently denied by the New York Court of Appeals on May 19, 2010. Dkt. No. 52.

### B.    Proceedings In This Court

Petitioner commenced this proceeding on August 24, 2005. Dkt. No. 1. Lee's petition sets forth four grounds for habeas relief, arguing that 1) evidence that was the product of Fourth Amendment violations was improperly admitted at trial; 2) the trial court erred in permitting witnesses to testify regarding his handling of the victim's body following her death; 3) his due process rights were violated when he was denied the opportunity to present the expert psychological testimony of Dr. Lesswing; and 4) he was denied a fair trial through the introduction of an excessive number of

photographs of the victim's body. *Id.* Appropriately named as the respondent in Lee's petition is Gary Greene, the Superintendent of the correctional facility at which the petitioner was confined at the time of filing. *Id.*

On October 10, 2006, respondent Greene, who is represented in this proceeding by the New York State Attorney General, filed a response to the petition. Dkt. No. 10. Accompanying that response was a letter dated April 7, 2006 forwarding various state court records associated with the petitioner's state court prosecution and conviction, well organized and tabbed for the convenience of the court. With permission of the court, petitioner submitted a reply, or "traverse", to Greene's response on June 30, 2006 addressing his original claims and respondent's opposition, and for the first time interjecting three additional issues into the matter. Dkt. No. 14.

This proceeding was stayed, at petitioner's request, during most of the period from September 21, 2006 to the present in order to permit him to pursue certain unexhausted claims in the state courts. *See* Dkt. No. 15, Text Orders dated 9/2/09, 9/15/09, and 6/8/10. Now that the various state court collateral challenges to petitioner's conviction have been concluded

and the stay has been lifted, the matter is ripe for determination and has

been referred to me for the issuance of a report and recommendation,

pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York

Local Rule 72.3(c).[4]  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Petitioner's Assertion Of Additional Grounds For Habeas Relief
          In His Reply Papers

By letter dated April 11, 2006 petitioner requested permission to

submit a reply to respondent's opposition to his petition as well as an

extension of time to file that reply.  *See* Dkt. No. 12.  Petitioner's letter did

not seek leave to amend his petition or otherwise indicate that he intended

to raise additional grounds for seeking habeas relief in this matter.  *See id.*

Petitioner's request was granted, and he was afforded leave to file a reply

on or before June 30, 2006.  *Id.*

Lee's reply was received by the court and filed on June 30, 2006 –

more than one year after his conviction became final for statute of limitation

---

[4]    Following the lifting of the stay, petitioner renewed an earlier motion for
leave to amend his petition.  Dkt. No. 53.  That motion was denied by decision and
order issued by District Judge Glenn T. Suddaby on July 20, 2010.  Dkt. No. 57.  While
petitioner initially appealed from that interlocutory ruling, his appeal has since been
dismissed by the United States Court of Appeals for the Second Circuit.  *See* Dkt. Nos.
58, 62, 63.

purposes.  In that reply Lee not only addressed many of the grounds

asserted in his original petition and the arguments offered by respondent in

opposition to those grounds, but additionally purported to add three new

grounds for seeking habeas relief, arguing that 1) his conviction was

against the weight of the evidence; 2) the testimony of witness Yvette

Rivers McCray should not have been admitted in light of her unsettled

mental condition; and 3) the sentence imposed by the trial court was

unduly excessive.  *See* Dkt. No. 14.  As a threshold matter the court must

determine whether those additional grounds, which were not originally

contained in either Lee's original petition or a properly filed amended

pleading, should now be considered.[5]

The rules applicable to section 2255 habeas proceedings provide, in

relevant part, that "[t]he petition must . . . specify all grounds for relief

available two the petition."  *See* Rules Governing Section 2254 Cases in

the United States District Courts, Rule 2(c)(1).  Construing this rule, courts

have observed that a traverse, or reply, is not a proper vehicle for raising

---

[5]        The court notes that petitioner has attempted on several prior occasions
to amend his petition in this matter.  *See, e.g.,* Dkt. No. 27 (proposed amended petition
stricken by the court); Dkt. No. 47 (motion to amend denied, without prejudice, in light
of stay of action); Dkt. No. 53 (motion to amend denied, with prejudice).  In none of
those proposed amended petitions did Lee raise the new arguments set forth in his
traverse.

additional grounds for habeas relief, and claims raised for the first time in such a pleading have been considered as not properly before the court. *See Parker v. Duncan*, No. 9:03-CV-0759 (LEK/RFT), 2007 WL 2071745 at *6 (N.D.N.Y. July 17, 2007) (Kahn, J.), *aff'd*, 255 Fed. App'x 565 (2d Cir. 2007); *see also Simpson v. United States,* No. 5:03-CV-691, 5:00-CR-373, 2005 WL 3159657 (N.D.N.Y. Nov. 25, 2005) (Scullin, J.); *Morris v. Duncan*, No. 03-CV-1428, 2007 WL 2815632, at *4 n.5 (McAvoy, D.J. and Bianchini, M.J.).[6]

Petitioner's additional claims related to the weight of the evidence, the propriety of his sentence, and a witness competency issue were not contained in or advanced in his initial petition, nor were they the subject of a successful motion for leave to amend. For these reasons, I recommend that they not be considered in this proceeding.

B.   Exhaustion

Before addressing the merits of petitioner's four habeas claims, respondent first argues that three of those claims remain unexhausted, and thus are not presently cognizable under section 2254. Specifically, respondent maintains that with the exception of the Fourth Amendment

---

[6]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

argument which forms the basis for the first ground in his petition, Lee's claims have not been fairly presented to the state courts, and therefore cannot now be offered as a basis for seeking habeas relief from this court.

Prior to applying for a writ of habeas corpus, a petitioner must exhaust available state remedies, or establish either an absence of available state remedies or that such remedies cannot adequately protect his or her rights. *Aparicio v. Artuz*, 269 F.3d 78, 89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994), *cert. denied*, 515 U.S. 1118, 115 S. Ct. 2269 (1995). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982) (citations omitted). "Comity concerns lie at the core of the exhaustion requirement." *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir.), *cert. denied*, 544 U.S. 1025, 125 S. Ct. 1996 (2005). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Id.* "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose

17

fundamental legal basis was substantially different from that asserted in state court." *Daye,* 696 F.2d at 192 (footnote omitted).

In arguing that of the four grounds asserted in Lee's petition only the Fourth Amendment issue was properly presented to the state courts, respondent overlooks the fact that petitioner's brief to that court raises each of the remaining three issues, and the Appellate Division's decision reflects that all three were addressed on the merits.

It may be true that those arguments were not presented in constitutional terms in that, for example, the phrase "due process" was not utilized in connection with those claims, nor were federal cases addressing the fundamental right of a defendant to a fair trial cited.  However, this is not controlling; the exhaustion requirement is satisfied if the federal claim has been "'fairly presented'" to the state courts. *See Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971)).  A claim has been "fairly presented" if the state courts are apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court."  *Daye*, 696 F.2d at 191.  Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature."  *Daye*, 696 F.2d at 192.

18

In this instance, petitioner's presentation to the Fourth Department sufficiently alerted that court to the constitutional underpinnings of the arguments advanced in support of his second, third, and fourth habeas claims.  Each of the three points of his brief addressing those arguments makes specific reference to the denial of a fair trial, a familiar concept under federal constitutional law.  *See* State Court Records, Exh. D (Petitioner's Appellate Brief) at 47, 51, 53.  Under these circumstances, I conclude that all four of petitioner's claims in this action should be deemed to have been exhausted.

     C.    AEDPA Standard of Review

Before turning to the merits of petitioner's remaining claims, I must first address the standard against which the sufficiency of those claims are to be gauged.  The standard to be applied when evaluating the merits of a federal habeas petition was significantly circumscribed by Congress through  enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  Under the AEDPA, a federal court may not grant habeas relief to a state prisoner on a claim

> that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim –

19

> 1) resulted in a decision that was
> contrary to, or involved an unreasonable
> application of, clearly established
> Federal law, as determined by the
> Supreme Court of the United States; or
>
> 2) resulted in a decision that was based
> on an unreasonable determination of
> the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Besser v. Walsh*, 601 F.3d 163, 178 (2d Cir.

2010),*vacated in part on rehearing en banc by Portalatin v. Graham*, 624

F.3d 69 (2d Cir. 2010); *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir. 2000),

*cert. denied*, 534 U.S. 886, 122 S. Ct. 197 (2001); *Boyette v. Lafevre*, 246

F.3d 76, 88 (2d Cir. 2001).  When applying this test, the Second Circuit

has noted that

> [u]nder AEDPA, we ask three questions to
> determine whether a federal court may grant
> habeas relief: (1) Was the principle of Supreme
> Court case law relied upon in the habeas petition
> "clearly established" when the state court ruled?
> (2) If so, was the state court's decision "contrary
> to" that established Supreme Court precedent? (3)
> If not, did the state court's decision constitute an
> "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Francis S. v.

Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000) (citing *Williams v. Taylor*, 529

U.S. 362, 412-13, 120 S. Ct. 1495, 1523 (2000)).  For AEDPA purposes

federal law is "clearly established" if it is based upon holding of Supreme Court decisions rendered prior to the time of the state court decision being examined. *Williams*, 529 U.S. at 412, 120 S. Ct. 1495.  When applying this test, a court must recognize that under the AEDPA "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Boyette*, 246 F.3d at 88 (quoting § 2254(e)(1)) (internal quotes omitted).

Because the AEDPA's restriction on federal habeas power was premised in no small part upon the duty of state courts to uphold the Constitution and faithfully apply federal laws, the AEDPA's exacting review standards apply only to federal claims that have been actually adjudicated on the merits in the state court. *Besser*, 601 F.3d at 179; *Washington v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001).  Specifically, as the Second Circuit explained in *Sellan v. Kuhlman*, "[f]or the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment."  261 F.3d 303, 312

21

(2d Cir. 2001); *see Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006)

(citing *Sellan*), *cert. denied sub nom.*, *Jimenez v. Graham*, 549 U.S. 1133,

127 S. Ct. 976 (2007).  Significantly, the Second Circuit went on in *Sellan*

to note that when a state court adjudicates a claim on the merits, "a

federal habeas court must defer in the manner prescribed by 28 U.S.C. §

2254(d)(1) to the state court's decision on the federal claim – *even if the*

*state court does not explicitly refer to either the federal claim or to relevant*

*federal case law.*"[7]  *Sellan*, 261 F.3d at 312 (emphasis added).

       When a state court's decision is found to be decided "on the merits",

that decision is "contrary to" established Supreme Court precedent if it

applies a rule that contradicts Supreme Court precedent, or decides a

case differently than the Supreme Court on a set of materially

---

       [7]       In the past, when wrestling with interpretation and application of the
AEDPA's deference standard the Second Circuit had suggested, although leaving
open the question, that deference under section 2254(d) is not mandated if a state
court decides a case without citing to federal law or otherwise making reference to a
federal constitutional claim in a manner adequate to justify deference under AEDPA, in
which case pre-AEDPA standards would apply. *Washington*, 255 F.3d at 52-55; *see
also Noble*, 246 F.3d at 98.   That court clarified in *Sellan*, however, that the question
of whether or not a state court makes specific reference to a constitutional principle is
not controlling.  In his opinion in *Sellan*, Chief Judge Walker acknowledged that
enlightenment in state court decisions as to the manner of disposition of federal claims
presented would greatly enhance a federal court's ability, on petition for habeas
review, to apply the AEDPA deference standard.  *Sellan*, 261 F.3d at 312.  He noted,
however, that a state court's failure to provide such useful guidance does not obviate a
federal court's duty to make the analysis and pay appropriate deference if the federal
claim was adjudicated on the merits, albeit tacitly so.  *Id.*

indistinguishable facts. *Williams*, 529 U.S. at 405-06, 120 S. Ct. at 1519-20. An unreasonable application of clearly established federal law occurs when the governing rule is correctly identified but the court "'applies it unreasonably to the facts of a particular prisoner's case', or refuses to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." *Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006) (quoting *Williams*, 529 U.S. at 407-08, 120 S. Ct. 1495) (other citations omitted). As the Second Circuit has observed, this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great[.]" *Francis S.*, 221 F.3d at 111.

D.    Ground One: Fourth Amendment

In the first ground of his petition, Lee asserts that his rights were violated by the gathering and introduction at trial of evidence obtained by law enforcement agents following his traffic stop, including the results of a consensual search of his vehicle, and oral and written statements in which he admitted having murdered the victim. Specifically, petitioner argues that once a traffic citation was administered, the police officers at the scene had no legal right to detain him further. This claim, which arises under the Fourth Amendment, was unsuccessfully litigated by the

23

petitioner in the state courts, the Fourth Department concluding that the continued detention of the petitioner was justified based upon officers' observations of what appeared to be a body in plain view in the rear of Lee's vehicle.

Petitioner's Fourth Amendment argument must be considered against the backdrop of the well-established body of habeas jurisprudence in this circuit teaching that where a state has provided a criminal defendant with the opportunity to fully and fairly litigate a Fourth Amendment claim, review of such a constitutional claim by a federal court on petition for habeas relief is limited.  *See Stone v. Powell*, 428 U.S. 465, 481-82, 96 S. Ct. 3037, 3046 (1976); *Hernandez v. Filion*, No. 05 Civ. 4046, 2005 WL 3164063, at *5-6 (S.D.N.Y. Nov. 29, 2005); *see also Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992); *Campbell v. Greene,* 440 F. Supp. 2d 125, 138 (N.D.N.Y. 2006).  A federal court may only review a claim based upon the Fourth Amendment "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process."

24

*Capellan,* 975 F.2d at 70 (citing *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir. 1977)) (other citation omitted); *Campbell*, 440 F. Supp. 2d at 138 (citing *Capellan*).

By statute, New York provides a procedure for adjudication of claimed Fourth Amendment violations.  *See* N.Y. Crim. Proc. Law § 710.10 *et seq.*  "[F]ederal courts have approved New York's procedure for litigating the Fourth Amendment claims . . . as being facially adequate." *Cappellan*, 975 F.2d at 70 n.1 (citations omitted); *see also Jackson v. Lacy*, 74 F. Supp. 2d 173, 176 (N.D.N.Y. 1999) (McAvoy, C.J.) (adopting Report-Recommendation of Magistrate Judge Ralph W. Smith, Jr.). "[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief."  *Graham v. Costello,* 299 F.3d 129, 134 (2d Cir. 2002).  It should be noted, moreover, that "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process."  *Capellan*, 975 F.2d at 72.

In this case there is no evidence that the trial court failed to conduct

25

a meaningful suppression hearing and conscientiously address

petitioner's Fourth Amendment claim.  To the contrary, the record reveals

that the trial court afforded the petitioner a full and fair opportunity to

develop his Fourth Amendment claims, conducted a thorough evidentiary

hearing extending over a period of two days and, following that hearing,

made detailed findings of fact and set forth conclusions of law addressing

the arguments now raised by the petitioner.  The trial court's

determination, moreover, was upheld on Lee's appeal to the Fourth

Department.  Petitioner's claim for relief based upon an alleged Fourth

Amendment violation thus provides no basis for habeas intervention.  *See*

*Campbell,* 440 F. Supp. 2d at 139-40 (citing, *inter alia Morales v. Walsh*,

No. 02-CV-6045, 2003 WL 23185770, at *15 (E.D.N.Y. Oct. 30, 2003)

(denying Fourth Amendment claims, including claim of unlawful arrest,

under *Stone*) (other citations omitted).

E.    Grounds Two and Four: Fair Trial

Grounds two and four of Lee's petition, in essence, entail claims that

he was denied a fair trial as a result of certain evidentiary rulings by the

trial court.  In ground two, petitioner asserts that the prosecution should

not have been permitted to adduce the quantity of evidence that it did

26

regarding his handling of the victim's body following her death, while in the fourth ground he asserts that the jury was tainted by the number of inflammatory and prejudicial photographs of the victim's body entered into evidence.  Both of these claims were addressed and rejected by the Fourth Department.

>        1)        <u>Applicable Standard of Review</u>

Claimed errors by state courts are not ordinarily subject to habeas review unless they deprive a defendant of a fundamentally fair trial. *Estelle v. McGuire*, 502 U.S. 62, 72-75, 112 S. Ct. 475, 482-84 (1991).  A party is entitled to habeas relief on a claim that evidence was improperly admitted against him or her where the introduction of that evidence "so infused the trial with unfairness as to deny [the defendant] due process of law." *Lisenba v. California*, 314 U.S. 219, 228,  62 S. Ct. 280, 286 (1941). The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 674 (1990) (quoting *United States v. Lovasco*, 431 U.S. 783, 790, 97 S. Ct. 2044, 2048 (1977)).

The threshold inquiry presented with respect to the evidentiary rulings at issue is whether the trial court's ruling violated a state evidentiary rule, "because the proper application of a presumptively constitutional state evidentiary rule could not be unconstitutional." *Velazquez v. Fischer*, 524 F. Supp. 2d 443, 450 (S.D.N.Y. 2007) (citation and internal quotation omitted).  Moreover, "[w]here allegedly prejudicial evidence is 'probative of [an] essential element' in the case, its admission does not violate the defendant's right to due process.  *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.) (quoting *Estelle*, 502 U.S. at 69, 112. S. Ct. at 481), *cert. denied*, 525 U.S. 840, 119 S. Ct. 101 (1998)).

Turning first to the admission of photographs of the victim's body, I note that under New York law a trial court is vested with broad discretion in determining the admissibility of such evidence.  *McCullough v. Filion*, 378 F. Supp.2d 241, 254 (W.D.N.Y. 2005); *see also People v. Pobliner*, 32 N.Y.2d 356, 369, 345 N.Y.S.2d 482 (1973), *cert. denied*, 416 U.S. 905, 94 S. Ct. 1609 (1974).  Even gruesome photographs of a homicide victim with a tendency to arouse jury passions are admissible, if relevant in that they tend to prove or disprove a disputed fact, and "should be excluded only if their sole purpose is to arouse the emotions of the jury and to

28

prejudice the defendant[.]"  *Pobliner*, 32 N.Y.2d at 370; 343 N.Y.S.2d at 493.

Here, the trial court admitted a number of photographs offered by the prosecution and depicting all or some of the victim's body.  *See* TT 323 (image of partially unwrapped body lying in trunk showing head wrap in plastic bag; second photograph showing partially unwrapped body located in petitioner's vehicle); 324 (image of partially unwrapped body taken from driver side of petitioner's vehicle); 385 (image on body of autopsy table, wrapped in comforter and sheet; second photograph also showing image of body on the autopsy table with comforter folding back revealing sheet that was wrapping the body); 386 (photograph of fully exposed body on autopsy table, dressed in sheet with plastic bag over her head; 390 (image of Dr. Wolff holding ruler next to abrasion on victim's nose; second photograph similarly showing bruising on victim's lip); 390 (photograph of left side of victim's neck showing two areas of abrasion; 391 (first photograph showing both abrasions on the left side of victim's neck; second photograph showing right side of victim's neck with a small curve abrasions); 392 (three photographs, showing images of right side of victim's neck revealing areas of scraping and abrasions, left eye held

open to demonstrate area of bleeding, and right eye also similarly held
open to reveal bleeding); 395 (two images revealing ankle markings and
injuries and one photograph of the upper part of victim's arm showing
markings and abrasions; 396 (image of Dr. Wolff holding rope next to
marking on victim's arm); 396 (image of post-mortem injuries to victim's rib
cage area).[8]  The record in this matter reveals that at least eight
photographs offered by the prosecution were not admitted into evidence.
*See* TT 324, 385, 387, 389, 394, 396; *see also* 509-517.

The photographs received in evidence were offered by the
prosecution to illustrate the cause of death, revealing the victim's injuries
and augmenting the forensic testimony offered at trial.  The photographs
were also offered as probative on the issue of intent as lending support to
the forensic's pathologist's opinion that pressure had been applied to the
victim's neck for an extended period of time, causing her death.  In light of
the fact that the photographs received in evidence at trial were relevant to
disputed issues in the case and therefore properly admitted under New
York evidentiary principles, no constitutional violation is implicated.
*Dunnigan*, 137 F.3d at 125.

---

[8]     One image of the victim's body, wrapped in a comforter, was offered into
evidence by the defense.  *See* TT 299.

The second aspect of petitioner's fair trial claim concerns testimony of his actions taken with respect to the victim's body following her death. Those actions, however, were directly relevant to showing evidence of guilt, and in addition necessarily provided context to the events leading up to petitioner's arrest and subsequent admissions.  As such, the evidence was properly admitted, and the petitioner has therefore failed to carry his heavy burden of establishing a constitutional violation.

Even if this court were to conclude that the trial court's evidentiary rulings regarding the photographs and evidence of petitioner's conduct toward the body constituted error, that finding alone would nonetheless not provide a basis to grant habeas relief.  "Even an incorrect state court evidentiary ruling does not rise to the level of constitutional error necessary to warrant habeas relief, unless the error deprived Petitioner of a fundamentally fair trial." *Alfini v. Lord,* 245 F. Supp. 2d 493, 499-500 (E.D.N.Y. 2003) (citations omitted).  In this case, the evidence against the petitioner supporting his depraved indifference murder conviction was overwhelming, and the photographs of the victim and evidence regarding his actions toward the victim following the murder, even if erroneously admitted, did not deprive him of a fundamentally fair trial.

31

In sum, I recommend rejection of petitioner's fair trial arguments, as set forth in grounds two and four of his petition.

F.    Ground Three: Due Process

In the third ground of his petition, Lee argues that his due process rights were violated by the trial court's refusal to allow him to call Dr. Lesswing as a witness at trial.  Lee maintains that Dr. Lesswing's testimony was offered "to help explain his conduct in the handling of the victim's body after the alleged acts and to help explain the reason for making his statements to the police".  *See* Petition (Dkt. No. 1) at p. 6.

When this issue initially arose the trial court conducted a hearing and determined that the proffered evidence was excludable for failure to comply with the requirements of CPL § 250.10, and in any event because the testimony of Dr. Lesswing would not assist jurors in understanding any issue beyond their competence.  That ruling was upheld by the Fourth Department based upon petitioner's failure to comply with the notice requirements of CPL § 250.10, or to provide good cause for failing to provide a timely notice.  Respondent asserts that this represents an independent and adequate procedural ground for rejection of the argument, thereby obviating the need to address its merits in this

32

proceeding.

As a matter both of comity and in keeping with the principles of federalism, a federal court ordinarily will not review a federal claim presented in a habeas petition if it has been rejected by the state courts on a ground which is both "independent and adequate[.]"  *Coleman v. Thompson*, 501 U.S. 722, 736, 111 S. Ct. 2546, 2558 (1991); *Monroe v. Kuhlman*, 433 F.3d 236, 240-41 (2d Cir. 2006); *Brown v. Greiner*, 409 F.3d 523, 532 (2d Cir. 2005).  While a procedural forfeiture is typically the product of a failure to comply with a state's requirements regarding timely presentment of issues to the court, the question of whether a default discerned by a state court is sufficiently adequate and independent to preclude federal habeas review is governed by federal law.  *Monroe*, 433 F.3d at 241.

Addressing the issue of adequacy, the Second Circuit has observed that

> a procedural bar will be deemed adequate only if it is based on a rule that is firmly established and regularly followed by the state in question.  When a federal court finds that the rule is inadequate under this test the rule should not operate to bar federal review.  Nonetheless, the principles of comity that drive the doctrine counsel that a federal court that deems a state procedural rule inadequate should

> not reach that conclusion lightly or without clear
> support in state law.

*Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal citations and

quotation marks omitted).  As may be self-evident, a state court

determination is sufficiently independent, for purposes of this rule, if it is

divorced from and bears no relation to the merits of the federal law claim

presented.  *See Brown*, 409 F.3d at 532.  When addressing the question

of procedural forfeiture, a court should presume that there is no

independent and adequate state ground for a state court decision when

the decision "fairly appears to rest primarily on federal law, or to be

interwoven with the federal law, and when the adequacy and

independence of any possible state law ground is not clear from the face

of the opinion[.]'" *Coleman*, 501 U.S. at 733, 111 S. Ct. at 2556 (quoting

*Michigan v. Long*, 463 U.S. 1032, 1040-41, 101 S. Ct. 3469, 3476 (1983)).

        For a federal court to deny habeas review based on the independent

and adequate state ground doctrine, it must be clear that the state court

actually relied upon the procedural bar as an independent basis for its

disposition of the claim.  *Fama*, 235 F.3d at 809.  In a case where both

procedural and substantive arguments have been advanced by the parties

but no opinion is issued by the state court explaining its rejection of a

claim, a federal court may properly assume that the state court based its decision on state procedural grounds absent "good reason" to believe the state courts' silence represents a decision to deny the claim on its merits. *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993).  In instances where a state court has expressly found both a failure to preserve the argument for appellate review and alternatively or "in any event" that the argument lacks merit, the procedural bar applies.  *Fama*, 235 F.3d at 810 n.4 (citing *Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996) and *Velasquez v. Leonardo*, 989 F.2d 7, 9 (2d Cir. 1990)).  If there is ambiguity, however, as in "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama*, 235 F.3d at 810; *see also Coleman*, 508 U.S. at 735, 111 S. Ct. at 2557.

In this instance, both prongs of the adequate and independent standard are met.  The Fourth Department's decision to uphold the trial court's rejection of Dr. Lesswing's testimony was squarely bottomed on petitioner's failure to comply with the notice requirement of CPL § 250.10. *Lee*, 6 A.D.3d at 1236, 775 N.Y.S.2d 734.  Moreover, there is clear

35

indication that the provision relied on is firmly established in New York,

and regularly followed.  *See, e.g., People v. Hill,* 4 N.Y.3d 876, 877, 799

N.Y.S.2d 166, 166 (2005).

Even assuming the petitioner's argument concerning Dr. Lesswing's

trial testimony was not properly rejected by the state courts on adequate

and independent grounds, it nonetheless lacks merit.  To be sure, a

petitioner is entitled to seek habeas relief on a claim that evidence offered

in support of his or her defense was improperly excluded in violation of the

right of a criminal defendant to a meaningful opportunity to present a

complete defense.  *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct.

1038, 1049 (1973) ("Few rights are more fundamental than that of an

accused to present witnesses in his own defense."); *Crane v. Kentucky*,

476 U.S. 683, 690, 106 S. Ct. 2142, 2146 (1986).  The right to call

witnesses and to present testimony "is a fundamental constitutional right

secured by both the Compulsory Process Clause of the Sixth Amendment

and the Due Process Clause of the Fourteenth Amendment."  *Washington

v. Shriver*, 255 F.3d 45, 56 (2d Cir. 2001).  That right, however, is not

without limits.  The constitution does not, for example, entitle a criminal

defendant "to offer testimony that is incompetent, privileged, or otherwise

inadmissible under standard rules of evidence." *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S. Ct. 646, 653 (1988).

Not every exclusion of evidence offered by a criminal defendant rises to a level sufficient to establish a due process violation. *See Dowling*, 493 U.S. at 352, 110 S. Ct. at 674. As was previously noted, even an improper evidentiary ruling, including one having the effect of excluding testimony, is constitutionally insignificant if it does not result in the denial of the fundamental right to a fair trial. *Alfini*, 245 F. Supp.2d at 499-500.

In this case, the court does not understand Dr. Lesswing's anticipated testimony as undermining the jury's verdict finding him guilty of depraved indifference murder. The subject matter of Dr. Lesswing's anticipated testimony and its relevance to the prosecution against the petitioner, including the issues of whether the victim's killing was intentional or instead reckless, is somewhat unclear. It appears that petitioner's counsel intended to elicit Dr. Lesswing's testimony on two subjects, the first related to the fact that petitioner was knowingly living with a prostitute, and the second concerning his efforts to dispose of her body. May 23, 2001 Hearing Tr. at 10-11. During the evidentiary hearing

conducted by a trial court there was no specific offer of proof on the part of petitioner's counsel showing how Dr. Lesswing's testimony on either of those points would have shed light on any material issue in the case.

Under the circumstances, I am unable to conclude that by denying him the right to present to the jury testimony of Dr. Lesswing, a psychologist, the petitioner was deprived of a fundamentally fair trial. Accordingly, I recommend that this last and final ground of Lee's petition be denied.

IV.     SUMMARY AND RECOMMENDATION

As a threshold matter, I recommend a finding that the grounds not asserted in Lee's petition but newly raised in his reply papers are not properly before the court.  Turning to the claims contained in the petition, having reviewed applicable state court records to determine whether the four grounds now advanced for requesting habeas relief were fairly presented to the state court, I conclude that petitioner has satisfied his obligation to exhaust those claims by fairly presenting them in the state courts before requesting habeas relief.  With respect to the substance of petitioner's claims, applying the requisite deferential standard, I find that petitioner's claims are lacking in merit.  It is therefore hereby

RECOMMENDED that Lee's petition in this matter be DENIED and DISMISSED in its entirety; and it is further

RECOMMENDED, based upon my finding that Lee has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), that a certificate of appealability not issue with respect to any of the claims set forth in his petition.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon respondents' counsel electronically and upon the *pro se* plaintiff.

Dated:     December 15, 2010
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Curly HERNANDEZ, Petitioner,
v.
Gary FILION, Superintendent of Correctional Facility, Respondent.
**No. 05 Civ. 4046(GWG).**

Nov. 29, 2005.

*OPINION AND ORDER*

GORENSTEIN, Magistrate J.

***1** Curly Hernandez, proceeding *pro se,* brings this petition for a writ of habeas corpus challenging his conviction in the Supreme Court of the State of New York, New York County, for Criminal Possession of a Controlled Substance in the First Degree (New York Penal Law ("N.Y.P.L.") § 220.21(1)). Hernandez was tried *in absentia* by a jury, found guilty, and sentenced to a term of imprisonment of fifteen years to life. On March 28, 2005, Hernandez was resentenced to a term of eight years' imprisonment under amendments to the so-called "Rockefeller Drug Laws." Hernandez was released on parole on May 13, 2005. The parties have consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the petition is denied.

I. *BACKGROUND*

A. *The Suppression Hearing*

On September 21, 1992, the trial court held a suppression hearing *in absentia* to determine whether cocaine recovered by the officers who arrested Hernandez was legally seized. The evidence at that hearing was as follows:

On March 11, 1992, shortly after 3:00 p.m., Curly Hernandez was walking west on 140th Street in Manhattan, approaching Amsterdam Avenue, when he was spotted by two police officers patrolling the area in a marked car. (*See* H. 6-8). FN1 The officers, Michael Kennedy and Matthew Barrett, were in a police car in a "very heavy narcotics area," and were stopped at the light at 140th and Amsterdam when they saw Hernandez walking "stiffly" and wearing a "heavy winter coat." (*See* H. 10, 12). While they did not see any bulges in the coat, they testified that it was very bulky, and that Hernandez's arms were not swinging normally but were "braced against his waist." (*See* H. 10, 17-18).

FN1. "H." refers to the transcript of the pre-trial suppression hearing. "T." refers to the trial transcript. Both are contained within Docket # 4.

As Hernandez turned north on Amsterdam Avenue, he looked over his shoulder and made eye contact with Kennedy, who was driving the police car. He continued to look over his shoulder at the officers, and then entered the College Restaurant, an establishment where Kennedy had made many previous narcotics arrests. (*See* H. 8, 11-12). As Hernandez entered, Kennedy saw him reach into his jacket. (*See* H. 11). Kennedy then pulled up to the curb in front of the restaurant, at which point Hernandez "spun around and came back out[.]" (*See* H. 8). Kennedy also saw a man in the restaurant "making a [waving] motion," as though telling Hernandez to leave. (*See* H. 8).

Upon leaving the restaurant, Hernandez took a couple of steps north on Amsterdam Avenue, and then ran twenty or thirty feet before entering another restaurant. (*See* H. 8-9). At this point, the officers got out of their squad car and ran after Hernandez. They lost sight of him for "just seconds," but saw him reach into his jacket as he entered the second restaurant. (*See* H. 9, 14, 37). As the officers entered the

Not Reported in F.Supp.2d, 2005 WL 3164063 (S.D.N.Y.)
(Cite as: 2005 WL 3164063 (S.D.N.Y.))

second restaurant, they saw Hernandez standing in the back near a garbage can. He pulled out a large yellow package and dropped it in the can. (*See* H. 9). Kennedy retrieved the package, which was later determined to contain more than two pounds of cocaine. Kennedy and Barrett then arrested Hernandez. (*See* H. 9, 46; *see also* T. 143).

### B. *The Denial of the Motion to Suppress*

**\*2** The court denied the motion to suppress orally on the record. (*See* T. 86). On October 29, 1992, after the completion of the trial, the court issued a written decision which has not been made part of the record but which has been quoted and cited in detail in other papers. *See* Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated July 25, 2005 (Docket # 5) ("Opp.Mem."), at 5; Brief for Respondent, dated October 2003 (reproduced as Ex. M to Declaration in Opposition to Petition for a Writ of Habeas Corpus, dated July 25, 2005 (Docket # 6) ("Opp.Decl.")) ("Resp.Br."), at 6-8 (citing written ruling on suppression hearing ("Suppression Ruling")).

The court found that the cocaine had been legally seized because the officers had been justified in approaching Hernandez in the first place to investigate his "unusual" actions in a heavy narcotics area. Resp. Br. at 6. The court found that Kennedy, an experienced narcotics officer, had "a founded suspicion that criminal activity was afoot." *See id.* at 7 (citing *People v. DeBour*, 40 N.Y.2d 210 (1976)). The pursuit of Hernandez was also legal, since the officers had a right to inquire of him before he ran. *See id.* Finally, the court found the officers had probable cause to arrest Hernandez after finding what appeared-and was later confirmed-to be a large quantity of cocaine in a package he had just discarded. Moreover, Hernandez's decision to throw the package in the trash was an intentional "independent act involving a calculated risk" rather than a "spontaneous reaction to a sudden and unexpected confrontation with the police." *See id.* at 8 (quoting Suppression Ruling at 13 (citing *People v. Boodle*, 47 N.Y.2d 398, 404 (1979))).

### C. *Trial and Sentencing*

On September 24, 1992, Hernandez's trial *in absentia* began. On September 25, the jury found Hernandez guilty of Criminal Possession of a Controlled Substance in the First Degree (N.Y.P.L. § 220.21(1)). (*See* T. 319). On October 19, 1992, Hernandez was sentenced to an indeterminate prison term of fifteen years to life. *See* Opp. Mem. at 7. On November 12, 1992, Hernandez's counsel filed a notice of appeal of his conviction. *See* 440 Motion ¶ 11. Briefing on that appeal did not occur until July 2002. *See* Section I.E below.

### D. *Motion to Vacate Conviction*

Hernandez remained a fugitive until March 1996, when he was arrested on a misdemeanor drug charge and began serving his sentence. *See* Opp. Mem. at 7. On October 28, 1998, he filed a motion to vacate his conviction, pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10. *See* Motion and Affidavit in Support of Motion to Vacate Judgment and Set Aside Sentence, dated October 28, 1998 (reproduced as Ex. A to Opp. Decl.) ("440.10 Motion"). In that motion, Hernandez argued that his *Brady* rights were violated when the People failed to disclose "exculpatory material" regarding the corruption investigation of Officers Kennedy and Barrett, who had both since left the force as a result of the investigation. *See* Memorandum of Law in Support of 440 Motion, dated October 3, 1998 (reproduced as Ex. B to Opp. Decl.), at 1-9; Decision and Order, dated October 5, 2000 (reproduced as Ex. G to Opp. Decl.) ("2000 Decision"), at 4.[FN2] The People argued that there was no knowledge of corruption in the 30th Precinct-where Kennedy and Barrett were stationed-until nearly a year after the conclusion of Hernandez's trial. *See* Memorandum of Law in Opposition to Defendant's Motion to Vacate Judgment Pursuant to CPL § 440.10, dated July 27, 1999 (reproduced as Ex. C to Opp. Decl.), at 1. The trial court ordered the filing of affidavits and a hearing to determine at what point the People had *"serious* information concerning the corrupt activities of Officers Kennedy and Barrett." *See* Decision and Order, dated December 22, 1999 (reproduced as Ex. D to Opp. Decl.), at 4-5 (emphasis in original). He also appointed Hernandez counsel. *See id.* at 6.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3164063 (S.D.N.Y.)
(Cite as: 2005 WL 3164063 (S.D.N.Y.))

FN2. The Court has added page numbers to this and other unpaginated decisions of the trial court.

**\*3** In accordance with the trial court's order, the People submitted affidavits from two Assistant District Attorneys involved in the corruption investigation, stating that the investigation of the 30th Precinct began in September 1992, and that the first complaint concerning Kennedy and Barrett was received in February 1993. *See* Affidavit of William Burmeister, dated January 27, 2000 (reproduced as Ex. E to Opp. Decl.) ("Burmeister Aff."), ¶ 2; Affirmation of Emery E. Adorario, dated February 14, 1995 (reproduced as Ex. F to Opp. Decl.) ("Adorario Aff."), ¶ 2. After following up on this complaint, the Official Corruption Unit ("OCU") found there was "not enough credible evidence" to prosecute Kennedy and Barrett. *See* Adorario Aff. ¶ 9. The affidavits also stated that by the fall of 1993, "additional and significant information" regarding corruption at the 30th Precinct came to light, leading to the arrest of 33 officers, including Kennedy, who was arrested in March 1994 for assaulting an undercover officer. *See* Burmeister Aff. ¶ 2; Adorario Aff. ¶¶ 12-13. However, the OCU "possessed no derogatory information regarding Officers Matthew Barrett or Michael Kennedy" at the time of Hernandez's arrest, trial, and sentence. *See* Burmeister Aff. ¶ 4.

On October 5, 2000, the court ruled that a hearing was unnecessary, and that the material Hernandez requested was *"not Brady* material," since the state had not received the allegations of misconduct until *"well after"* Hernandez's trial and sentencing. *See* 2000 Decision at 3 (emphasis in original). Further, the court rejected Hernandez's claim of "newly discovered evidence," ruling that " 'it must be shown that the new evidence creates a reasonable probability of a more favorable verdict," ' and that " 'generally, evidence which would merely impeach testimony at trial would not be sufficient." ' *See id.* at 5 (quoting *People v. Vasquez,* 214 A.D.2d 93, 102 (1st Dep't 1995), *appeal denied,* 88 N.Y.2d 943 (1996)).

On January 16, 2003, the Appellate Division denied Hernandez's application for leave to appeal the denial of his 440.10 motion, and denied his alternative application to consolidate that motion with his direct appeal. *See*

Certificate Denying Leave, dated January 16, 2003 (reproduced as Ex. J to Opp. Decl.).

## E. *Direct Appeal*

In his direct appeal, Hernandez argued to the Appellate Division that the police had lacked reasonable suspicion of criminal activity when they approached him, and thus that the drugs they recovered should have been suppressed. *See* Defendant-Appellant's Brief, dated July 2002 (reproduced as Ex. K to Opp. Decl.), at 9-15. On June 7, 2003, Hernandez filed a supplemental *pro se* brief arguing that Kennedy had committed perjury during the suppression hearing by testifying that he had reasonable suspicion Hernandez was involved in criminal activity. *See* Supplemental Brief for Defendant-Appellant, dated June 7, 2003 (reproduced as Ex. L to Opp. Decl.), at 5-14. On January 6, 2004, the Appellate Division rejected these arguments and affirmed Hernandez's conviction. *People v. Hernandez,* 3 A.D.3d 325 (1st Dep't 2004). On March 19, 2004, the Court of Appeals denied Hernandez's application for leave to appeal. *People v. Hernandez,* 2 N.Y.3d 741 (2004).

## F. *Resentencing*

**\*4** On February 10, 2005, following the passage of amendments to the "Rockefeller Drug Laws," *see* N.Y.P.L. § 60.08, Hernandez filed a resentencing application *See* Opp. Mem. at 13. On March 28, 2005, he was resentenced to a term of eight years' imprisonment with five years' "supervised release." *See id.* He was released on parole on May 13, 2005. *See id.* at 13-14.

## G. *The Instant Petition*

Hernandez timely filed the instant *pro se* petition for habeas corpus relief on April 2, 2005. *See* Petition Under 28 U.S.C. 2254 for Writ of Habeas Corpus, filed April 2, 2005 (Docket # 1) ("Petition") (attaching typewritten pages). In his petition, Hernandez raises the same grounds for relief that he raised on his direct appeal and in his 440.10 motion. Specifically, he argues that (1) Kennedy

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3164063 (S.D.N.Y.)
(Cite as: 2005 WL 3164063 (S.D.N.Y.))

and Barrett did not have reasonable suspicion of criminal activity; (2) Kennedy committed perjury by testifying at the suppression hearing and at trial that he did have reasonable suspicion; and (3) prosecutors failed to disclose exculpatory material regarding the investigation of Kennedy and Barrett. *See* Petition ¶ 13 and attachment.

## II. *APPLICABLE LEGAL PRINCIPLES*

A petition for a writ of habeas corpus may not be granted with respect to any claim that has been "adjudicated on the merits" in the state courts unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

For a claim to be adjudicated "on the merits" within the meaning of 28 U.S.C. § 2254(d), it must "finally resolv[e] the parties' claims, with res judicata effect," and it must be "based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (citation omitted). As long as there is nothing in its decision to indicate that the claims were decided on anything but substantive grounds," a state court decision will be considered to be adjudicated "on the merits" even if it fails to mention the federal claim and no relevant federal case law is cited. *See Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir.2001); *accord Rosa v. McCray,* 396 F.3d 210, 220 (2d Cir.2005) ("This standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether the court has alluded to federal law in its decision."), *cert. denied, Rosa v. Murray,* 126 S.Ct. 215 (2005).

In *Williams v. Taylor,* the Supreme Court held that a state court decision is "contrary to" clearly established federal law only "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. 529 U.S. 362, 405-06 (2000). *Williams* also held that habeas relief is available under the "unreasonable application" clause only "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A federal court may not grant relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the state court's application must have been "objectively unreasonable." *Id.* at 409.

**\*5** Finally, under 28 U.S.C. § 2254(a), federal habeas review is available for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Errors of state law are not subject to federal habeas review. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). To be entitled to habeas relief, a petitioner must demonstrate that the conviction resulted from a state court decision that violated federal law. *See, e.g., id.* at 68.

## III. *DISCUSSION*

A. *Suppression Resulting from Allegedly Illegal Arrest (Claims One and Two)*

In his first claim for habeas relief, Hernandez argues that "the police officer did not have a reasonable suspicion of criminal activity," and thus that the seizure of the package was illegal. *See* Petition ¶ 13 and attachment. In his second claim, Hernandez argues that Kennedy "committed perjury" by testifying at the suppression hearing and the trial that he had reasonable suspicion of criminal activity. *Id.* ¶ 13(b). The Appellate Division held that the record supported the credibility determinations of the trial court, and that "the totality of [the officers'] observations gave rise to a founded suspicion that criminal activity was afoot." *Hernandez,* 3 A.D.3d at 325.

Because the only federal issue raised by the first claim is that Hernandez was the subject of an unreasonable seizure under the Fourth Amendment, the claim is barred by *Stone*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3164063 (S.D.N.Y.)
(Cite as: 2005 WL 3164063 (S.D.N.Y.))

v. Powell, 428 U.S. 465 (1976). Under *Stone*, a habeas petitioner is not entitled to relief if the state courts provided him with "an opportunity for full and fair litigation" of a claim under the Fourth Amendment. *Id.* at 482. Rather, a habeas petitioner's Fourth Amendment claims may be reviewed only "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir.1992) (citing Gates v. Henderson, 568 F.2d 830, 840 (2d Cir.1977)).

New York provides such a corrective procedure in the form of a suppression hearing. *See* C.P.L. § 710.10 et seq.; Capellan, 975 F.2d at 70 n. 1 (" '[F]ederal courts have approved New York's procedure for litigating Fourth Amendment claims ... as being facially adequate.' ") (quoting Holmes v. Scully, 706 F.Supp. 195, 201 (E.D.N.Y.1989)). Thus, only the second part of the *Gates* test is applicable. Hernandez, however, makes no claim that he was precluded from using New York's suppression hearing procedure-and, indeed, he was afforded that procedure here. The Second Circuit has squarely held that "once it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the [state] court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief." Graham v. Costello, 299 F.3d 129, 134 (2d Cir.2002). A "mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." Capellan, 975 F.2d at 72.

**\*6** Hernandez's second claim-that the officers committed perjury during the suppression hearing-does not avoid the bar of *Stone v. Powell*. Hernandez's perjury claim seeks to attack the outcome of the suppression hearing, and that attack does not fit within either of the exceptions to *Stone*. Thus, the allegation that perjury occurred during the hearing does not mean that New York State provided Hernandez with "no corrective procedures at all" to redress the alleged Fourth Amendment violations. Capellan, 975 F.2d at 70. Obviously, Hernandez was free to make any arguments he wished during the hearing to

attack the credibility of the officers and, had he not absconded, was free to testify as to his own version of his events. Nor can it be said that the alleged perjury caused Hernandez to be "precluded from using" the suppression hearing mechanism. *See id.* Thus, *Stone v. Powell* bars Hernandez's claim regarding perjury during the suppression hearing.

In any event, the evidence in the record would not allow an attack on the suppression ruling even if it could be considered by this Court. Here, both the trial court and the Appellate Division found that the officers were, in fact, credible. *See* 3 A.D.3d at 325; Resp. Br. at 2. Such determinations of fact are entitled to a presumption of correctness that can only be overturned by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Leka v. Portuondo, 257 F.3d 89, 98 (2d Cir.2001). The evidence in the record most favorable to Hernandez-other than his own assertions that the officers were lying-is the People's concession that Kennedy was charged with assault and official misconduct. *See* Adoradio Aff. ¶¶ 12-13. Hernandez concedes, as he must, that "there is no valid proof that all members of the NYPD who testified are perjurers." *See* Petition ¶ 13(b). Obviously, these allegations do not provide the "clear and convincing evidence" necessary to rebut the state courts' factual determinations.

B. *Brady* Claim

Hernandez's third claim is that the state failed to disclose potentially exculpatory evidence of the police corruption investigations. *See* Petition ¶ 13(c). Specifically, Hernandez asserts that the officers' alleged corruption "involved conducting illegal seizures, stolen property, and use of their power to arrest, to coerce bribes, steal drugs and resell them," and that if such information had been available to him during the suppression hearing or at trial, he could have used it to impeach the officers' testimony. *See* Petition ¶ 13(c).

Under Brady v. Maryland, 373 U.S. 83, 87 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." To

Not Reported in F.Supp.2d, 2005 WL 3164063 (S.D.N.Y.)
(Cite as: 2005 WL 3164063 (S.D.N.Y.))

establish a *Brady* violation, a defendant must show three things: the "evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999); *accord United States v. Rivas,* 377 F.3d 195, 199 (2d Cir.2004).

**7** While a prosecutor can be found to have suppressed evidence "even if the evidence is 'known only to police investigators and not to the prosecutor,'" *United States v. Coppa,* 267 F.3d 132, 140 (2d Cir.2001) (citing *Kyles v. Whitley,* 514 U.S. 419, 438 (1995)), here, the trial court made a factual finding that the "information regarding all of the allegations of misconduct against [Kennedy and Barrett] was obtained by the People ... *well after the defendant's arrest, trial, and conviction." See* 2000 Decision at 3 (emphasis in original). That finding was supported by affirmations from two Assistant District Attorneys involved in the investigation of the 30th Precinct, to the effect that such investigation did not begin until September 1992, and that the earliest official complaint regarding Kennedy and Barrett dated from February 1993. *See* Adoradio Aff. ¶ 2; Burmeister Aff. ¶ 2.

This factual finding is "presumed to be correct" and can only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Leka v. Portuondo,* 257 F.3d at 98. Hernandez has presented no evidence to rebut the state court's finding that the investigation into Kennedy and Barrett's actions did not begin until "well after" Hernandez's trial was over. Because the allegedly exculpatory material was not available until after Hernandez's trial, the trial court could properly have concluded that the information was "perforce *not Brady* material." 2000 Decision at 3 (emphasis in original); *see Coppa,* at 140 ("the government's obligations under Brady may be thought of as a constitutional duty arising before or during the trial of a defendant"). Inasmuch as Hernandez has failed to establish one of the components of the *Brady* test-that the State in fact suppressed the allegedly exculpatory evidence either willfully or inadvertently, *Strickler,* 527 U.S. at 282-Hernandez's *Brady* claim must fail.

*Conclusion*

Hernandez's petition is denied. Because Hernandez has not made a substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c). In addition, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from the judgment would not be taken in good faith.

S.D.N.Y.,2005.
Hernandez v. Filion
Not Reported in F.Supp.2d, 2005 WL 3164063 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Danny MORALES, Petitioner,
v.
James J. WALSH, Respondent.
**No. 02-CV-6045, 03-MISC-0066.**

Oct. 30, 2003.

**Background:** Defendant convicted of murder and robbery petitioned for a writ of habeas corpus.

**Holdings:** The District Court, Weinstein, Senior District Judge, held that:

(1) challenge to trial court's failure to give a missing witness charge did not present a federal constitutional issue;

(2) claim that state courts erroneously concluded that probable cause existed for defendant's arrest did not warrant habeas relief;

(3) state appellate court's denial of defendant's claim that there was insufficient evidence of the voluntariness of his statements to support his conviction was reasonable; and

(4) defendant's claims that his sentence should be modified because the sentencing court failed to take into account his background and potential for rehabilitation did not allege a constitutional violation.

Petition denied.

West Headnotes

**[1] Habeas Corpus 197 ☞ 498**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint

197II(B) Particular Defects and Authority for Detention in General
        197k498 k. Instructions. Most Cited Cases
Challenge to trial court's failure to give a missing witness charge did not present a federal constitutional issue cognizable on habeas corpus review; whether to grant a request for a missing witness charge lay in the sound discretion of the trial court, and the petitioner could have called the witness himself. 28 U.S.C.A. § 2254(d).

**[2] Habeas Corpus 197 ☞ 775(2)**

197 Habeas Corpus
    197III Jurisdiction, Proceedings, and Relief
        197III(C) Proceedings
            197III(C)4 Conclusiveness of Prior Determinations
                197k765 State Determinations in Federal Court
                    197k775 Admissibility of Evidence; Arrest and Search
                        197k775(2) k. Adequacy or Effectiveness of State Proceeding; Full and Fair Litigation. Most Cited Cases
Petitioner's claim that state courts erroneously concluded that probable cause existed for his arrest did not warrant habeas relief; petitioner failed to show that the state had provided no corrective procedures at all to redress the alleged Fourth Amendment violations, or that the petitioner was precluded from using such procedures because of an unconscionable breakdown in the underlying process. U.S.C.A. Const. Amend. 4; 28 U.S.C.A. § 2254(d).

**[3] Habeas Corpus 197 ☞ 490(3)**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General
            197k489 Evidence
                197k490 Admissibility
                    197k490(3) k. Confessions, Declarations,

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

and Admissions. Most Cited Cases
State appellate court's denial of arson defendant's claim,
that there was insufficient evidence of the voluntariness of
his statements to support his conviction, was a reasonable
application of clearly established federal law as
determined by the United States Supreme Court, thus
precluding federal habeas relief. 28 U.S.C.A. § 2254(d).


[4] Habeas Corpus 197 ⬅️🔑 503.1


197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for
Detention in General
            197k503 Judgment, Sentence, or Order
                197k503.1 k. In General. Most Cited Cases
Habeas petitioner's claims that his sentence should be
modified because the sentencing court failed to take into
account his background and potential for rehabilitation did
not allege a constitutional violation cognizable on habeas
review; defendant's sentence was lawful under state law,
and thus, defendant was not entitled to habeas relief. 28
U.S.C.A. § 2254(d).
Danny Morales, pro se, Fallsburg, NY, for Plaintiff.

Marie-Claude Palmieri Wrenn, Kings County D.A. Office,
Brooklyn, NY, for Defendant.


MEMORANDUM, JUDGMENT & ORDER


WEINSTEIN, Senior J.


*1 The petition for a writ of habeas corpus is denied. No
hearing on this matter is necessary. This memorandum
briefly addresses petitioner's claims.


I. Facts and Procedural History


This petition was filed on December 12, 2002. Petitioner,
sometimes referred to as defendant or appellant, claims:

Point I: The court's denial of Appellant's request for a
missing witness instruction as to an informant who had set
up the instant robbery incident and who had personal
contact with the perpetrators immediately before and after
the incident deprived appellant of his due process right to
a fair trial in this identification case. U.S. Const., Amend.
XIV; N.Y. Const., Art. 1 § 6.

Point II: The hearing court's denial of Appellant's motion
to suppress the evidence flowing from an arrest premised
upon a suggestive photographic identification deprived
appellant of his right to due process and to be free from
unreasonable searches and seizures. U.S. Const., Amends.
IV, XIV; N.Y. Const., Art. I § 12.

Point III: Appellant was deprived of due process and his
right to be free from self-incrimination where, at trial, the
people failed to prove beyond a reasonable doubt and by
the weight of the evidence that his statements were
voluntarily made. U.S. Const., Amends. V, XIV; N.Y.
Const., Art. I § 6.

Point IV: Appellant's maximum sentences should be
reduced in light of his background and demonstrated
potential for rehabilitation; at the very least, his minimum
term for second-degree robbery should be modified since
it is illegally high.

The evidence supports the following statements:

On June 10, 1992, defendant and an accomplice were
hired to steal drug money from Annette Cortez. Arming
themselves with a loaded handgun, defendant and his
accomplice accosted Cortez in front of a residential
building at 210 Roebling Street in Brooklyn. As the man
who had hired them waited in a nearby car, defendant
attempted to wrest a paper bag from Cortez, but she
resisted. Defendant fired a single bullet at point-blank
range into Cortez's temple, killing her. Defendant and his
accomplice then ran around the corner to the waiting car.
Defendant was paid in money and cocaine.

Two neighborhood residents, including a thirteen-year old

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

schoolboy, had witnessed defendant commit the murder. One witness told the police that he had seen the entire crime, and he described both perpetrators. A second witness, at the urgings of his frightened mother, told the police only that he had heard the gunshot and run away. Both witnesses would later testify at defendant's trial and identify him as the shooter.

In 1996, four and one-half years after the crime, detectives assigned to the Brooklyn North Homicide Cold Case Squad reinvestigated the murder of Annette Cortez.

On December 2, 1996, detectives interviewed Jesus Sierra, an inmate at the Auburn State Correctional Facility. Sierra was offered and received no benefit for his cooperation in the murder investigation. Sierra admitted that he and another man had arranged for defendant and the accomplice to rob Annette Cortez near the corner of South Second and Roebling Streets. Sierra explained that he had previously sold large quantities of cocaine to Cortez, and that he had reason to believe that she possessed $900 dollars on the day of the robbery. Sierra had waited in a car around the corner from the robbery location. When defendant and the accomplice returned to the car, they reported to Sierra that "the girl had been shot."

**\*2** During a canvass of the neighborhood in which the murder had been committed, Sierra pointed out a building and told the detectives that one of the two robbers lived on the second floor. A computer check revealed that defendant lived on the second floor of the building pointed out by Sierra.

On December 4, 1996, detectives showed Jesus Sierra an array of six photograph's, which included the photograph of defendant. Defendant's photograph, which had a pink background, was the most recent photograph then on file with the New York City Police Department. The five filler photographs depicted men who resembled defendant. The filler photographs had gray or white backgrounds because the detective was unable to locate any suitable photographs with pink backgrounds. Sierra identified the photograph of defendant as one of the two men whom he had hired to rob Annette Cortez.

Detectives re-interviewed the two witnesses to the shooting. They were more forthcoming about what they had seen four years earlier. Both described the perpetrators.

On January 13, 1997, at approximately 5:10 p.m., detectives arrested defendant in front of his Brooklyn home and transported him to the 90th Precinct.

At approximately 6:10 p.m. on June 13, 1997, a detective advised defendant of his rights under *Miranda*. Defendant waived his rights to an attorney and to remain silent. He then gave an oral statement followed by a written statement. He admitted that he had participated in the June 10, 1992 robbery of Cortez at the behest of "Jesus" and others. Defendant related that after the robbery he and his accomplice ran around the corner to where "Jesus" waited for them in a cab. "Jesus" paid defendant $50 and two grams of coke.

At approximately 9:45 p.m. on June 13, 1997, the two eyewitnesses separately viewed defendant in a lineup. One witness identified defendant as the man he had seen shoot the victim. Another witness stated that defendant looked like one of the two robbers, but that he could not be certain. Both witnesses would later testify at defendant's trial and identify defendant as the gunman.

After midnight on January 14, 1997, defendant was again advised of his *Miranda* rights, which he again waived before giving a videotaped statement. Defendant admitted that he and his accomplice planned to steal the victim's package, which had contained not money but 125 grams of cocaine. According to defendant, the accomplice had been armed with a gun provided by "Jesus." Defendant further claimed that the gun accidentally discharged while his accomplice struggled with their victim.

Defendant was charged, under Kings County Indictment Number 513/97, with acting alone and in concert with his unapprehended accomplice in the commission of three counts of Murder in the Second Degree (N.Y. Penal Law § 125.25[1], [2] and [3] ), two counts of Robbery in the First Degree (N.Y. Penal Law § 160.15[1] and [2] ),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

Robbery in the Second Degree (N.Y. Penal Law § 160.10[1] ), Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03), and Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02[4] ).

**\*3** On April 13-15, 1998, an evidentiary hearing on defendant's motions to suppress evidence was conducted. Defendant argued that he had been arrested without probable cause and that his post-arrest statements and lineup identification should be suppressed as the fruits of that illegal arrest. According to defendant, the photographic array shown to Jesus Sierra was suggestive because the background of his photograph was pink, and that, therefore, Sierra's identification of defendant's photograph over four years after the crime was unreliable and could not provide a basis for probable cause to arrest defendant. The hearing court denied each of defendant's suppression motions. The court found, *inter alia,* that probable cause to arrest defendant had existed even without the Sierra's identification of defendant's photographs, but that, in any event, the photographs array had not been unduly suggestive. Defendant and the individuals portrayed in the filler photographs were sufficiently similar in appearance, and nothing about defendant's photograph would have signaled to the witness that the police had reason to believe that defendant was the perpetrator.

During the ensuing jury trial the two eyewitnesses identified defendant as one of the two robbers and as the man who had fired the fatal gunshot. Each of defendant's statements admitting to the robbery was admitted in evidence. Defendant testified, claiming that he did not commit the crime and that he had been coerced into making statements to the contrary.

The People did not call Jesus Sierra as a witness. The defense interviewed Sierra and also did not call him as a witness. The trial court refused the defense request to charge the jury that Sierra was a "missing witness" and that an inference adverse to the People's case could be drawn from the People's decision not to call him. The court based its decision on the defense failure to establish that Sierra, who did not witness the crime, had knowledge about a material fact in issue and that his testimony would

not be cumulative to the testimony of the eyewitnesses and defendant's own statements.

On April 30, 1998, defendant was convicted of second-degree murder (N.Y. Penal Law § 125.25[3] ), robbery in the first degree (N .Y. Penal Law § 160.10[1] ), and robbery in the second degree (N.Y. Penal Law § 160.15[2] ).

On May 15, 1998, the court imposed concurrent indeterminate terms of imprisonment of twenty-five years to life for the murder count, twelve and one-half to twenty-five years for the first-degree robbery count, and seven and one-half to fifteen years for the second-degree robbery count. The sentence for the second-degree robbery count was subsequently modified to five to fifteen years in order to reflect the Penal Law sentencing provisions in effect at the time of the crime, as opposed to at the time of the trial.

Defendant, represented by assigned counsel, appealed from this judgment of conviction to the Appellate Division. Defendant claimed that the judgment of conviction should be reversed and a new trial ordered because:

**\*4** (i) the trial court improperly denied defendant's request for a "missing witness charge" relating to informant Jesus Sierra, who did not testify at the trial, and the court thereby "deprived [defendant] of his due process right to a fair trial in this identification case. U.S. Const. Amend. XIV";

(ii) the hearing court erroneously denied defendant's motion to suppress his statements and the lineup identifications as the fruits of an illegal arrest without probable cause, and the court thereby "deprived [defendant] of his right to due process and to be free from unreasonable searches and seizures. U.S. Const. Amends IV, XIV". According to defendant, the hearing court should have concluded that the police wrongly took into account information derived from Jesus Sierra's identification of defendant from a suggestive photographic array, and that without that tainted information probable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

cause did not exist;

(iii) defendant "was deprived of due process and his right to be free from self-incrimination where, at trial, the People failed to prove beyond a reasonable doubt and by the weight of the evidence that his statements were voluntarily made. U.S. Const. Amends. V, XIV";

(iv) defendant's maximum sentences for murder and robbery should be modified because they were excessive in light of defendant's background and potential for rehabilitation. Defendant also claimed that his sentence for second-degree robbery reflected the law at the time of his trial and not at the time of the crime.

In a decision dated November 13, 2001, the Appellate Division unanimously affirmed defendant's judgment of conviction. People v. Morales, 288 A.D.2d 328, 733 N.Y.S.2d 617 (2d Dep't 2001). The Appellate Division wrote:

The defendant contends that the People failed to prove at trial the voluntariness of his statements to law enforcement officials. Viewing the evidence in the light most favorable to the prosecution (see People v. Contes, 60 N.Y.2d 620, 621 [1983] ), we find that it was legally sufficient to prove the voluntariness of the defendant's statements and to prove his guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence (see, C.P.L. § 470.05(2) .15[5] ).

Contrary to the defendant's contention, the trial court properly denied his request for a missing witness charge. A missing witness charge is appropriate where it is shown that "the uncalled witness is knowledgeable about a material issue upon which evidence is already in the case; that the witness would naturally be expected to provide noncumulative testimony favorable to the party who has not called him, and that the witness is available to such party" ( People v. Gonzalez, 68 N.Y.2d 424, 427, 509 N.Y.S.2d 796, 502 N.E.2d 583; see People v. Fields, 76 N.Y.2d 761, 559 N.Y.S.2d 951, 559 N.E.2d 645). The People established that the witness in question was not knowledgeable about a material and relevant issue and that his testimony would be cumulative, (see, People v. Macana, 84 N.Y.2d 173, 177, 615 N.Y.S.2d 656, 639 N.E.2d 13; People v. Gonzalez, supra ). In any event, even if the trial court erred in failing to grant the defendant's request for a missing witness charge, the error was harmless in light of the overwhelming evidence of the defendant's guilt. Given the defendant's statements and those of the prosecution witnesses, there is not a significant probability that the defendant would have been acquitted (see People v. Fields, supra; People v. Crimmins, 36 N.Y.2d 230, 241, 367 N.Y.S.2d 213, 326 N.E.2d 787).

*5 As the People correctly concede, the sentence imposed on the conviction of robbery in the second degree, which was committed in 1992, was illegal (see, Penal Law former § 70.02[2][a]; [4] ). However, it is clear that the trial court intended to impose upon the defendant the maximum sentence, and we find that would be appropriate to do so. Consequently, the judgment is modified [from 7 1/2 to 15 years to 5 to 15 years] to reflect the intention of the court (see, People v. Dorch, 117 A.D.2d 677, 498 N.Y.S.2d 415). The defendant's sentence in all other respects is not excessive (see, People v. Suitte, 90 A.D.2d 80, 455 N.Y.S.2d 675).

Contrary to the defendant's contention, the photographic identification procedure was not unduly suggestive (see, People v. Mack, 2243 A.D.2d 731).

The defendant's remaining contentions are without merit.

By letter dated December 17, 2001, defendant, acting through his assigned counsel, sought leave to appeal from this decision to the New York Court of Appeals, raising in this application each issue that he had raised on appeal to the Appellate Division.

On March 26, 2002, defendant's application for leave to appeal to the New York Court of Appeals was denied. People v. Morales, 97 N.Y.2d 758, 742 N.Y.S.2d 619, 769 N.E.2d 365 (2002).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

II. AEDPA

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan v. Kuhlman,* 261 F.3d 303, 313 (2d Cir.2001) (quoting *Aycox v. Lytle,* 196 F.3d 1174, 1178 (10th Cir.1999)). Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

*6 "[F]ederal law, as determined by the Supreme Court,

may as much be a generalized standard that must be followed, as a bright-line rule designed to effectuate such a standard in a particular context." *Overton v. Newton,* 295 F.3d 270, 278 (2d Cir.2002); *see also Yung v. Walker,* No. 01-2299, 2002 U.S.App. LEXIS 28137 (2d Cir. Aug. 1, 2003) (amended opinion) (district court's habeas decision that relied on precedent from the Court of Appeals is remanded for reconsideration in light of "the more general teachings" of Supreme Court decisions). The Court of Appeals for the Second Circuit has also indicated that habeas relief may be granted if a state court's decision was contrary to or an unreasonable application of "a reasonable extension" of Supreme Court jurisprudence. *Berbary v. Torres,* No. 02-2463, 2003 U.S.App. LEXIS 16167, at *25 (2d Cir. Aug. 7, 2003). Determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

III. Limitations Period

Congress has set a one-year period of limitations for the filing of an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). A conviction becomes final for habeas purposes when the ninety-day period for filing a petition for a writ of certiorari to the United States Supreme Court has expired. *See McKinney v. Artuz,* No. 01-2739, 2003 U.S.App. LEXIS 6745, at *22 (2d Cir.2003); *see also* Sup.Ct. R. 13.

Prisoners whose convictions became final before the effective date of AEDPA, April 24, 1996, had a grace period of one year, until April 24, 1997, to file their habeas application. *See Ross v. Artuz,* 150 F.3d 97, 103 (2d Cir.1998).

"[T]he district court has the authority to raise a petitioner's apparent failure to comply with the AEDPA statute of limitation on its own motion." *Acosta v. Artuz,* 221 F.3d 117, 121 (2d Cir.2000). "If the court chooses to raise sua

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

sponte the affirmative defense of failure to comply with the AEDPA statute of limitation, however, the court must provide the petitioner with notice and an opportunity to be heard before dismissing on such ground." *Id.*

In calculating the one-year limitation period, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted...." 28 U.S.C. § 2244(d)(2). The "filing of creative, unrecognized motions for leave to appeal" does not toll the statute of limitations. *Adeline v. Stinson,* 206 F.3d 249, 253 (2d Cir.2000); *see also Artuz v. Bennett,* 531 U.S. 4, 8, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000) ("[A]n application is *'properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings. These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.... The question whether an application has been 'properly filed' is quite separate from the question whether the claims contained in the application are meritorious and free of procedural bar." (emphasis in original; footnote omitted)).

*7 The term "pending" in the statute has been construed broadly to encompass all the time during which a state prisoner attempts, through proper use of state procedures, to exhaust state court remedies with regard to a particular post-conviction application. *See Bennett v. Artuz,* 199 F.3d 116, 120 (2d Cir.1999), *aff'd,* 531 U.S. 4, 121 S.Ct. 361, 148 L.Ed.2d 213 (2000). "[A] state-court petition is 'pending' from the time it is first filed until finally disposed of and further appellate review is unavailable under the particular state's procedures." *Bennett,* 199 F.3d at 120; *Carey v. Saffold,* 536 U.S. 214, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002) (holding that the term "pending" includes the intervals between a lower court decision and a filing in a higher court for motions for collateral review). A motion for extension of time to file an appeal does not toll AEDPA's limitations period unless an extension is actually granted. *See Bertha v. Girdich,* 293 F.3d 577, 579 (2d Cir.2002).

The period of limitations set forth in AEDPA ordinarily does not violate the Suspension Clause. *See Muniz v.*

*United States,* 236 F.3d 122, 128 (2d Cir.2001) ("[T]he Suspension Clause does not always require that a first federal petition be decided on the merits and not barred procedurally" (quotation omitted)); *Rodriguez v. Artuz,* 990 F.Supp. 275, 283 (S.D.N.Y.1998) (AEDPA statute of limitations is not, "at least in general," an unconstitutional suspension of the writ).

A pro se litigant is accorded "some degree of latitude" in meeting filing requirements. *Brown v. Superintendent,* 1998 U.S. Dist. LEXIS 1936, No. 97 Civ. 3303, 1998 WL 75686, at *4 (S.D.N.Y. Feb.23, 1998). But "[it] has long been recognized that ignorance does not excuse lack of compliance with the law." *Velasquez v. United States,* 4 F.Supp.2d 331, 334-35 (S.D.N.Y.1998) (holding that Bureau of Prison's failure to notify prisoners regarding AEDPA's time limitation did not warrant acceptance of untimely petition); *see also Brown,* 1998 WL 75686 at *4 ("self-serving statement that the litigant is ignorant of the law is not grounds for equitable tolling of a statute of limitations").

The Supreme Court held in *Duncan v. Walker* that "an application for federal habeas corpus review is not an 'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C. § 2244(d)(2)," and that therefore the section does "not toll the limitation period during the pendency of [a petitioner's] first federal habeas petition." 533 U.S. 167, 181-82, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001). *Duncan* reversed a case in this circuit which held to the contrary. *See Walker v. Artuz,* 208 F.3d 357, 361-62 (2000). Although the Supreme Court has now declared that AEDPA's one-year limitations period is not tolled during the pendency of a properly filed federal habeas petition, this statute of limitations is not jurisdictional and may be tolled equitably. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000). "Equitable tolling ... is only appropriate in 'rare and exceptional circumstances.' To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski,* 273 F.3d 133, 138 (2d Cir.2001).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

**\*8** Although state prisoners are not entitled to counsel as of right in either New York state collateral or federal habeas corpus proceedings, the Court of Appeals for the Second Circuit has stated that "an attorney's conduct, if it is sufficiently egregious, may constitute the sort of 'extraordinary circumstances' that would justify the application of equitable tolling to the one-year limitations period of AEDPA." *Baldayaque v. United States,* No. 02-2611, 2003 U.S.App. LEXIS 15063, at \*17 (2d Cir. July 30, 2003); compare *Smaldone,* 273 F.3d at 138-39 (attorney calculation error does not justify equitable tolling).

Prisoners cannot circumvent the strict AEDPA limitations period by invoking the "relation back" doctrine by arguing that a new petition should be treated as having been filed on the same day as a first petition. As the Court of Appeals has explained,

If [the limitations period] were interpreted as Petitioner argues, the result would be impractical. A habeas petitioner could file a non-exhausted application in federal court within the limitations period and suffer a dismissal without prejudice. He could then wait decades to exhaust his state court remedies and could also wait decades after exhausting his state remedies before returning to federal court to "continue" his federal remedy, without running afoul of the statute of limitations.

*Warren v. Garvin,* 219 F.3d 111, 114 (2d Cir.2000) (quoting *Graham v. Johnson,* 158 F.3d 762, 780 (5th Cir.1999)).

IV. Exhaustion

In the past, a state prisoner's federal habeas petition had to be dismissed if the prisoner did not exhaust available state remedies as to any of his federal claims. *See Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1989). "This exhaustion requirement is ... grounded in principles of comity; in a federal system, the States should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *Coleman v. Thompson,* 501 U.S. 722, 731, 111 S.Ct.

2546, 115 L.Ed.2d 640 (1991). The exhaustion requirement requires the petitioner to have presented to the state court "both the factual and legal premises of the claim he asserts in federal court." *Daye v. Attorney General,* 696 F.2d 186, 191 (2d Cir.1982) (en banc).

Pursuant to AEDPA, a district court may now, in its discretion, *deny* on the merits habeas petitions containing unexhausted claims-so-called "mixed petitions." *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."). In addition, the state may waive the exhaustion requirement, but a "State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *Id.* § 2254(b)(3); *see also Ramos v. Keane,* No. 98 CIV. 1604, 2000 U.S. Dist. LEXIS 101, at \*10 (S.D.N.Y.2000) (state's failure to raise exhaustion requirement does not waive the issue).

V. Procedural Bar

**\*9** A federal habeas court may not review a state prisoner's federal claims if those claims were defaulted in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750. In determining whether a procedural bar is sufficient to preclude habeas review, a federal court must consider as "guideposts" the following:

(1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

governmental interest.

Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir.2003) (quoting Lee v. Kemna, 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)).

If a state court holding contains a plain statement that a claim is procedurally barred then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision).

When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is not preserved. See Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir.1996). When a state court "uses language such as 'the defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." Fama v. Comm'r of Corr. Svcs., 235 F.3d 804, 810 (2d Cir.2000). Where "a state court's ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." Su v. Filion, No. 02-2683, 2003 U.S.App. LEXIS 13949 at *15 n. 3 (2d Cir. July 11, 2003) (citing Miranda v. Bennett, 322 F.3d 171, 178 (2d Cir.2003)). This congeries of holdings leaves it an open question whether there are "situations in which, because of uncertainty as to what the state courts have held, no procedural bar exists and yet no AEDPA deference is required." Id.

VI. Actual Innocence

"[A] habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, *i .e.,* that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 729 (2d Cir.2002).

**\*10** Because habeas corpus "is, at its core, an equitable remedy," Schlup v. Delo, 513 U.S. 298, 319, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), the Supreme Court has stated that "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration," *id.* at 320-21 (quotations omitted). To ensure that this exception remains rare and will be applied only in the extraordinary case, the Court has "explicitly tied" the miscarriage of justice exception to the petitioner's innocence. Id . at 321. "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence ... that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id. at 324.

A showing of actual innocence serves merely as a gateway to the airing of the petitioner's defaulted claim and is not itself cognizable in habeas as a free-standing claim. See Herrera v. Collins, 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). A habeas court is, in short, concerned " 'not [with] the petitioners' innocence or guilt but solely [with] the question whether their constitutional rights have been preserved." ' Id. (quoting Moore v. Dempsey, 261 U.S. 86, 87-88, 43 S.Ct. 265, 67 L.Ed. 543 (1923)); cf. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (habeas court may review an *independent constitutional claim* that the evidence adduced at trial was insufficient to convict a criminal defendant beyond a reasonable doubt); Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) (reversing conviction of "Shuffling Sam" *on direct review* from conviction in Louisville's police court where there was no evidence that defendant violated city ordinances).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

VII. Ineffective Assistance of Counsel

The Counsel Clause of the Sixth Amendment provides that a criminal defendant "shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) (emphasis added). The Supreme Court has explained that in giving meaning to this requirement we must be guided by its purpose-"to ensure a fair trial"-and that therefore the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail on a Sixth Amendment claim, a petitioner must prove both that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See also Wiggins v. Smith,* 539 U.S. ----, No. 02-311, slip op. at 8-10 (June 26, 2003); *United States v. Eyman,* 313 F.3d 741, 743 (2d Cir.2002). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

**11 The performance and prejudice prongs of *Strickland* may be addressed in either order, and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Id.* at 697. In evaluating the prejudice suffered by a petitioner as a result of counsel's deficient performance, the court looks to the "cumulative weight of error" in order to determine whether the prejudice "reache[s] the constitutional threshold." *Lindstadt v. Keane,* 239 F.3d 191, 202 (2d Cir.2001). The court must also keep in mind that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland,* 466 U.S. at 696. "The result of a [criminal] proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the

outcome." *Purdy v. Zeldes,* No. 02-7468, 2003 U.S.App. LEXIS 2053, at *18 (2d Cir. Feb. 6, 2003) (quoting *Strickland,* 466 U.S. at 694). Ineffective assistance may be demonstrated where counsel performs competently in some respects but not in others. *See Eze v. Senkowski,* 321 F.3d 110, 112 (2d Cir.2003).

As a general matter, strategic choices made by counsel after a thorough investigation of the facts and law are "virtually unchallengeable," though strategic choices "made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland,* 466 U.S. at 690-91. Counsel, in other words, "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. Where counsel fails to make a reasonable investigation that is reasonably necessary to the defense, a court must conclude that the decision not to call an expert cannot have been based on strategic considerations and will thus be subject to review under *Strickland'* s prejudice prong. *See Pavel v. Hollins,* 261 F.3d 210, 223 (2d Cir.2001) (counsel ineffective in a child sexual abuse case where his failure to call a medical expert was based on an insufficient investigation); *Lindstadt,* 239 F.3d at 201 (same). The Court of Appeals for the Second Circuit has recently gone so far as to imply that all of counsel's significant trial decisions must be justified by a sound strategy-a significant raising of the bar that would appear to require an unrealistic degree of perfection in counsel. *See Eze,* 2003 U.S.App. LEXIS 2511, at *78-*79 (remanding to district court for factual hearing because it was "unable to assess with confidence whether strategic considerations accounted for ... counsel's decisions").

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689.

**12 Each factual claim made in support of an allegation of ineffective assistance of counsel must be fairly presented to a state court before a federal habeas court may rule upon it. *See Rodriguez v. Hoke,* 928 F.2d 534, 538 (2d Cir.1991) (dismissing petition as unexhausted where petitioner's claim of ineffective assistance of counsel

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

alleged more deficiencies before the habeas court than were presented to the state court, because "[t]he state courts should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole" (quotation omitted)). Where an additional factual claim in support of the ineffective-assistance allegation merely "supplements" the ineffectiveness claim and does not "fundamentally alter" it, dismissal is not required. *Caballero v.. Keane,* 42 F.3d 738, 741 (2d Cir.1994). Each significant factual claim in support of an ineffective-assistance allegation premised on appellate counsel's deficient performance must be exhausted. *See Word v. Lord,* No. 00 CIV. 5510, 2002 U.S. Dist. LEXIS 19923, at *34-*35 (S.D.N.Y. Mar. 18, 2002) (Magistrate's Report and Recommendation).

Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test is used with respect to claims of ineffective appellate counsel. *See Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir.1992). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, *see Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker," *Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.1994). Either a federal or a state law claim that was improperly omitted from an appeal may form the basis for an ineffective assistance of appellate counsel claim, "so long as the failure to raise the state ... claim fell outside the wide range of professionally competent assistance." *Id.* (quotations omitted).

VIII. Errors of State Law

Federal habeas corpus relief does not lie for mere errors of state law. *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). Nonetheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.' " *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998) (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941)). Errors

of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimensions will merit habeas corpus relief only if it had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quotation omitted).

IX. Evidentiary Error

**\*13** For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so egregious as to have denied him a fundamentally fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The standard is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been 'crucial, critical, highly significant.' " *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) (quoting *Nettles v. Wainwright,* 677 F.2d 410, 414-15 (5th Cir.1982). This test applies post-AEDPA. *See Wade v. Mantello,* No. 02-2359, slip op. at 13 (2d Cir. June 13, 2003).

X. Verdict Against the Weight of the Evidence

To the degree petitioner claims that his guilt was not proven beyond a reasonable doubt, the relevant question for this court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in a state criminal conviction. *Einaugler v. Supreme Court,* 109 F.3d 836, 840 (2d Cir.1997). To the degree petitioner claims the verdict was against the weight of the evidence, such a claim does not present a federal constitutional issue.

XI. Legal Claims Frequently Raised in Habeas Corpus

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

Applications

For an explication of the law concerning other claims that are frequently raised before this court in applications for a writ of habeas corpus, *see Waters v. McGuiness,* 99-CV-0615, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11077, at *4-*5 (E.D.N.Y. June 16, 2003) (grand jury claims); *Custodio v. Duncans,* Nos. 99-CV-2561, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11050, at *4-*7 (E.D.N.Y. June 11, 2003) (*Batson* challenges); *Reyes v. Irwin,* 99-CV-3758, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11045, at *5-*6 (E.D.N.Y. June 20, 2003) (*Wade* claims); *Brathwaite v. Duncan,* 00-CV-0860, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11056, at *4-*5 (E.D.N.Y. June 10, 2003) (*Sandoval* claims); *Thomas v. Kuhlman,* 255 F.Supp.2d 99, 108-09 (E.D.N.Y.2003) (perjured testimony); *Martinez v. Greiner,* 99-CV-4663, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11046, at *7 (E.D.N.Y. June 20, 2003) (Fourth Amendment claims); *Plunkett v. Keane,* 97-CV-1992, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11048, at *8-*9 (E.D.N.Y. June 10, 2003) (*Rosario* claims); *Beniquez v. Bennett,* 00-CV-0985, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11032, at *15-*16 (E.D.N.Y. June 16, 2003) (prosecutorial misconduct); *Sevencan v. Herbert,* No. 01-2491, slip op. at 6-13 (2d Cir. Aug. 7, 2003) (public trial); *Cox v. Donnelly,* 99-CV-8216, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 9886, at *12-*14 (E.D.N.Y. June 12 2003) (shifting burden of proof); *Jelinek v. Costello,* 247 F.Supp.2d 212, 266-67 (E.D.N.Y.2003) (right to self-representation); *Stewart v. Senkowski,* 00-CV-0806, 03-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11028, at *6 (E.D.N.Y. June 16, 2003) (erroneous jury instructions); *Jenkins v. Artuz,* 98-CV-7837, 00-MISC-0066 (JBW), 2003 U.S. Dist. LEXIS 11049, at *7-*8 (E.D.N.Y. June 13, 2003) (abuse of discretion in sentencing);

XII. Harmless Error

**\*14** In order to be entitled to habeas relief, a petitioner must ordinarily demonstrate that any constitutional error "had substantial and injurious effect or influence in determining the jury's verdict," and that the error resulted in "actual prejudice." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)

(quotation marks omitted).

When a claim was never adjudicated on the merits in the state courts and there is no ruling which commands AEDPA deference, it is unclear what the standard for review for harmlessness should be in a collateral attack when a federal court finds constitutional error. Should it proceed under the "beyond a reasonable doubt" standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (conviction infected by constitutional error must be overturned unless "harmless beyond a reasonable doubt") or under the "substantial and injurious effect or influence" standard of *Brecht* (for cases on collateral review, an error is generally considered harmless if it did not have a "substantial and injurious effect or influence in determining the jury's verdict")? The correct standard of review is an open question in this circuit. *See Cotto v. Herbert,* No. 01-2694, 2003 U.S.App. LEXIS 8326, at *92 (2d Cir. May 1, 2003).

XIII. Analysis of Claims

A.

[1] At defendant's trial, the State did not call as a prosecution witness Jesus Sierra, who had not witnessed the crimes but who had provided the police with information about defendant's role in it. Defendant asked the trial court to instruct the jury that Sierra was a "missing witness" and that the jury could infer from the State's failure to call Sierra that his testimony would have contradicted or undermined the State's evidence of defendant's guilt. The trial court refused to do so. Defendant now claims, as he did on direct appeal, that this was error and that he was denied due process as a result.

This claim of charging error presents no federal constitutional issue. The Appellate Division upheld the trial court's ruling as correct under New York State law.

The ruling does not raise concerns that defendant's right to a fair trial was abridged. As found by the Appellate Division, defendant was not prejudiced by the omission of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

the charge. *See Cupp v. Naughten,* 414 U.S. 141, 146-47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973) (an incorrect jury instruction, or the omission of an instruction, must so infect the entire trial that the resulting conviction violates due process in order to entitle a defendant to *habeas* relief). The Appellate Division's determination of defendant's claim was not "contrary to, or an unreasonable application of, clearly established law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

A state trial court's jury instruction, such as a missing witness charge, is ordinarily a matter of state law. In order to obtain a writ of *habeas corpus* on the ground that a state court erred in its instructions to the jury under state law, a petitioner must establish that the state court misstated state law and that the error violated a right guaranteed to him by federal law. *See* 28 U.S.C. § 2254(a); *Casillas v. Scully,* 769 F.2d 60, 63 (2d cir.1985). The *habeas* petitioner must show not only that the instruction, or lack of instruction, was "undesirable, erroneous, or even 'universally condemned,' 'but also that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. at 146-47; *United States ex rel. Smith v. Montanye,* 505 F.2d 1355, 1359 (2d Cir.1974), *cert. denied,* 423 U.S. 856, 96 S.Ct. 106, 46 L.Ed.2d 81 (1975).

**\*15** Under New York law, whether to grant a request-- by either party--for a missing witness charge lies in the sound discretion of the trial court.

No prejudice has been shown. Petitioner could have called the witness.

This claim has no merit.

**B.**

[2] Defendant claims that the State courts erroneously concluded that probable cause existed for his arrest although the arresting officers relied on a suggestive photographic identification in determining that there was

probable cause to believe that defendant had committed the robbery and murder.

In *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that, "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *See also McPhail v. Warden, Attica Correctional Facility,* 707 F.2d 67 (2d cir.1983); *Gates v. Henderson,* 568 F.2d 830 (2d Cir.1977) (en banc), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978).

*Stone v. Powell* applies to all Fourth Amendment claims-- including claims of arrest without probable cause-- and regardless of the nature of the evidence that the defendant is seeking to suppress. *See Cardwell v. Taylor,* 461 U.S. 571, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983); *Chavis v. Henderson* 638 F.2d 534 (2d Cir.1980), *cert. denied,* 454 U.S. 842, 102 S.Ct. 152, 70 L.Ed.2d 125 (1981).

In *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992), the Second Circuit refined the *Powell* analysis to allow habeas corpus review of Fourth Amendment claims in only two circumstances: "(a) if the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process."

Neither prong can be satisfied by petitioner. In addition the state decision was reasonable on the facts.

This claim has no merit.

**C.**

[3] Defendant claims, as he did on his direct appeal, that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)
(Cite as: 2003 WL 23185770 (E.D.N.Y.))

the prosecution did not prove beyond a reasonable doubt at trial the voluntariness of his oral, written, and videotaped statements and that, therefore, the verdict convicting him of murder and robbery was not supported by proof beyond a reasonable doubt. In reaching and rejecting this claim, the Appellate Division found that, upon viewing the evidence in the light most favorable to the prosecution, the evidence "was legally sufficient to prove the voluntariness of the defendant's statements and to prove his guilt beyond a reasonable doubt." *People v. Morales,* 288 A.D.2d at 328, 733 N.Y.S.2d at 617. The Appellate Division's denial of defendant's claim was a reasonable application of clearly established federal law as determined by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**\*16** The facts do not support petitioner's claims.

This claim has no merit.

### D.

[4] Defendant claims that his sentence should be modified because the sentencing court failed to take into account his background and potential for rehabilitation. This claim does not allege a constitutional violation. Because defendant's sentence was lawful under the New York State Penal Law, defendant is not entitled to *habeas* relief.

This claim has no merit.

### E.

No other claim rises above the frivolous.

### XIV. Conclusion

The petition for a writ of habeas corpus is denied.

No certificate of appealability is granted. Petitioner made no substantial showing of the possible denial of a constitutional right. He may, as already indicated, seek a certificate of appealability from the Court of Appeals for the Second Circuit.

SO ORDERED.

E.D.N.Y.,2003.
Morales v. Walsh
Not Reported in F.Supp.2d, 2003 WL 23185770 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
William MORRIS, Petitioner,
v.
George DUNCAN, Respondent.
**No. 03-CV-1428.**

Sept. 25, 2007.

William Morris, Albany, NY, pro se.

Michael G. McCartin, Office of Attorney General-Albany, Albany, NY, for Respondent.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District Judge.

**\*1** This *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 was referred to the Hon. Victor Bianchini, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.4.

No objections to the Report and Recommendation and Order dated August 13, 2007 have been filed.FN1 After examining the record, this Court has determined that the Report and Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, this Court adopts the Report and Recommendation for the reasons stated therein.

FN1. The Court notes that Report and

Recommendation was sent by the Court Clerk to Petitioner's last know address at 88 Elizabeth Street, Albany, New York. Petitioner had until August 27, 2007 to file objections. *See* dkt. entry # 26. On September 11, 2007, the Court received a request from Petitioner dated August 29, 2007 noting that he had received the Report and Recommendation and seeking an extension to file his objections. *See* doc. # 27. The requested was denied because Petitioner failed to offer any reasons why he did not request the extension within the applicable time period to file objections, as required by Fed.R.Civ.P. 6(b)(2). *Id.* The denial of the extension was also mailed to Petitioner's Albany address and was returned to Court as undeliverable. Petitioner's failure to keep the Court informed of his current address is a violation of Local Rule 10.1(b) and serves as an independent basis to dismiss the action pursuant to Local Rule 41.2(b).

It is therefore

**ORDERED** that the petition for a writ of habeas corpus is **DENIED** and **DISMISSED.** Further, the Court finds there is no substantial question presented for appellate review, and, therefore, a certificate of appealability is **DENIED.**

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

VICTOR E. BIANCHINI, United States Magistrate Judge.

### I. INTRODUCTION

Petitioner William Morris, acting *pro se,* commenced this action seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. In July of 2000, Petitioner was convicted in a New

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

York State court of Criminal Sale of a Controlled Substance in the Third Degree and was sentenced to a term of imprisonment. Petitioner contends that his conviction was imposed in violation of his constitutional rights and should therefore be vacated.

This matter was referred to the undersigned by the Honorable Norman A. Mordue, Chief United States District Judge, for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 23).

## II. BACKGROUND

### A. Facts

The following factual summary is derived from the state court records. In the early morning hours of April 23, 1999, Petitioner was observed on a street corner in Albany, New York, selling what appeared to be a controlled substance to Clarence Delaney ("Delaney"). (R at 248-249, 258, 261-265) [FN1]. Petitioner was observed and identified by Albany Police Officer, Stephen Dorn ("Officer Dorn"). Officer Dorn testified that he recognized Petitioner from prior street encounters and arrests. (R at 248-249). Officer Dorn reported the information to other police officers on duty and the other officers apprehended and arrested Delaney. (R at 266, 285, 310). A substance recovered from Delaney was later tested and determined to be cocaine. (R at 250-251).

> FN1. References preceded by "R" refer to the record on appeal.

On May 9, 1999, Petitioner was arrested for the alleged sale of a controlled substance. (R at 337). On November 5, 1999, an Albany County Grand Jury returned Indictment Number D-99-1670, charging Petitioner with one count of Criminal Sale of a Controlled Substance in the Third Degree, in violation of New York Penal Law ("NYPL") § 220.39(1) [FN2]. (R at 2).

> FN2. Unless otherwise indicated, all references to the NYPL are to McKinney 1998.

### B. State Trial Court Proceedings

The Honorable Thomas A. Breslin, Albany County Court Judge, presided over Petitioner's trial proceedings. The trial began on July 5, 2000. Petitioner was represented by assigned counsel, Theresa M. Suozzi, Esq. The defense theory was that Petitioner did not sell the drugs to Delaney on April 23, 1999, and that Officer Dorn was mistaken in his identification. On July 10, 2000, the jury found Petitioner guilty of Criminal Sale of a Controlled Substance in the Third Degree.

*2 On August 8, 2000, Petitioner, by and through Attorney Suozzi, moved to set aside his verdict pursuant to CPL § 330.30, citing several alleged errors. On August 21, 2000, prior to sentencing Petitioner, Judge Breslin denied Petitioner's CPL § 330.30 motion. (S at 1-12) [FN3]. Petitioner was then sentenced to a term of three to nine years in prison. (S at 12).

> FN3. References preceded by "S" are to the transcript pages of Petitioner's sentencing proceedings.

### C. State Appellate Proceedings

On May 10, 2001, Petitioner, through Attorney Suozzi, filed a motion pursuant to CPL § 440.10 to vacate his conviction based upon alleged newly discovered evidence. (SR at 1) [FN4]. On October 5, 2001, Judge Breslin denied the motion in a written Decision and Order. (SR at 14).

> FN4. References preceded by "SR" are to the pages of the Supplemental Record provided to this Court.

Petitioner then appealed his conviction to the Appellate Division, Third Department, of the New York State Supreme Court. Petitioner asserted two claims in support of the appeal: (1) that the trial court's denial of the § 330 motion was an abuse of discretion and (2) that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

conviction should have been reversed by the trial court based upon alleged newly discovered evidence.

In a decision issued on November 14, 2002, the Appellate Division affirmed Petitioner's conviction and sentence. *People v. Morris,* 299 A.D.2d 655, 751 N.Y.S.2d 56 (3rd Dep't 2002). Petitioner's application for leave to appeal to the Court of Appeals was denied on January 31, 2003. *People v. Morris,* 99 N.Y.2d 583, 755 N.Y.S.2d 719, 785 N.E.2d 741 (2003).

**D. Federal Habeas Corpus Proceedings**

Petitioner, proceeding *pro se,* commenced this action on December 1, 2003, by filing a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (Docket No. 1). Thereafter, Respondent filed a Response in Opposition. (Docket No. 10). Petitioner filed a Traverse in further support of his Petition. (Docket No. 13). On September 15, 2004, Petitioner submitted a supplemental Traverse claiming relief based upon additional newly discovered evidence. (Docket No. 15).

For the reasons that follow, the Court recommends that the Petition be DENIED.

**III. DISCUSSION**

**A. Federal Habeas Corpus Standard**

Federal habeas corpus review of a state court conviction is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal courts must give substantial deference to a state court determination that has adjudicated a federal constitutional claim "on the merits." 28 U.S.C. § 2254(d); *Sellan v. Kuhlman,* 261 F.3d 303, 309-10 (2d Cir.2001). The Second Circuit has stated that an "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan,* 261 F.3d at 313 (quotation omitted). The Second Circuit has also held that even a one-word denial of a petitioner's claim is sufficient to

constitute an "adjudication on the merits" for purposes of AEDPA. *Id.* at 312-313.

Specifically, AEDPA requires that where a state court has adjudicated the merits of a Petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication:

**\*3** (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

While both AEDPA and its predecessor statute recognize that a presumption of correctness shall apply to state court findings of fact, *Whitaker v. Meachum,* 123 F.3d 714, 715 n. 1 (2d Cir.1997), AEDPA also requires a Petitioner to rebut that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *LanFranco v. Murray,* 313 F.3d 112, 117 (2d Cir.2002). A presumption of correctness applies to findings by both state trial and appellate courts. *Galarza v. Keane,* 252 F.3d 630, 635 (2d Cir.2001); *Whitaker,* 123 F.3d at 715 n. 1.

In *Williams v. Taylor,* 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court defined the phrases "contrary to" and "unreasonable application of" clearly established federal law. A state court decision is "contrary to clearly established federal law ... if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Id.*

A state court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id.*

Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be some "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

**B. Impact of Petitioner's Conditional Release**

As a threshold matter, this Court notes that Petitioner was conditionally released to parole on or before July 12, 2007. However, for the reasons set forth below, Petitioner's release does not necessarily render his Petition moot.

"The federal habeas statute gives the United States district courts jurisdiction to entertain petitions for habeas relief only from persons who are *'in custody* in violation of the Constitution or laws or treaties of the United States.' " *Maleng v. Cook,* 490 U.S. 488, 490, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989) (quoting 28 U.S.C. § 2241(c)(3) (emphasis in original) and citing 28 U.S.C. § 2254(a)).

**\*4** The Supreme Court has "interpreted the statutory language as requiring that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed." *Maleng,* 490 U.S. at 490-91 (citing *Carafas v. LaVallee,* 391 U.S. 234, 238, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968)). In the present case, Petitioner filed his federal habeas petition on December 1, 2003, while he was in custody pursuant to his July 2000 conviction. Thus, because Petitioner was incarcerated at the time he filed his habeas petition, he fulfills the "in custody" requirement of 28 U.S.C. § 2241.

Although the custody requirement is satisfied, this Court's inquiry does not end there. If the Petitioner does not satisfy the "case-or-controversy" requirement of Article III, Section 2 of the Constitution, it is moot and the Court may not consider it. See *Spencer v. Kemna,* 523 U.S. 1, 7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

To satisfy the "case or controversy" requirement, the petitioner must, at all stages of the litigation, have suffered, or be threatened with, an actual injury which is likely to be redressed by a favorable judicial decision. *See id.* For a petitioner who is no longer in custody, that means a demonstration of a "concrete and continuing injury" that is a "collateral consequence" of the alleged constitutional violation and can be remedied by granting the writ. *Id.* (citing *Carafas,* 391 U.S. at 237-38).

Where, as in this case, the petitioner challenges the criminal conviction itself, the Supreme Court has been willing to presume that a wrongful conviction has continuing collateral consequences, or to "to count collateral consequences that are remote and unlikely to occur." *Spencer,* 523 U.S. at 8; *accord United States v. Probber,* 170 F.3d 345, 348 (2d Cir.1999).

This presumption of collateral consequences has been justified upon the notion that "most criminal convictions do in fact entail adverse collateral legal consequences," *Sibron v. New York,* 392 U.S. 40, 55 (1968), in that convicted criminals often face certain "civil disabilities" as a result of their conviction, *Lane v. Williams,* 455 U.S. 624, 632 n. 13, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982). Examples of such disabilities include being "barred from holding certain offices, voting in state elections, and serving as a juror." *Lane,* 455 U.S. at 632.

In light of the foregoing presumption of collateral consequences, this Court finds that the "case or controversy" requirement has been satisfied and will address the merits of Petitioner's claims.

**C. Petitioner's Claims**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

Petitioner asserts three grounds in his Petition. However, as set forth below, the first ground contains five separate claims. Each claim will be addressed in turn.[FN5]

> FN5. Petitioner raises an additional claim based upon alleged newly discovered evidence in a document entitled "Addendum of Petitioner Response to District Attorney's Opposition Brief" (Docket No. 15). This Court declines to consider a claim improperly raised for the first time in a responsive pleading. *See Parker v. Duncan,* 03-CV-0759, 2007 WL 2071745, at *6 (N.D.N.Y. July 17, 2007) ("Claims, therefore, that are raised for the first time in such a pleading are not properly considered by the court."). Moreover, it does not appear that the additional claim was ever presented to the state court, as required prior to seeking habeas review, or that the evidence in question would constitute "newly discovered evidence."

**1. Ground One-Denial of CPL § 330 Motion**

In a post-trial motion filed pursuant to § 330 of the New York Criminal Procedure Law, Petitioner argued that Petitioner raised five claims: (a) that he was denied *Brady*[FN6] material and other discovery materials that he requested, (b) that references made to his pretrial incarceration and prior arrest were in violation of the *Sandoval*[FN7] compromise, (c) that the evidence at trial was legally insufficient, (d) that there was juror bias and misconduct not disclosed until after trial, and (e) that newly discovered evidence would have likely affected the outcome of the trial. (R at 106) [FN8].

> FN6. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

> FN7. A "compromise" reached between the parties in any given criminal trial pursuant to *People v. Sandoval,* 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413 (1974), determines the extent to which a defendant may be cross-examined regarding prior crimes and bad acts bearing on his credibility, veracity, or

honesty.

> FN8. References preceded by "R" are to the pages of the Record on Appeal provided to this Court.

**\*5** In support of his Petition, Petitioner argues that the trial court's denial of the § 330 motion was "an abuse of discretion" and violation of his due process rights. Respondent contends that Petitioner's claims in this regard are not cognizable on habeas corpus review and, in any event, are without merit. Due to the fact that Petitioner is proceeding *pro se,* this Court will construe his Petition as seeking habeas relief based upon all of the grounds originally set forth in the § 330 motion.

**a. *Brady* Material (*Claim One* ) (330 Motion Claim)**

Under *Brady v. Maryland,* the prosecutor is obligated to disclose material evidence that is favorable to the accused. *See Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The Supreme Court has held that "there are three components of a true *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Id.; see also Boyette v. Lefevre,* 246 F.3d 76, 89 (2d Cir.2001).

In the present case, Petitioner argues that the prosecution withheld exculpatory evidence. As noted above, Petitioner was convicted of selling cocaine to Delaney. Almost immediately after the sale, Delaney was arrested while traveling in a car. (R at 266, 285, 310). Petitioner's trial counsel submitted discovery demands to the prosecution, requesting, *inter alia,* the names and addresses of the other occupants of the vehicle at the time of Delaney's arrest; the make and model of the vehicle; and the location of each occupant of the vehicle relative to Delaney. The prosecution never provided this information. Petitioner contends that this failure constituted a violation of his *Brady* rights.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

The Appellate Division, Third Department held that the trial court had not abused its discretion in finding that there had been no *Brady* violation. *Morris,* 751 N.Y.S.2d at 57. In this regard, the Appellate Division noted that there was no evidence that the information demanded by Petitioner "was either recorded or remembered by the police." *Id.* The court further found that "the record indicate[d] that the police focused solely on Delaney as the one person who matched the description of the buyer." *Id.*

This Court finds that the Appellate Division's decision in this regard did not involve an unreasonable application of clearly established Federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under *Brady,* "[t]o the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant." *United v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998). However, "the prosecution is not required to disclose evidence it does not possess or of which it is not aware ." *Sturdivant v. Barkley,* No. 04-CV-5659, 2007 WL 2126093, at *6 (E.D.N.Y. July 24, 2007) (citing *Smith v. Edwards,* No. 98 Civ. 7962, 2000 WL 709005, at *6 (S.D.N.Y. May 31, 2000)).

*6 In the present case, the record supports the Appellate Division's conclusion that the prosecution did not have the information demanded by Petitioner and, thus, cannot be considered to have "suppressed" that information under *Brady.*

Officer Scott Snide testified on cross-examination that the other occupants of the car were not arrested and that he did not "get their names." (R at 318). Officer Michael Seney stated that he did not remember asking the occupants for their names or identification. (R at 397). Officer Seney also testified that although the other occupants were questioned by the police, he took no notes of the interviews and did not observe any other officers taking notes. (R at 399-400).

In addition, the Appellate Division's factual finding as to this matter is also supported by the following exchange, which took place between the trial court and Petitioner's counsel:

THE COURT: Okay. Now, a couple of things, just so the record is clear. You're not saying the DA ever had the names of those ... two individuals in the car-are you?

MS. SUOZZI: No.

(R at 150). Petitioner's trial counsel also acknowledged that she had no "allegations or proof" that the prosecution had possession of the information at issue (R at 151).

It is well settled that "the mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief." *Mallet v. Miller,* 432 F.Supp.2d 366, 377 (S.D.N.Y.2006) (citing *Strickler v. Greene,* 527 U.S. 263, 286, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review."); *United States v. Avellino,* 136 F.3d 249, 261 (2d Cir.1998) ("In the absence of a proffer by [defendant] of any nonspeculative basis for inferring that ... the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary.")). As such, Petitioner's speculation that the prosecution withheld the information that he sought is insufficient to warrant habeas relief.

Accordingly, this Court finds that Petitioner is not entitled to habeas relief based upon the alleged *Brady* violation.

**b.** *Sandoval* **Compromise** *(Claim Two)*

In the Second Circuit, "the admission of a prior conviction to impeach a defendant is an evidentiary ruling and is only redressable in a federal habeas corpus petition if petitioner can show that the particular errors were of constitutional magnitude." *Whittman v. Sabourin,* No. 00 Civ. 2867,

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

2001 WL 687369, at *5 (S.D.N.Y. June 18, 2001). Any evidentiary error must be "so pervasive as to have denied [petitioner] a fundamentally fair trial." *Collins v. Scully,* 755 F.2d 16, 18 (2d Cir.1985).

When addressing a *Sandoval* issue, the trial court must balance the probative value of a prior conviction against the prejudicial effect. *See Sandoval,* 34 N.Y.2d at 376-77, 357 N.Y.S.2d 849, 314 N.E.2d 413. A trial court's ruling in this regard is afforded broad discretion with respect to the weighing of the probative value against the prejudicial effect. *See Simmons v. Ross,* 965 F.Supp. 473, 480 (S.D.N.Y.1997).

**\*7** In the present case, the trial court's *Sandoval* ruling was that, if Petitioner testified, the prosecution could not inquire as to two prior convictions for marijuana possession. (R at 174-175). However, the trial court ruled that he would permit "full inquiry" regarding a conviction for false impersonation, on the grounds that said conviction was relevant as to Petitioner's credibility. (R at 175). With respect to a weapons possession conviction, the trial court imposed "a *Sandoval* compromise" and indicated that he would limit questioning to the level of the arrest, conviction, and sentencing. (R at 175).

Petitioner argues that the prosecutor violated the trial court's *Sandoval* compromise by suggesting during cross-examination that Petitioner was "living in jail." Further, Petitioner contends that the prosecution improperly offered evidence of a prior arrest by Officer Dorn. According to Petitioner, the reference to this uncharged crime was contrary to the trial court's *Sandoval* ruling and was highly prejudicial.

With respect to this claim, the Appellate Division found that the record did not "provide support for defendant's contentions that the People failed to abide by County Court's *Sandoval* ruling or that the prosecutor described him as 'living in jail.' " *Morris,* 751 N.Y.S.2d at 57. In addition, regarding Officer Dorn's testimony as to having previously arrested Petitioner, the Appellate Division held as follows:

[A]lthough Dorn referred more than once to having previously arrested defendant in 1998, this testimony was admitted to explain the basis for Dorn's ability to recognize defendant in direct response to defense counsel's remarks questioning that ability in her opening statement. In addition, County Court, sua sponte, gave an appropriate instruction to limit the jury's consideration to the issue of Dorn's ability to readily recognize defendant.

*Id.*

This Court finds that the Appellate Division's decision as to this claim did not involve an unreasonable application of clearly established Federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

First, Petitioner's argument that the prosecutor suggested that he was "living in jail" is not supported by the evidentiary record. During cross-examination, the prosecutor asked Petitioner the following question: "And you're currently incarcerated for that, correct? Are you currently in jail for that charge?" (R at 552). Petitioner responded in the affirmative. It appears that the prosecutor was referring to the sentence that Petitioner received as a result of his weapons possession conviction. Under the trial court's *Sandoval* ruling, a question regarding the sentence was permissible. In any event, even if the prosecutor's statement was arguably inappropriate, any prejudice resulting from this single question would not have been sufficient to rise to the level of a constitutional violation.

**\*8** Second, with respect to the testimony regarding the fact that Officer Dorn had previously arrested Petitioner, such evidence was admissible as to the issue of identity. Petitioner's defense theory was that Dorn was mistaken in his identification of Petitioner. Evidence of prior uncharged crimes is admissible as to the question of identity under both New York and federal law. *See People v. Molineux,* 168 N.Y. 264, 293, 61 N.E. 286 (1901); *Fed R. Evid.* 404(b). Thus, this Court finds that the Appellate Division's determination with respect to this issue was not unreasonable. *See Alexander v. Walker,* No. 03 Civ. 8440,

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

2004 WL 1857575, at *5 (S.D.N.Y. Aug 19, 2004).

Lastly, any arguable prejudice that might have been created as a result of the foregoing evidence was adequately addressed by a limiting instruction given by the trial court, which specifically advised the jury that they were only to consider the prior arrest in connection with the identity issue. (R at 259). The Supreme Court has emphasized that prejudice "can be cured with proper instructions and juries are presumed to follow their instructions." Zafiro v. United States, 506 U.S. 534, 540-41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (internal quotation marks omitted); see also United States v. Downing, 297 F.3d 52, 59 (2d Cir.2002) (stating that "[a]bsent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").

For the foregoing reasons, this Court finds that Petitioner is not entitled to habeas relief based upon an alleged violation of the trial court's Sandoval compromise.

### c. Sufficiency of the Evidence (Claim Three)

A habeas petitioner challenging the sufficiency of the evidence bears "a very heavy burden." Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir.2002) (quotation marks omitted); Einaugler v. Supreme Court of New York, 109 F.3d 836, 840 (2d Cir.1997) (quotation marks omitted). A habeas challenge to the sufficiency of the evidence "does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' " Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (quoting Woodby v. INS, 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (emphasis in original).

Thus, a habeas court must uphold a conviction unless, upon the record evidence adduced at trial, no rational trier of fact could have found that the prosecution established the defendant's guilt beyond a reasonable doubt. See id.;

accord Ponnapula, 297 F.3d at 179 ("[W]e review the evidence in the light most favorable to the State and [hold that] the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial.").

*9 Petitioner attacks the sufficiency of the evidence supporting his conviction. Specifically, Petitioner notes that Officer Dorn's testimony was the only evidence offered regarding the identity of the person who sold the cocaine to Delaney. In addition, Delaney himself testified that Petitioner was not the person who sold him the drugs.

The Appellate Division concluded that the evidence was sufficient, stating that after viewing the evidence in a light favorable to the People ..., there exists a 'valid line of reasoning and permissible inferences' from which a rational jury could conclude that defendant engaged in the crime charged." Morris, 751 N.Y.S.2d at 57.

This Court finds that the Appellate Division's decision with respect to this issue did not involve an unreasonable application of clearly established Federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Officer Dorn testified that on the night in question, he was located approximately fifty feet from the intersection of Clinton Avenue and Henry Johnson Boulevard in Albany, observing the area using a pair of binoculars. (R at 255-256). According to Officer Dorn, the area was "well lit." (R at 256). Dorn testified that Petitioner arrived at the scene at approximately 4:20 in the morning. (R at 257-258). Dorn could identify Petitioner because he had "arrested him before and ... had different street encounters with him." (R at 258). Dorn testified that he observed an individual, later identified as Delaney, approach Petitioner. (R at 262). According to Dorn, Petitioner removed several white objects from his mouth and transferred them to Delaney. (R at 263-264). In return, Delaney gave Petitioner money. (R at 264).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

There was no dispute in the case that Delaney was arrested shortly thereafter, that he was in possession of a white substance, and that the substance was later determined to be cocaine. (R at 236-237). The only issue was the identity of the person who sold the cocaine to Delaney. Based upon the testimony of Officer Dorn, a rational juror could certainly conclude that Petitioner was the individual in question. This Court may not "disturb the jury's findings with respect to the witnesses' credibility." *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989); *see also Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996) (dismissing habeas claim because "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; stating that it must defer to the jury's assessments of both of these issues").

Accordingly, this Court finds that Petitioner's claim regarding the sufficiency of the evidence should be denied.

**d. Juror Bias** *(Claim Four)*

The Second Circuit has held that "[j]ury bias can be established only if a habeas petitioner demonstrates that 'prejudice [wa]s 'manifest.' " *Knapp v. Leonardo,* 46 F.3d 170, 176 (2d Cir.1995) (quoting *Irvin v. Dowd,* 366 U.S. 717, 724, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961)). In other words, "the petitioner must show the 'actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' " *Id.* (quoting *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643).

**\*10** Petitioner alleges that one of the jurors may have harbored a bias against him. In support of this argument, Petitioner offers the affidavit of Stacey Harper. (R at 112-114). Ms. Harper, who described herself as a "personal friend" of Petitioner and his family, stated that throughout the trial, Juror # 2, glanced at her and gave her "strange, almost 'dirty' or nasty looks." (R at 112). After the trial, Ms. Harper learned that Juror # 2 was Pamela Salamida. (R at 112). According to Harper, Salamida was going through a bitter divorce with Harper's uncle. (R at 113). Harper attempted to contact Ms. Salamida to discuss the verdict, but Salamida refused to speak with Harper. (R

at 113). Based upon the foregoing, Harper concluded that Salamida "was unable to remain impartial on *{sic}* this case due to her dislike and resentment of me and my family." (R at 113).

The Appellate Division did not discuss this claim in its decision, but did state that Petitioner's "remaining contentions [had] been reviewed and found to be equally without merit." *Morris,* 751 N.Y.S.2d at 57. The Second Circuit has held that a one-word denial of a petitioner's claim constitutes an "adjudication on the merits" for purposes of AEDPA. *Sellan v. Kuhlman,* 261 F.3d 303, 312-13 (2d Cir.2001). Where, as here, the state court fails to articulate a coherent rationale for its rejection of a petitioner's claim, but that rejection nevertheless is clearly on the merits, the federal court must " 'focus its review on whether the state court's ultimate decision was an "unreasonable application" of clearly established Supreme Court precedent.' " *Aparicio v. Artuz,* 269 F.3d 78, 94 (2d Cir.2001).

In the present case, this Court finds that the Appellate Division's ultimate decision concerning Petitioner's claim of juror bias was not an unreasonable application of clearly established Supreme Court precedent. The Supreme Court has said that a habeas petitioner must demonstrate that the prejudice was "manifest." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1643). In addition, pursuant to 28 U.S.C. § 2254(e)(1), "the state court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial, rebuttable by clear and convincing evidence." *Torres v. Woods,* 04 CV 5560, 2005 WL 1541047, at *6 (E.D.N.Y. June 20, 2005) (citing *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 813 (2d Cir.2000)). "[T]he trial court's findings of impartiality [may] be overturned only for " 'manifest error.' " *Fama,* 235 F.3d at 813 (quoting *Patton v. Yount,* 467 U.S. 1025, 1031, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)).

Harper's affidavit merely establishes that Salamida gave her "strange ... looks," that were *"almost* dirty." (R at 112) (emphasis added). Moreover, Harper alleges that Salamida was biased against *Harper* and her family, not necessarily Petitioner. There is no evidence in the record to support the claim that Salamida's alleged animus toward Harper was so great that she was unable to be fair and impartial to

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

Petitioner, who was not even related to Harper. Indeed, there is no credible evidence that Salamida even knew of the relationship between Salamida and Petitioner's family. Although Harper suggests that Salamida observed her sitting next to Petitioner's mother, there is no evidence concerning any communications between Harper and Petitioner in the presence of Salamida that might have led Salamida to conclude that Harper and Petitioner were friends.

**\*11** This Court concludes that this speculation offered by Petitioner and Ms. Harper does not constitute clear and convincing evidence sufficient to overcome the presumption of correctness afforded to the state court's finding of impartiality. Accordingly, Petitioner is not entitled to habeas relief based upon alleged juror bias.

**e. Newly Discovered Evidence** *(Claim Five)*

Petitioner raises two claims based upon alleged newly discovered evidence. The first of those claims, which was initially raised in Petitioner's [CPL § 330.30](CPL) motion, is discussed here. The second newly discovered evidence claim is discussed below in Section III.C.2.

The Supreme Court has explained that "newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Townsend v. Sain,* 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963). To warrant relief the newly discovered evidence "must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Id.* "Also, the district judge is under no obligation to grant a hearing upon a frivolous or incredible allegation of newly discovered evidence." *Id.*

"This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution-not to correct errors of fact." *Herrera v. Collins,* 506 U.S. at 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (citing cases). As such, a claim "based on newly discovered evidence ha[s] never been held to state

a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.*

After the conclusion of the trial, Petitioner's trial counsel submitted a Freedom of Information Law ("FOIL") request to the Albany City Clerk Records Access officer. (R at 115). As a result of that request, Petitioner obtained a December 1999 arrest report related to Delaney and two receipts for property taken from Delaney's person in May of 1999. Although one of the property receipts had been previously provided to Petitioner's trial counsel, the other had not. Petitioner contends that certain clerical errors contained on these items demonstrated "sloppy police work," which, if they had been made known to the jury, would have created a reasonable doubt as to Petitioner's guilt.

The Appellate Division did not discuss this particular claim of newly discovered evidence in its decision, but did state that Petitioner's "remaining contentions [had] been reviewed and found to be equally without merit." *Morris,* 751 N.Y.S.2d at 57. As noted above, a one-word denial of a petitioner's claim constitutes an "adjudication on the merits" for purposes of AEDPA. *Sellan,* 261 F.3d at 312-13.

The Appellate Division's decision in this regard did not involve an unreasonable application of clearly established Federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. The alleged newly discovered evidence related to collateral matters and Petitioner has failed to demonstrate that the introduction of the evidence would likely have changed the jury's verdict. Moreover, Petitioner has not established how the newly discovered evidence bears upon the constitutionality of his conviction, as required to obtain habeas relief. *See White v. Keane,* 51 F.Supp.2d 495, 502 (S.D.N.Y.,1999) ("The law is clear that 'the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus.' ") (quoting *Herrera v. Collins,* 506 U.S. 390, 400, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)).

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

**\*12** Lastly, it is not clear that the evidence in question was actually "newly discovered evidence," in that Petitioner's trial counsel presumably could have obtained the evidence prior to trial by making the same FOIL request she made after the trial. *See Shuler v. Spitzer,* No. 05-CV-0932, 2007 WL 1704644, at \*6 (E.D.N.Y. June 13, 2007) ("Newly discovered evidence is, by definition, incapable of discovery through counsel's due diligence before or during trial. Evidence in existence at an earlier date, though perhaps unknown to a petitioner, cannot later be described as newly discovered.") (citing *United States v. Middlemiss,* 217 F.3d 112, 122 (2d. Cir.2000) ("Relevant factors to a successful motion [based on newly discovered evidence] are whether ... counsel could not have discovered the evidence with due diligence before or during trial.").

For the foregoing reasons, this Court finds that Petitioner is not entitled to habeas relief based upon this claim of newly discovered evidence.

**2. Ground Two-Newly Discovered Evidence**

Petitioner's second newly discovered evidence claim is first raised in his CPL § 440.10 motion. In support of that motion, Petitioner submitted an affidavit from Delaney, which allegedly contained newly discovered evidence. At trial, Delaney testified that he could not remember the names of the other occupants of the vehicle on the night in question. (R at 363). However, after the trial concluded, Delaney remembered that the occupants' street names were "Slim" and "Black." Delaney also claimed that the police knew the true identities of the occupants.

The trial court denied the § 440.10 motion, concluding that Delaney's affidavit did not constitute newly discovered evidence because "defense counsel or an investigator could have interviewed [Delaney]" prior to trial. (SR at 0014). Affirming the trial court, the Appellate Division held "County Court correctly concluded that [Delaney's] affidavit was not newly discovered evidence for there is no indication that, with due diligence, this information could not have been produced at trial." *Morris,* 751 N.Y.S.2d at 57. In addition, the Appellate Division noted that the information contained in the

affidavit was not "of such character that, with it, the jury probably would have rendered a verdict favorable to defendant." *Id.*

The Appellate Division's decision in this regard did not involve an unreasonable application of clearly established Federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. The state courts' conclusion that the Delaney affidavit did not qualify as newly discovered evidence was reasonable. Petitioner failed to establish that the information contained therein could not have been discovered prior to or during trial through the exercise of due diligence. *See Martinez v. O'Connell,* 06-CV-0887, 2007 WL 189335, at \*2 (Jan. 22, 2007) ("A petitioner whose claim is based upon newly discovered evidence has the burden of showing that such evidence could not have been discovered earlier with due diligence."); *Shuler,* 2007 WL 1704644, at \*6; *see also Clark v. Irvin,* 844 F.Supp. 899, 907 (N.D.N.Y.1994); *Friedgood v. Keane,* 51 F.Supp.2d 327, 337 (E.D.N.Y.1999).

**\*13** In any event, Delaney testified at trial that he could not recall the names of the other occupants of the vehicle. (R at 363). To the extent that his affidavit might arguably be considered a recantation of his trial testimony, Petitioner failed to provide any "proof of the reliability of any such recantation," which is a minimum requirement to obtain habeas relief based upon recanted testimony. *Simmons v. Fisher,* 02 Civ. 4811, 2006 WL 2129770, at \*15 (S.D.N.Y. July 26, 2006); *see also Hamilton v. Herbert,* 01 CV 1703, 2004 WL 86413, at \*17 (E.D.N.Y. Jan.16, 2004) (finding witness's recantation to be "lacking credibility and insufficient proof that the prosecution was in possession of this exculpatory evidence"); *Gonzalez v. Superintendent, Sullivan Correctional Facility,* 761 F.Supp. 973, 983 (E.D.N.Y.1991) (holding that petitioner was not entitled to relief because recantation was not credible).

Accordingly, this Court finds that Petitioner is not entitled to habeas relief based upon this alleged newly discovered evidence.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)
(Cite as: 2007 WL 2815632 (N.D.N.Y.))

**3. Ground Three-*Brady* Material (Stand Alone Claim)**

The third ground raised in the Petition is based upon the prosecution's alleged failure to turn over *Brady* material. Specifically, Petitioner alleges the prosecution failed to disclose a "lab report, police report's [*sic* ], [and] arrest reports." This claim is essentially a restatement of the *Brady* and newly discovered evidence claims raised in Petitioner's § 330 motion and discussed above. For the reasons outlined *supra,* this Court finds that Petitioner is not entitled to habeas relief. The evidence at issue was of limited probative value and Petitioner has not established that it the introduction of the evidence would likely have changed the outcome of the trial, as is required to establish a *Brady* violation. *See Atkinson v. Portuondo,* 269 F.Supp.2d 57, 62 (E.D.N.Y.2003); *Montgomery v. Artuz,* 26 F.Supp.2d 497, 503 (W.D.N.Y.1998); *Perkins v. Bennett,* 97-CV-5917, 2003 WL 21696946, at *2 (E.D.N.Y. June 18, 2003).

As such, this Court finds that Petitioner is not entitled to habeas relief based upon an alleged *Brady* violation.

### IV. CONCLUSION

For the reasons stated above, the Court recommends William Morris' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied, and that his petition be dismissed. Because Petitioner has failed to make a substantial showing of a denial of a constitutional right, I recommend that a certificate of appealability not issue. See 28 U.S.C. § 2253(c)(2) (1996).

### V. ORDERS

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this**

Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).

***14 FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd. .,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

SO ORDERED.

N.D.N.Y.,2007.
Morris v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2815632 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Reginald L. PARKER, Petitioner,
v.
George B. DUNCAN, Superintendent, Great Meadow
Correctional Facility, Respondent.
**No. 9:03-CV-0759 (LEK/RFT).**

July 17, 2007.

Reginald L. Parker, Comstock, NY, pro se.

Michael G. McCartin, Esq., Assistant Attorney General, of
Counsel, Hon. Andrew M. Cuomo, Office of Attorney
General, State of New York, Albany, NY, for the
Respondent.

### *MEMORANDUM-DECISION AND ORDER*

LAWRENCE E. KAHN, United States District Judge.

### I. BACKGROUND

*A. State Court Proceedings*

**\*1** According to the testimony adduced at trial, on the
evening of March 20, 1996, Petitioner Reginald L. Parker,
William Blount (a.k.a "YG"), Ihsaan Abdul-Hameed
(a.k.a "Justice"), Denville Waithe (a .k.a "Dred" and
"Steve") and two other men identified at trial only by their
nicknames "Black" and "Siyout" conceived a plan to rob
Gavir Amador, whom the men believed to be a drug dealer
who would have a large quantity of drugs and money, at
his home in Schenectady, New York. *See* Transcript of
Trial of (9/18/96) ("Trial Tr.") at 1763-67. Some time
after arriving at Amador's residence, Parker struck
Amador in the head with the gun, opening a gash over
Amador's eye. *Id.* at 720, 1769-70. The robbers eventually
found a stash of drugs, together with between $1,000 and
$3,000 in cash. *Id.* at 724-25, 1770-71.

After leaving Amador's residence, the group returned to
Siyout's apartment, where they split the money and drugs
among all participants in the robbery. *Id.* at 1029-30. The
group then agreed to rob Philton Green, a drug dealer
from whom the men believed they could steal marijuana.
*Id.* at 1033-34, 1293-94. Parker, Blount and
Abdul-Hameed then drove to the home of Parker's friend,
Lynell McQueen, who agreed to assist the trio in robbing
Green. *Id.* at 1297-99. On the ride to McQueen's
apartment, Parker informed Blount that Parker wanted to
be the "gun man" in the robbery of Green and, as a result,
Blount provided Parker with the .380 caliber handgun that
would be used during that crime. *Id* . at 1039-40.

The group then drove to Green's residence on Crane Street
in Schenectady. *Id.* at 1046, 1298. During that trip, Parker
volunteered that if Green "got out of hand" during the
robbery, Parker would "bust," *i.e.,* shoot, Green. *Id.* at
1825. When they arrived at Green's residence,
Abdul-Hameed remained in the car at Parker's direction
while he, Blount and McQueen approached Green's home.
*Id.* at 1046-48. Once inside, Parker pulled out the pistol
and he and his companions demanded that Green give
them his money and drugs. *Id.* at 1051-52. Green then
gave the group the money and marijuana he had on his
person and also directed the robbers to the rear portion of
his apartment where Green kept additional quantities of
marijuana. *Id.* at 1053-54. As Blount went to get the
marijuana, Green apparently tried to grab the gun from
Parker's hand. *Id.* at 1054. Although Parker and Green
struggled briefly, Parker succeeded in maintaining control
of the weapon, and thereafter proceeded to shoot Green
multiple times. *Id.* at 1056-58, 1312-14. Immediately after
shooting Green, Parker, Blount and McQueen ran from the
victim's apartment, jumped into the car, and directed
Abdul-Hameed to drive away from the scene. *Id.* at
1314-16. Although Abdul-Hameed had stayed in the car
and did not witness the shooting, he testified at trial that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

heard Blount ask Parker why he "bust[ed]" Green, to which Parker responded: "[he] had to." *Id.* at 1827-29. The group drove from Green's home to an apartment on Germania Street which at the time was rented by Kimberly Flanders. When Parker and his three accomplices arrived at the Germania Street home, they entered the bathroom and proceeded to split up the proceeds of the fatal robbery of Green. *Id.* at 1063-67, 1830.

**\*2** After spending the night at Flanders' apartment, Parker and McQueen, together with their friend Waithe, drove to Gloversville, New York. *Id.* at 1319-23. While in Gloversville, Parker and McQueen learned that the Schenectady police were looking for the two for questioning in connection with Green's murder. *Id.* at 1329-30. The two then devised a plan to frame Waithe for Green's murder. *Id.* at 1330. In furtherance of that scheme, the two falsely told Waithe that they had learned that law enforcement agents from the Gloversville Police Department had suspected Waithe of a drive-by shooting in Gloversville and that he should therefore leave town, thereby causing Waithe to appear guilty of the Green homicide while simultaneously preventing Waithe from providing the police with his alibi on the night Green was killed. *Id.* at 1331-32. Parker thereafter approached Flanders and offered her $1000.00 to provide him with a false alibi for the night of the two robberies. *Id.* at 1339.

Law enforcement agents eventually apprehended Parker and McQueen and questioned the two about Green's murder. *Id.* at 1340-41, 1535-36. At the time, Parker was read his *Miranda* warnings and he thereafter agreed to answer questions about the shooting. *Id.* at 1537-39. Although he initially denied all knowledge of the robbery and murder of Green, Parker subsequently admitted that he had traveled from Germania Street to Crane Street (the street on which Green resided) and back to Germania Street the night of the murder, however he claimed that he never entered Green's home at that time.[FN1] *Id.* at 1542-43.

> [FN1.] At one point during this questioning, Parker asked the police what could happen if, "hypothetically," he and another person went to a house to do one thing but Parker's companion shot someone. Trial Tr. at 1547. The investigator informed Parker that the police would need

additional details to provide him with an answer, prompting Parker to declare that the hypothetical situation had not happened. *Id.*

As that interview continued, an investigator showed Parker a pair of jeans that had been recovered from Flanders' apartment soon after the murder. *Id.* at 1549-51. After Parker identified the pants as the pair he had worn on the night Green was killed, the investigator then showed Parker the presence of a stain on the jeans which subsequent deoxyribonucleic acid ("DNA") testing established was consistent with Green's blood. *Id.* at 1550-51. Parker was then taken to an interview room at the police station where McQueen was being questioned, where Parker learned that McQueen had provided the police with a written statement in which he admitted to having been present at the murder. *Id.* at 1555-56. Parker then admitted that he had gone to Green's house the evening and night of March 20, 1996 for the purpose of stealing Green's marijuana, but denied shooting Green. *Id.* at 1558-59. At that time, Parker also falsely identified Waithe as the shooter from a photograph shown to Parker by New York State Police Investigator Charles DeLuca. *Id.* at 1631-32.

Based upon the foregoing, on June 6, 1996, a Schenectady County grand jury returned Indictment No. 396-35 against Parker. *See* Respondent's Appendix on Appeal ("Resp.App.") at RA 10-13 ("Initial Indictment"). That accusatory instrument charged Parker with nine counts arising from the robbery and murder of Green, including "felony murder" in the second degree, robbery, conspiracy, and bribing a witness.[FN2]

> [FN2.] At the time the Initial Indictment was returned, law enforcement agents were unaware of the earlier robbery of Amador.

**\*3** In his defense of the charges against him, Parker retained Terence Kindlon, Esq., who conducted pretrial discovery and filed various pretrial motions on Parker's behalf, including motions to suppress identification testimony as well as Parker's statements to law enforcement agents. On September 13, 1996, Schenectady County Court Judge Clifford T. Harrigan presided over a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

combined *Wade* [FN3]/*Huntley*[FN4] hearing which he had scheduled to address the issues raised in Parker's pretrial omnibus motion. Subsequent to that hearing, Judge Harrigan issued a Decision and Order in which he found: (1) that "there was no improper conduct on the part of law enforcement officers and the identification procedure was not suggestive or constitutionally impermissible;" and (2) the statements made by Parker to the police were voluntarily made. *See People v. Parker,* No. 396-35 (Schenectady Cty. Ct. Nov. 14, 1996) at 2-3. The County Court therefore denied Parker's suppression motion in all respects. *Id.* at 3.

> FN3. *United States v. Wade,* 388 U.S. 218 (1967). The purpose of a *Wade* hearing is to determine whether identification testimony should be suppressed because the manner in which the identification of the suspect was obtained was unduly suggestive. *See Blas v. Herbert,* No. 02 Civ.6257, 2003 WL 22480093, at *3 n. 2 (S.D.N.Y. Oct. 31, 2003) (citing *Wade*).

> FN4. *People v. Huntley,* 15 N.Y.2d 72 (1965). A *Huntley* hearing is conducted to determine whether a defendant's statements to the police must be suppressed on the grounds that he was subjected to custodial interrogation without the warnings required under *Miranda v. Arizona,* 384 U.S. 436 (1966). *See Harris v. New York,* 202 F.Supp.2d 3, 4 & n. 3 (S.D.N.Y.2001); *see also* New York's Criminal Procedure Law ("CPL") § 710.

While the Initial Indictment was pending against Parker, the District Attorney negotiated a disposition of a related indictment that had been returned against Abdul-Hameed-the driver of the car which the perpetrators used following Green's murder. In conjunction with that agreement, the District Attorney obtained information from Abdul-Hameed concerning the night Green was killed including information about the Amador robbery. Trial Tr. at 1159, 1845.

The District Attorney and Waithe thereafter entered into

negotiations which culminated in a plea agreement in which he pled guilty to a Superior Court Information charging him with the armed robbery of Amador in exchange for an agreed upon sentence of five years imprisonment. Following that agreement, the prosecutor re-presented to the grand jury the criminal case it had developed relating to Waithe, Blount and Parker. That second grand jury, *inter alia:* (1) absolved Waithe of all charges arising out of the crimes involving Green; (2) indicted Blount for the felony murder of Green and the robbery of Amador; and (3) returned a 30-count superceding indictment against Parker. *See, e.g.,* Resp.App. at RA 29-42 ("Superceding Indictment").

On March 21, 1997, at Parker's arraignment on the Superceding Indictment, Attorney Kindlon entered into a voluntary disclosure agreement with the District Attorney which enabled trial counsel to obtain additional discovery not available to him under the discovery requests he had previously filed in connection with the Initial Indictment. Resp.App. at RA 52-53. On May 5, 1997, Kindlon filed a new omnibus motion in which he renewed his request for, *inter alia,* an order suppressing identification testimony relating to Parker as well as his statements to law enforcement agents. *Id.* at RA 49-51. The County Court thereafter scheduled a new *Wade/Huntley* hearing, however Kindlon and the District Attorney ultimately agreed that all of the issues that could have been argued at such hearing had already been raised and fully resolved in the prior hearing before Judge Harrigan. *Id.* at RA 16-28. Therefore, that second suppression hearing was not held and a jury trial on the charges was scheduled by the court.

**\*4** Parker was tried before a jury on the charges in Schenectady County Court with County Court Judge Guy P. Tomlinson presiding. During the course of that trial, Parker's accomplices implicated Parker in the robbery and homicide of Green as well as the robbery of Amador. *See* Trial Tr. at 1019-25; 1047-58; 1308-15, 1766-72, 1822-29. Their testimony was corroborated by the testimony of both Flanders and Heather Fournier (an acquaintance of the perpetrators), as well as New York State Police Investigator Dennis J. Moessner, who had questioned Parker about his involvement in the crimes.

The jury began its deliberations on September 30, 1997.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

*Id.* at 2272. During the course of those deliberations, Judge Tomlinson responded to several requests of the jury, which included a request that the court re-instruct the jury members as to the elements of the charges brought against Parker, as well as the reading back of certain testimony provided at trial. *Id.* at 2272-318. The jury thereafter returned a unanimous verdict in which it found Parker guilty of numerous charges returned against him in the Superceding Indictment, including the top count of first degree murder. *Id.* at 2318-21.

On November 13, 1997, Parker appeared before Judge Tomlinson for sentencing. At that proceeding, the County Court sentenced Parker to a term of life imprisonment without the possibility of parole on the first degree murder conviction, and lesser, concurrent sentences on the other charges related to the Green homicide. *See* Transcript of Sentencing of Reginald Parker (11/13/97) at 33-36. Judge Tomlinson also sentenced Parker to a term of twelve and one-half to twenty five years imprisonment on his conviction on the charge in the Superceding Indictment which charged Parker with the first degree robbery of Amador. *Id.* at 36. That sentence, as well as lesser, concurrent sentences imposed on Parker in light of his convictions on other charges arising out of the robbery of Amador, was ordered to run consecutive to the sentences imposed on Parker which related to Green's murder. *Id.* at 37. Judge Tomlinson also sentenced Parker to a term of one and one third to four years imprisonment on the final count in the Superceding Indictment, which charged Parker with fourth degree conspiracy, which sentence was ordered to run consecutive to all other sentences imposed on him by the court. *Id.* at 37-38.

Parker appealed his conviction to the New York State Supreme Court, Appellate Division, Third Department. In that appeal, Parker's appellate counsel argued that: (1) the County Court's failure to obtain Parker's consent to the waiving of a second *Wade/Huntley* hearing constituted reversible error; (2) testimony elicited by the prosecutor from a police officer during Parker's trial required reversal of the convictions; (3) the sentencing procedures utilized by the District Attorney deprived Parker of his right to equal protection of the law; and (4) the sentence imposed on Parker on his first degree murder conviction was both harsh and excessive. *See* Appellant's Brief on Appeal (9/27/00). Parker then filed a supplemental *pro se*

appellate brief in support of his appeal in which he claimed that: (1) he received the ineffective assistance of trial counsel; and (2) he was deprived of his right to be present at a critical stage of his criminal trial. *See* Supplemental *Pro Se* Appellate Brief ("Supplemental Br."). The District Attorney opposed that appeal, and on January 10, 2002, the Third Department denied Parker's appeal. *See People v. Parker,* 290 A.D.2d 650 (N.Y.App.Div., 3d Dep't.2002). On March 27, 2002, New York's Court of Appeals denied his application for leave to appeal to that court. *See People v. Parker,* 97 N.Y.2d 759 (2002), *recon. denied People v. Parker,* 98 N.Y.2d 679 (2002).

### B. Proceedings in This Court

***5** Petitioner filed a Petition for a writ of habeas corpus, on June 19, 2003. *See* Dkt. No. 1. In his Petition, Parker claims that: (1) he was denied the effective assistance of trial counsel; and (2) he was deprived of his right to be present at all material stages of his trial. *See* Pet. (Dkt. No. 1), Grounds One, Two. By Order filed July 10, 2003, this Court directed Parker to pay the filing fee required for this action and ordered the Respondent to file his response to the Petition. *See* Dkt. No. 3. On September 25, 2003, the Office of the Attorney General for the State of New York, acting on Respondent's behalf, filed an Answer in response to Parker's Petition, together with a memorandum of law in opposition to that application (Dkt. No. 7).

In an application filed on October 6, 2003, Parker sought permission to file "supplemental reply papers in response to opposition." *See* Dkt. No. 8. Parker reiterated that request in a letter addressed to the Court filed on October 31, 2003. *See* Dkt. No. 10. Parker was thereafter granted permission to file a Traverse, not exceeding twenty (20) pages in length, and on December 3, 2003, Petitioner filed a Traverse in this action, which, in addition to offering arguments in support of the claims raised in his Petition, purports to assert numerous new theories in support of his application for federal habeas relief. *See* Traverse (Dkt. No. 11).

### II. DISCUSSION

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

*A. Claims Asserted for the First Time in Traverse*

In his Traverse, Parker asserts, for the first time, his claims that: (1) the verdict was against the weight of the evidence, Traverse (Dkt. No. 11) at 2; (2) the incriminating testimony of the co-defendants was not sufficiently corroborated thereby rendering same insufficient as a matter of law to support the conviction, *id .* at 3; (3) the jury's verdict was inconsistent, *id.* at 4; (4) law enforcement agents never informed Parker of his *Miranda* rights before questioning him about the crimes, *id.* at 7-8; (5) the prosecutor knowingly elicited perjurious testimony, *id.* at 9; (6) he was wrongfully denied his right to testify before the grand juries that returned the Initial and Superceding Indictments, *id.* at 10; (7) his conviction was the result of an "unreasonable" jury verdict and "insufficient, contradictive [*sic* ] and false evidence," *id.* at 12; and (8) the County Court wrongfully failed to provide the jury with curative instructions after the prosecutor engaged in misconduct at Parker's trial, *id.* at 15.

Nowhere in his Petition did Parker raise any of the foregoing claims. *See* Pet. (Dkt. No. 1).[FN5] Furthermore, in requesting permission to file his Traverse, Parker did not indicate that he wished to assert any new or additional claims in this proceeding. To the contrary, Petitioner argued that his Traverse would:

> FN5. Parker did not file any supporting memorandum of law along with his Petition.

substantiate his claims according to issues raised in the state court, and according to the issue [*sic* ] raised in the petition as they relate to the issues raised in state court in [*sic* ] which the respondent is aware of.
*6 See* Aff. in Support of Motion to File Reply (10/2/03) (Dkt. No. 8) at ¶ 6; *see also* Dkt. No. 10 at 3 (Petitioner requesting permission to file a Traverse in excess of ten pages so that he could submit argument and supporting facts relating to claims asserted in his Petition). Significantly, during the over four (4) years that this action has been pending, Parker never filed any motion to amend his habeas petition to assert any of the eight (8) new claims he now seeks to raise through his

Traverse.[FN6]

> FN6. None of the above-referenced claims were raised by Parker in his state court appeal. *See* App. Br. at 1-39; Supplemental Br. at 1-40. Although Parker alludes to certain theories-such as his claim that the testimony of the co-defendants was not sufficiently corroborated-in his Supplemental *Pro Se* Appellate Brief (*see* Supplemental Br. at 5-6), those claims were asserted by Parker therein as support for his claim that his attorney rendered ineffective assistance by failing to lodge appropriate objections during the course of Parker's trial; Petitioner never raised any of the above-cited claims as separate, independent arguments in support of his claim for appellate relief.

Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts provides, in part, that **"[t]he petition** must ... specify all grounds for relief available to the petitioner." *See* Rule 2(c)(1) of the Rules Governing Section 2254 Cases in the United States District Courts (emphasis added). In light of this Rule, it has been recognized that a traverse is not the proper pleading in which to raise additional grounds for habeas relief. *See Haupt v. Moore,* No. 4:03 CV 1438MLM, 2005 WL 1518265, at *2 n. 3 (E.D.Mo. June 24, 2005) (quoting *Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir.1994)). Claims, therefore, that are raised for the first time in such a pleading are not properly considered by the court. *Haupt,* 2005 WL 1518265, at *2 n. 3; *see also Simpson v. United States,* No. 5:03-CV-691, 2005 WL 3159657 (N.D.N.Y. Nov. 25, 2005) (Scullin, C.J.) (declining to consider habeas claims "raised for the first time in [Petitioner's] Traverse").

In light of the foregoing, the Court finds that Parker did not properly raise the claims asserted for the first time in his Traverse, and, therefore, those claims are denied.[FN7]

> FN7. Petitioner's failure to exhaust his newly asserted claims, as well as the one year limitations period imposed by the Antiterrorism

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

and Effective Death Penalty Act of 1996
("AEDPA"), would also appear to impose
significant procedural hurdles to any
consideration of the merits of the claims he has
raised for the first time in his Traverse.

*B. Standard of Review Applicable to Parker's Claims*

Under AEDPA, a federal court may award habeas corpus
relief with respect to a claim adjudicated on the merits in
state court only if the adjudication of the claim: (1) was
contrary to, or involved an unreasonable application of,
clearly established federal law, as determined by the
Supreme Court of the United States; or (2) was based on
an unreasonable determination of the facts in light of the
evidence presented in the State court proceeding. *DeBerry
v. Portuondo,* 403 F.3d 57, 66 (2d Cir.2005) (citing 28
U.S.C. § 2254(d)). AEDPA also requires that in any such
proceeding "a determination of a factual issue made by a
State court shall be presumed to be correct [and][t]he
applicant shall have the burden of rebutting the
presumption of correctness by clear and convincing
evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry,* 403
F.3d at 66; *Boyette v. LeFevre,* 246 F.3d 76, 88 (2d
Cir.2001).

A state court decision violates the "contrary to" clause of
section 2254(d)(1) when it "reaches a result opposite to
the one reached by the Supreme Court on the same
question of law or arrives at a result opposite to the one
reached by the Supreme Court on a 'materially
indistinguishable' set of facts.' " *Earley v. Murray,* 451
F.3d 71, 74 (2d Cir.2006) (citing *Williams v. Taylor,* 529
U.S. 362, 405-06 (2000)). A federal habeas court may
only grant the writ under the "unreasonable application"
clause of the section when the state court's decision
"identifies the correct rule of law but applies that principle
to the facts of the prisoner's case in an unreasonable way."
*Earley,* 451 F.3d at 74 (citing *Williams,* 529 U.S. at 413).
A federal court engaged in habeas review is not charged
with determining whether the state court's determination
was merely incorrect or erroneous, but instead whether
such determination was "objectively unreasonable."
*Williams,* 529 U.S. at 409; *see also Sellan v. Kuhlman,*
261 F .3d 303, 315 (2d Cir.2001). Objectively
unreasonable means " 'some increment of incorrectness

beyond error' " is required in order to grant a federal
habeas application. *Earley,* 451 F.3d at 74 (quoting
*Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000)).

*B. Substance ofParker's Claims*

**1. Ground One**

**\*7** In his first ground for relief, Parker argues that he
received the ineffective assistance of counsel. *See* Pet.
(Dkt. No. 1), Ground One.

*i. Clearly Established Supreme Court Precedent*

In order to prevail on a claim of ineffective assistance of
counsel within the framework established by the Supreme
Court in *Strickland v. Washington,* 466 U.S. 668 (1984),
a habeas petitioner must satisfy a two-part test. First, he
must demonstrate that counsel's performance was so
deficient that his attorney was not functioning as "counsel"
within the meaning of the Sixth Amendment to the U.S.
Constitution. *Id.* at 688. In other words, a petitioner must
show that his attorney's performance "fell below an
objective standard of reasonableness." *Id.* Second, a
petitioner must show that counsel's deficient performance
prejudiced him. *Id.* at 694. To establish the "prejudice"
prong of the *Strickland* test, a petitioner must show that a
"reasonable probability" exists that, but for counsel's
error, the outcome of the trial would have been different.
*Id.; see also Wiggins v. Smith,* 539 U.S. 510, 521 (2003)
("the legal principles that govern claims of ineffective
assistance of counsel" were established in *Strickland* ).

The Supreme Court has also recognized that a court need
not necessarily address both components of the *Strickland*
inquiry; as that Court noted, "there is no reason for a court
deciding an ineffective assistance claim to ... address both
components of the inquiry if the defendant makes an
insufficient showing on one." *Strickland,* 466 U.S. at 697.

*ii. Contrary To, or Unreasonable Application Of, Clearly
Established Supreme Court Precedent*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

In support of his claim that his defense counsel rendered ineffective assistance, Parker argues that his trial attorney: (1) failed to object when the prosecutor vouched for the credibility of his witnesses; (2) did not move to have the verdict set aside due to insufficient evidence or based upon a claim that the verdict was against the weight of the evidence; (3) waived Parker's right to have a second *Wade/Huntley* hearing; (4) failed to argue that the testimony of the co-defendants was not sufficiently corroborated; (5) performed an inadequate pre-trial investigation; (6) did not claim that Parker was not advised of his *Miranda* warnings before he was questioned by law enforcement officers; (7) failed to object to the manner in which the prosecutor questioned Parker regarding his interaction with Investigator Moessner; and (8) did not object when the prosecutor knowingly allowed its witnesses to provide false and perjurious testimony. *See* Traverse (Dkt. No. 11) at 1-14. Petitioner also appears to assert that the cumulative effect of counsel's errors amounted to a violation of Parker's Sixth Amendment right to effective counsel. *Id.* at 16.

These claims were raised by Parker in the state courts through his Supplemental *Pro Se* Appellate Brief. *See* Supplemental Br. at 1-34. The Third Department found these claims to be "without merit." *Parker,* 290 A.D.2d at 652. This Court must, therefore, ascertain whether that finding is either contrary to, or represents an unreasonable application of, clearly established Supreme Court precedent.

**A. Failure to Object to Prosecutorial Misconduct**

**\*8** Parker's Traverse does not clearly articulate the manner in which he now claims that the prosecutor improperly vouched for the credibility of his witnesses. *See* Traverse (Dkt. No. 11) at 1. In his Supplemental *Pro Se* Appellate Brief, however, Parker claimed that trial counsel failed to object when the prosecutor vouched for the credibility of his witnesses, and otherwise committed misconduct, during his summation. *See* Supplemental Br. at 23-30. Federal courts may properly look to the state court record where a *pro se* petitioner's submissions fail to reveal the factual underpinnings of a particular habeas claim. *See*

*Gillis v. Edwards,* 445 F.Supp.2d 221, 229 n. 6 (N.D.N.Y.2006) (McCurn, Senior D.J.) (citation omitted). Therefore, this Court will presume that this aspect of Parker's habeas claim relates to the summation delivered by the prosecution.

The record, however, does not support Parker's claim that the prosecutor vouched for the credibility of his witnesses. Rather, the comments cited by Parker in support of this claim appear to this Court to have been proper argument on the part of the prosecution, rather than impermissible vouching. For example, the prosecutor could properly argue that Parker's accomplices accepted responsibility for their actions because they had entered into plea agreements prior to Parker's trial. *See* Trial Tr. at 2077-78. Referring to one of the prosecution witnesses as a "nice lady," *see id.* at 2081, does not constitute misconduct, and, contrary to Petitioner's claim, Supplemental Br. at 24, the prosecutor did not claim that Parker "looked like" a murder. Rather, the prosecutor specifically cautioned the jury to ***avoid*** believing that any individual "looks like a murder," and instead argued that "no one knows what a murderer looks like." Trial Tr. at 2085. Furthermore, Petitioner is incorrect in arguing that the prosecutor expressed his personal knowledge as to Parker's guilt. *Compare* Supplemental Br. at 24 *with* Trial Tr. at 2081. Nor has Petitioner established that the other comments of the prosecutor during his summation were inflammatory, disparaging to Parker's counsel, or otherwise improper.[FN8]

[FN8]. Parker's claim that the prosecutor improperly shifted the burden of proof to Parker during his closing argument is not supported by the record. *Compare* Supplemental Br. at 26-28 *with* Trial Tr. at 2125-31.

In sum, the comments of the prosecutor during his summation were fair comment based upon the evidence adduced at trial, and therefore not objectionable. *See United States v. Walker,* 155 F.3d 180, 187 (3d Cir.1998) (citing *Lawn v. United States,* 355 U.S. 339, 359 n. 15 (1958)) (other citation omitted); *Almonte v. People of State of New York,* No. 07 CV 70, 2007 WL 1674167, at *3 (E.D.N.Y. June 7, 2007); *United States ex rel. Haynes v. McKendrick,* 350 F.Supp. 990, 996-97 (S.D.N.Y.1972), *aff'd,* 481 F.2d 152 (2d Cir.1973); *see,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

*e.g., United States v. Smith, 778 F.2d 925, 929 (2d Cir.1985)* ("final arguments of counsel may be vigorous and robust if based on the evidence in the record."). Parker's trial counsel, therefore, did not render ineffective assistance in failing to argue that the prosecutor engaged in misconduct in delivering his summation at Parker's trial.

### B. Failure to Challenge Adequacy of Evidence Adduced at Trial

**\*9** Petitioner next faults counsel for failing to argue that the verdict was against the weight of the evidence and/or not supported by legally sufficient evidence. *E.g.,* Pet. (Dkt. No. 1), Ground One; Traverse (Dkt. No. 11) at 3; *see also* Supplemental Br. at 31-34.

Substantial evidence which established Parker's guilt of the charged crimes, however, was presented at trial. Specifically, both Blount and Abdul-Hameed implicated Parker in the robbery and related crimes concerning Amador, and those men, as well as McQueen, provided testimony that established Parker's complicity in Green's murder and the crimes related to that homicide. *See* Trial Tr. at 1019-25, 1047-58, 1308-15, 1766-72, 1822-29. Chemical analysis of blood found in the car the perpetrators used to flee the crime demonstrated that such blood was consistent with that of Green, *id .* at 1929, and blood consistent with that belonging to both Green and Parker was found on pants Parker admitted to wearing the day the victim was killed. *Id.* at 1550-51; 1919-20.[FN9] Additionally, Fournier overheard Parker discuss his plan to rob a "weed spot" the day Amador and Green were robbed, *id.* at 1732, and Flanders testified that later on that same day, she observed Parker with a wad of money,[FN10] and overheard a group of men that included Parker boasting about recently committing a robbery at a drug house. *Id.* at 1211-16. She also noticed that Parker was nervously pacing around in her apartment after Green was killed, *id.* at 1219, and testified that he had offered her $1000.00 if she agreed to falsely state that he was with her the evening and night of March 20, 1996. *Id.* at 1227-28. Moreover, Fournier testified that she overheard Parker plan to leave for the Gloversville area after committing the robbery, *id.* at 1735, the location where the perpetrators ultimately fled after committing the crimes. *Id.* at 1320-21.

FN9. When Investigator Moessner asked Petitioner if he had sustained a cut on his leg around the time of Green's death, Parker responded that he had not been cut and further declared that had he not been with anyone who was bleeding around that time. Trial Tr. at 1551.

FN10. Flanders testified that prior to March 20, 1996, she never saw Parker with any money. Trial Tr. at 1209.

In light of the foregoing, trial counsel properly refrained from arguing that the jury's verdict was against the weight of the evidence, or, alternatively, that there was legally insufficient evidence adduced at trial to establish Parker's guilt.[FN11]

FN11. In New York, the standard for determining the legal sufficiency of evidence "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Carthrens, 171 A.D.2d 387, 392 (N .Y.App. Div. 1st Dep't.1991)* (citing *Jackson v. Virginia, 443 U .S. 307, 319 (1979)* (other citations omitted)). By contrast, weight of the evidence review "requires the appellate court, viewing the evidence in a neutral light, to make its own independent determination as to the 'relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony.' " *Carthrens, 171 A.D.2d at 392* (quoting *People v. Bleakley, 69 N.Y.2d 490, 495 (1987)*).

### C. Failure to Argue Lack of Corroboration

Advancing to Parker's claim that counsel wrongfully failed to argue that the testimony of Parker's co-defendants was not sufficiently corroborated, [FN12] the Court notes that under the CPL:

FN12. Parker's ineffectiveness claim relating to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

counsel's waiver of a second suppression hearing is addressed by this Court in conjunction with Parker's second ground for relief.

A defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of such offense. *See* CPL § 60.22(1). This law provides that the corroborative evidence "connect the defendant with the commission of the crime to be proven, not ... prove [he] committed it." *Longtin v. Walker*, 99-CV-2182, slip op. at 27 (N.D.N.Y. Feb. 25, 2004) (Sharpe, D.J.) (quoting *People v. Smith*, 55 N.Y.2d 945, 946 (1982) (other citation omitted)).

**\*10** In discussing this corroboration requirement, New York's Court of Appeals has observed that: "[t]he corroborative evidence need not establish all the elements of the offense[;][s]eemingly insignificant matters may harmonize with the accomplice's narrative so as to provide the necessary corroboration." *People v. Breland* 83 N.Y.2d 286, 292-93 (1994) (internal quotations and citations omitted). Significantly, "[i]n assessing corroborative evidence, 'proof of the elements of the crimes is not the determinative template ... and much less evidence and of a distinctly inferior quality is sufficient to meet the slim corroborative linkage to otherwise independently probative evidence from accomplices.' " *Nova v. Ercole*, No. 06 Civ. 562(NRB), 2007 WL 1280635, at *4 (S.D.N.Y. Apr. 30, 2007) (quoting *Breland*, 83 N.Y.2d at 294) (other citation omitted).

As noted above, in addition to the testimony of Parker's accomplices, witnesses for the prosecution established the following facts which were strongly suggestive of Parker's guilt: (1) trace amounts of blood consistent with that belonging to Green were found in the car Parker used when leaving the scene of the crime; (2) the blood of both Green and Parker was found on Parker's jeans; (3) Fournier overheard Parker discuss his plan to rob a home that sold marijuana the day of the crimes; (4) later that same day, Flanders observed Parker with a quantity of money and overheard a group of men (including Parker) discussing their recent robbery of a drug house; (5) Parker offered Flanders $1000.00 to provide Parker with a false

alibi; and (6) after the crimes, Parker fled to Gloversville, the precise location to which Fournier testified Parker declared he would travel after the robbery. That evidence, particularly when viewed in combination with the evidence which established that the location of the shell casings in the apartment in which Green was killed was inconsistent with Parker's statement to law enforcement agents as to where he was located at the time Green was shot, but entirely consistent with him having shot the victim, *see* Trial Tr. at 1621-23, clearly surpassed the relatively modest corroboration hurdle posed by CPL § 60.22(1). Therefore, Parker's trial counsel did not render ineffective assistance in failing to argue that the testimony of the accomplices of Parker was not sufficiently corroborated.

**D. Inadequate Investigation**

Parker next contends that his trial counsel rendered ineffective assistance by failing to adequately prepare Parker's defense to the charges against him. In support of this contention, Parker argues that if counsel had conducted an adequate investigation, he would have learned that the evidence at the crime scene was inconsistent with the trial testimony provided by the accomplices. *See* Traverse (Dkt. No. 11) at 2-5. He further argues that Flanders could not have seen Parker in her bathroom holding the wad of cash about which she testified, *id.* at 5-6, and generally asserts that counsel did not properly investigate the evidence upon which his prosecution was based. *Id.* at 10.

**\*11** Petitioner's argument that counsel failed to adequately prepare for Parker's trial is premised in large part on his claims that the prosecution witnesses testified falsely and/or inconsistently with one another. Specifically, he argues that: (1) Fournier's testimony was "false and inconsistent," *id.* at 2; (2) McQueen's testimony contradicted the testimony provided by the other accomplices as well as Fournier, *id.;* (3) the evidence presented by the prosecution that Parker pistol-whipped Amador was "false," *id.;* the prosecution's evidence was replete with "lies, inconsistencies and contradictions as well as manipulated evidence," *id.* at 3; (4) the testimony of the co-defendants was "inconsistent [and] untrustworthy," *id.;* (5) Blount's testimony was false,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

"unbelievable and untrustworthy," *id.;* (6) the crime scene evidence was inconsistent with the "false testimony that was concocted" by Parker's accomplices, *id.* at 5; (7) Investigator Moessner "tampered" with Parker's statement, *id.;* (8) the testimony of McQueen and Blount contradicted the testimony provided by Flanders, *id.* at 6; and (9) Abdul-Hameed's testimony contradicted the testimony provided by McQueen, *id.* at 7.

These claims, however, fail to acknowledge the fact that "[i]t is the jury's function to resolve inconsistencies present in the evidence and to determine which evidence it will credit." *People v. Johnson,* 24 A.D.3d 967, 968 (N.Y.App.Div., 3d Dep't.2005); *People v. Cotto,* 189 A.D.2d 707, 707 (N.Y.App.Div., 1st Dep't.1993) (inconsistencies in testimony "were for the jury to resolve"); *see also Quartararo v. Hanslmaier,* 186 F.3d 91, 95-96 (2d Cir.1999) (federal habeas courts must not assume "the position of a thirteenth juror;" "inconsistencies [are] for the jury to resolve," not the district court).

Parker has submitted nothing short of pure surmise which demonstrates that had trial counsel performed a more thorough pretrial investigation, the jurors would have been more aware of the claimed inconsistencies in the prosecution witnesses' testimony.[FN13] Moreover, Parker has not substantiated the claims he had raised in support of this aspect of his motion. For example, Parker offers no evidence that supports his claim that it was "impossible" for Flanders to observe Parker holding a wad of bills in her bathroom, and such claim appears to be highly suspect in light of that witness's testimony that she was walking by her bathroom at that time while the door to that room was open. *See* Trial Tr. at 1215-16. Nor has Parker offered any evidence that substantiates his claim, *see* Traverse (Dkt. No. 11) at 7, that Flanders' testimony regarding his attempt to create a false alibi was anything other than truthful. Moreover, although Parker now claims that his trial attorney "did not investigate the full facts of the evidence that [the] prosecution used at trial," *id.* at 10, the Court notes that prior to trial, Parker's counsel filed a comprehensive omnibus motion. *See* Record on Appeal at R32-38. After the County Court ruled on that application, *id.* at R172-74, counsel filed a motion that sought: (1) the dismissal of all charges brought against Parker; (2) an order directing the prosecution to provide defense counsel

with all *Brady* and *Rosario* material in its possession; (3) a court order suppressing all statements made by Parker to law enforcement officials; (4) the scheduling of pretrial *Huntley* and *Molineux* hearings and (5) the suppression of any identification testimony. *Id.* at R184-92. Additionally, as noted above, Parker's trial counsel actively participated in the pretrial hearing over which Judge Harrigan presided on September 13, 1996. Furthermore, the trial transcript establishes that defense counsel thoroughly cross-examined the prosecution's witnesses and lodged appropriate objections during the course of Parker's trial-conduct that strongly suggests that counsel had adequately prepared for Petitioner's trial.[FN14]

> FN13. Parker himself conceded in his Supplemental *Pro Se* Appellate Brief that his trial attorney "made appropriate motions and objections during the course of the trial," and "vigorously cross-examined some of [Parker's] co-defendant witnesses, and strenuously argued [Parker's] position to the jury." *See* Supplemental Br. at 2.

> FN14. At the conclusion of Petitioner's trial, the County Court specifically complimented both the prosecutor and defense counsel "for the able manner in which each of them ... represented their client." Trial Tr. at 2183-84.

*12 "A petitioner's 'bald assertion that counsel should have conducted a more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably.' " *Campbell v. Greene,* 440 F.Supp.2d 125, 149 (N.D.N.Y.2006) (McCurn, Senior D .J.) (quoting *Atkinson v. United States,* No. 05-CV-286, 2005 WL 3555946, at *7 (N.D.N.Y. Dec. 28, 2005) (McAvoy, Senior D.J.) (other quotations and citations omitted). Since Petitioner's claim that his trial counsel did not adequately prepare a defense for Parker is squarely contradicted by the state court record, this theory does not support his claim alleging ineffective assistance.

### E. Failure to Challenge Voluntary Nature of Statements to Police

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

Petitioner next seems to claim that his trial attorney wrongfully failed to object at trial to the admission into evidence of Parker's statements to, and interactions with, Investigator Moessner. Traverse (Dkt. No. 11) at 8. In a related claim, Parker argues that counsel wrongfully conceded Parker's guilt of the robbery charges in the Superceding Indictment. *See* Supplemental Br. at 19-22.

However, it is clear that counsel attempted to use Parker's statements to law enforcement agents as proof that Parker had cooperated with the police during the criminal investigation below. During counsel's cross-examination of Investigator Moessner, Petitioner's attorney elicited testimony which demonstrated that Parker had cooperated with the police, admitted his complicity in the robberies but denied killing Green. *See* Trial Tr. at 1599-1609. Defense counsel reiterated this theme in his summation, when he noted that Parker had provided a detailed account of his actions on the night of March 20, 1996 to Investigator Moessner, had made "no bones" about his involvement in the robberies but consistently denied shooting Green. *Id.* at 2062-63.

Courts have held that it is a reasonable strategy for a trial attorney to concede his client's guilt as to certain crimes in the hopes of obtaining an acquittal on more serious charges in an indictment. *See Farrington v. Senkowski, 214 F.3d 237, 244 (2d Cir.2000)* (sound trial strategy where defense counsel conceded defendant's guilt of certain crimes in an effort "to persuade the jury to acquit on the more serious charges") (citing *Strickland,* 466 U.S. at 690); *Brown v. Rick,* No. 01 CIV.4310 DC, 2003 WL 22801397, at *5 (S.D.N.Y. Nov. 25, 2003) (conceding petitioner's guilt of one crime while contesting guilt as to other charge constituted "a reasonable tactical decision"); *Nunez v. Miller,* No. 00 CIV 0966(ERK), 2001 WL 1773731, at *7 (E.D.N.Y. July 12, 2001) ("ample strategic reason" existed for defense counsel's concession that his client committed lesser included offense).

Counsel's use at trial of Parker's statements to the police, as well as counsel's concession of Petitioner's guilt of the robbery charges, was clearly part of counsel's trial strategy of defending Parker against the most serious charges brought against him in the Superceding Indictment, including the first degree murder charge. This theory,

therefore, does not support Parker's ineffectiveness claim.

**F. Failure to Object to False Testimony**

**\*13** Parker also contends that by the conclusion of his trial, his attorney "realize[d] that the prosecutors [*sic* ] evidence was false as well as ... tainted," but that counsel nevertheless "failed to protect [Parker's] defense by asking for a mistrial on insufficient evidence." Traverse (Dkt. No. 11) at 14.

However, other than the fact that the version of events about which the prosecution witnesses testified is substantially different from the statements now offered by Parker as to what transpired on the evening and night of March 20, 1996, he has failed to demonstrate that any of the testimony at his criminal trial was false or perjurious. Petitioner has failed to provide the Court with any evidence, other than his self-serving statements, that supports his claim that the prosecutor elicited false testimony at Parker's trial.[FN15] Since he has not established that false or perjurious testimony was admitted into evidence at his trial, he has failed to demonstrate that counsel rendered ineffective assistance in failing to move for a mistrial based upon the purported admission of such testimony.

> FN15. Petitioner's claim regarding counsel's failure to argue that there was insufficient evidence adduced at trial to establish Parker's guilt has already been addressed by this Court in Section II(B)(1)(ii)(B) of this Memorandum-Decision and Order.

**G. Cumulative Effect of Claimed Errors**

Petitioner additionally appears to assert that the cumulative effect of his trial attorney's errors also establishes that such counsel rendered ineffective assistance and deprived him of a fair trial. *See* Traverse (Dkt. No. 11) at 16.

In light of the Court's finding that all of the theories

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

advanced by Petitioner in support of his ineffective assistance claim are without merit, his claim that the cumulative effect of such errors entitles him to habeas intervention must also fail. *See, e.g., Nicholas v. Smith,* No. 02 CV 6411(ARR), 2007 WL 1213417, at * 16 (E.D.N.Y.2007); *Shepherd v. Portunda,* No.99-CV-1866 (JBW), 2003 WL 22964538, at *9 (E.D.N.Y. Nov 10, 2003)* ("Trial counsel's alleged errors, whether considered individually or cumulatively, did not deprive petitioner of constitutionally ineffective assistance of counsel meriting habeas corpus relief"); *White v. United States,* No. 99 CIV. 11809, 2000 WL 546426, at *6 (S.D.N.Y. May 4, 2000)* ("[p]etitioner further maintains that the cumulative effect of the errors asserted above deprived him of a fair trial. Because all of [petitioner's] earlier points have been rejected, this point must be rejected as well").

In sum, Parker has not established that he received the ineffective assistance of trial counsel. He has therefore failed to establish that the Third Department's decision rejecting this aspect of his appeal, *see Parker,* 290 A.D.2d at 652, is either contrary to, or represents an unreasonable application of, *Strickland* and its progeny. Parker's first ground for relief, therefore, is denied.

### 2. Ground Two

In his second ground, Parker asserts that he was deprived of his constitutional right to be present at all material stages of his trial. Pet. (Dkt. No. 1) at Ground Two. Specifically, he alleges that his trial attorney and the prosecutor engaged in a "private discussion," after which his counsel agreed to waive Parker's right to a second suppression hearing. *Id.* Petitioner asserts that as a result, he was wrongfully deprived of his right to "give relevant testimony," and to provide argument in support of his request to suppress certain evidence, including his statements to the police. *Id.*

### i. Clearly Established Supreme Court Precedent

**\*14** It is well settled that a criminal defendant's presence at trial is required "to the extent that a fair and just hearing would be thwarted by his absence." *Snyder v.*

*Massachusetts,* 291 U.S. 97, 107-08 (1934), *overruled on other grounds by Malloy v. Hogan,* 378 U.S. 1 (1964); *see Illinois v. Allen,* 397 U.S. 337, 338 (1970). This guarantee encompasses the right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *Faretta v. California,* 422 U.S. 806, 819 n. 15 (1975), and assures that an accused may even attend hearings in which he is not actually confronting witnesses or evidence against him. *See Kentucky v. Stincer,* 482 U.S. 730, 745 (1987); *United States v. Gagnon,* 470 U.S. 522, 526 (1985)* (*per curiam* ). This right stems from an individual's Sixth Amendment right to confront witnesses, as well as his due process right to attend hearings in which he is not actually confronting witnesses or evidence against him. *See Stincer,* 482 U.S. at 745. As the Supreme Court has recognized, however, the right to be present is not absolute; it is triggered only when the defendant's "presence has a relation, reasonably substantial, to the fu[l]lness of his opportunity to defend against the charge." *Snyder,* 291 U.S. at 105-06. Thus, there is no constitutional right to be present when the defendant's presence "would be useless, or the benefit but a shadow." *Snyder,* 291 U.S. at 106-07.

Additionally, in *Jones v. Barnes,* 463 U.S. 745 (1983), the United States Supreme Court recognized that criminal defendants have "the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Id.* at 751 (citing *Wainwright v. Sykes,* 433 U.S. 72, 93 n. 1 (1977)). Where a fundamental right of the defendant is implicated, due process mandates that he personally make an informed waiver of such right. *New York v. Hill,* 528 U.S. 110, 114 (2000) (citing *Johnson v. Zerbst,* 304 U.S. 458, 464-465 (1938)). All other rights, however, may be waived by counsel because " 'the lawyer has-and must have-full authority to manage the conduct of the trial.' " *Hill,* 528 U.S. at 115 (quoting *Taylor v. Illinois,* 484 U.S. 400, 417-418 (1988)). Thus, decisions by counsel pertaining to the conduct of the trial, such as "what arguments to pursue, ... what evidentiary objections to raise, ... and what agreements to conclude regarding the admission of evidence" may properly be made by counsel and bind his client. *Hill,* 528 U.S. at 115 (citations omitted).

### ii. Contrary To, or Unreasonable Application Of, Clearly

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

*Established Supreme Court Precedent*

The Third Department rejected Parker's claim that his trial attorney wrongfully waived Parker's right to a second suppression hearing, opining that:

> To be sure, criminal defendants retain authority over various fundamental decisions pertaining to their case. With respect to strategic and tactical decisions concerning the conduct of trials, by contrast, defendants are deemed to repose decision-making authority in their lawyers. Said differently, by accepting counseled representation, a defendant assigns control of much of the case to the lawyer, who, by reason of training and experience, is entrusted with sifting out weak arguments, charting strategy and making day-to-day decisions over the course of the proceedings. The decision to forego a duplicate suppression hearing as superfluous is precisely the type of day-to-day decision making over which an attorney, in his or her professional judgment, retains sole authority.

**\*15** *Parker,* 290 A.D.2d at 651-52 (internal quotations and citations omitted).

This Court, therefore, is charged with ascertaining whether that decision is either contrary to, or represents an unreasonable application of, the above-referenced Supreme Court precedent.

The Court initially finds any claim that Parker was denied his right to be present at a material stage of his trial to plainly be without substance. Although Parker states that he was not present at a "private discussion" between his counsel and the prosecutor, he never claims that the trial judge was present at that meeting. Additionally, the record reflects that Parker was clearly aware of the decision made by counsel to forego a second suppression hearing, and that he voiced no objection to that strategic decision of his counsel. Specifically, the transcript of a June 17, 1997 hearing before the County Court reflects the following exchange between that court, Parker's counsel, and the prosecutor concerning the issue of whether or not a second *Wade / Huntley* would be held:

THE COURT: Good morning.

MR. MUELLER: Good morning, your Honor.

THE COURT: This matter is scheduled today for a Huntley and Wade hearing this morning.

MR. KINDLON: That's correct, your Honor. I can speak to this issue if it's permissible.

MR. MUELLER: Please.

MR. KINDLON: Your Honor, my client was initially indicted on an indictment charging, among other things, murder in the Second Degree, and during the pendency of that initial prosecution, Huntley and Wade hearings were duly conducted and concluded, and in fact there has been a decision rendered by Judge Harrigan. Between the commencement of the prosecution and the present time there was a superseding indictment which charged in its top count Murder in the First Degree, and new motions were interposed and Huntley and Wade hearings were ordered.

Mr. Mueller and I have had occasion to go through the [CPL § ] 710.30 notices and the other relevant facts and circumstances of the case, and we have determined that there are no new issues to be determined in the Huntley and Wade hearing which was ordered by the Court pursuant to the motions that were filed after the superseding indictment. Consequently, there's really no necessity to conduct a hearing, and we are here this morning to affirm that on the record.

THE COURT: Mr. Mueller?

MR. MUELLER: All of that is correct, your Honor....

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))

THE COURT: Anything else for the record?

MR. MUELLER: One thing, your Honor. I think that in fairness I will provide to Mr. Kindlon in advance of the trial whatever materials in the nature of Rosario would have been provided to him had we gone through a second or repetitive Huntley and Wade hearing....

THE COURT: That's very sensible.

(There was discussion off the record between Mr. Kindlon and the defendant.)

MR. KINDLON: We're all set, Judge.

*See* Resp.App. at RA21-27.

**\*16** The foregoing conclusively establishes that Parker: (1) was aware of his attorney's decision to waive the second hearing; (2) heard the reasons for counsel's strategic decision to forego that hearing; (3) had a discussion with his attorney after the decision to waive the hearing was placed on the record but before that hearing concluded; and (4) voiced no objection to his attorney's decision to waive the second hearing. Thus, his claim that he not present for the material stage in his proceeding where that hearing was waived is squarely contradicted by the record.

Moreover, Petitioner's argument that his trial attorney improperly waived that hearing without Parker's consent,[FN16] *see* Petition, Ground Two, appears to overlook the fact that the Second Circuit has specifically noted that "defense counsel may waive on behalf of defendant ... strategic and tactical matters such as the selective introduction of evidence, stipulations, objections and pre-trial motions." *United States v. Plitman,* 194 F.3d 59, 63 (2d Cir.1999) (defense counsel could properly waive client's Sixth Amendment right of confrontation); *see also Key v. Artuz,* No. 99-CV-161, 2002 WL 31102627, at *7 (E.D.N.Y. Sept. 16, 2002) (decision to withdraw motion to suppress videotaped statement was a

tactical decision that could properly be made by defense counsel alone).

FN16. Of course, Parker's consent to counsel's decision to waive the hearing could properly be inferred by his failure to voice any objections at the June 17, 1997 hearing before the County Court. *E.g. Maula v. Freckleton,* 972 F.2d 27, 29 (2d Cir.1992) (petitioner's consent "could ... be properly inferred from [petitioner's] failure to object").

In the criminal matter below, trial counsel noted that there were no new issues to be resolved if a second *Wade/Huntley* hearing were held, Resp.App. at RA21, a characterization with which the prosecutor agreed. *Id.* at RA23. The prosecutor described the proposed second hearing as "repetitive," *id.* at RA27, and the Third Department characterized that hearing as both "duplicat[ive]" and "superfluous." *Parker,* 290 A.D.2d at 651.

The record firmly establishes that trial counsel properly waived Parker's right to conduct the second suppression hearing. That stipulation of counsel-of which Parker was plainly aware and to which he voiced no objection-was entirely appropriate in light of the relevant facts and circumstances, and in no way infringed on, or otherwise violated, Parker's constitutional rights. He, therefore, cannot establish that the Third Department's decision denying this aspect of his appeal is either contrary to, or represents an unreasonable application of, the Supreme Court precedent noted above. His second and final ground for relief, therefore, is denied.

Accordingly, it is hereby

**ORDERED,** that Parker's Petition (Dkt. No. 1) is **DENIED** and **DISMISSED;** and it is further

**ORDERED,** that the Clerk of Court serve a copy of this Order on the parties.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071745 (N.D.N.Y.)
(Cite as: 2007 WL 2071745 (N.D.N.Y.))


**IT IS SO ORDERED.**


N.D.N.Y.,2007.
Parker v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2071745
(N.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Robert SIMPSON, Petitioner,
v.
UNITED STATES OF AMERICA, Respondent.
**No. 5:03-CV-691, 5:00-CR-373.**

Nov. 25, 2005.

Robert Simpson,[FN1] Syracuse Pavilion, Syracuse, New York, Petitioner pro se.

> **FN1.** The Bureau of Prisons recently informed the Court that Petitioner is no longer confined at Ray Brook FCI. Rather, he is at Syracuse Pavilion in Syracuse, New York, with a tentative release date in late November 2005.

The United States Attorney, Syracuse, New York, for Respondent, John M. Katko, AUSA, of counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. BACKGROUND [FN2]

> **FN2.** The Court has derived the background information relating to this action from the materials that the parties submitted in conjunction with the present civil proceeding, *Simpson v. United States,* 5:03-CV-691 ("Action No. 03-CV-691"), as well as the underlying criminal action, *United States v. Sugamele,*

5:00-CR-373 ("Action No. 00-CR-373").

**\*1** On July 31, 2000, a federal grand jury indicted Petitioner Robert Simpson and charged him with various criminal acts. *See* Action No. 00-CR-373, Dkt. No. 1 ("Indictment"). On August 3, 2000, Petitioner appeared before then-Magistrate Judge Gary L. Sharpe, at which time he was arraigned and a not guilty plea was entered on his behalf. *See* Action No. 00-CR-373, Dkt. No. 6. After reviewing the financial affidavit that Petitioner filed in accordance with the Criminal Justice Act in the underlying criminal matter, then-Magistrate Judge Sharpe determined that Petitioner was eligible for court-appointed counsel; therefore, he directed the Office of the Federal Public Defender for the Northern District of New York to file a Notice of Appearance on Petitioner's behalf. *See* Action No. 00-CR-373, Dkt. No. 10. Assistant Federal Public Defender David G. Secular, Esq. ("Mr. Secular" or "assigned counsel") thereafter entered an appearance in that criminal action on Petitioner's behalf. *See* Action No. 00-CR-373, Dkt. No. 18.

By letter dated March 15, 2001, Mr. Secular advised Assistant United States Attorney John Katko ("AUSA Katko") that, although defense counsel wanted to "resolve" the criminal matter pending against his client, Mr. Secular was nevertheless "troubled over the requirement" that the Government had imposed in the proposed plea agreement that Petitioner plead guilty both to the narcotics conspiracy and to the § 924(c) count [FN3] asserted in the Indictment. *See* Action No. 03-CV-691, Dkt. No. 21. AUSA Katko subsequently informed Mr. Secular in a letter that, notwithstanding Mr. Secular's concerns, the Government intended to pursue the firearms charge against Petitioner. *See* Action No. 03-CV-691, Dkt. No. 22. In that letter, AUSA Katko also requested that defense counsel inform the Government no later than March 27, 2001, whether his client intended to enter into a plea agreement concerning the charges that the Government had brought against him. *See id.* Petitioner subsequently executed a plea agreement in which he pled guilty to Counts One and Three of the Indictment in full satisfaction of all charges brought against him in that accusatory instrument. *See* Action No. 00-CR-373, Dkt. No. 37 ("Plea Agreement"). In that Plea Agreement,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

Petitioner specifically pled guilty to (1) conspiring to distribute and possessing with intent to distribute cocaine, cocaine base/crack cocaine and marijuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One), and (2) knowingly using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three). *See* Plea Agreement at ¶ 2. Petitioner also acknowledged that he had been thoroughly advised of his rights to appeal his conviction and sentence, that he fully understood such rights, but that he was, among other things, "knowingly and expressly waiv[ing] all rights, conferred by 18 U.S.C. § 3742, to appeal any sentence of imprisonment of 180 months or less." *See id.* at ¶ 14.[FN4]

> FN3. Section 924(c) of Title 18 of the United States Code prohibits the knowing use or carrying of a firearm "during and in relation to any ... drug trafficking crime." 18 U.S.C. § 924(c).

> FN4. Section 3742 of Title 18 of the United States Code authorizes a defendant to file a notice of appeal in the district court for review of an otherwise final sentence if, among other things, the sentence (1) was imposed in violation of law, (2) was imposed as a result of an incorrect application of the United States Sentencing Guidelines, or (3) was greater than the sentence specified in the applicable guideline range. *See* 18 U.S.C. § 3742(a)(1)-(3).

**\*2** On March 30, 2001, this Court presided over a hearing relating to the Plea Agreement into which Petitioner had entered with the Government. At that hearing, Petitioner indicated that he was satisfied with the advice and representation that he had received from Mr. Secular in conjunction with the criminal matter. *See* Transcript of Change of Plea, dated March 20, 2001 ("Plea Tr."), Action No. 03-CV-691, Dkt. No. 23, at 4. Petitioner thereafter acknowledged that he (1) had thoroughly reviewed the substance of the Plea Agreement with his attorney, (2) understood everything contained in that agreement, and (3) did not have any questions about anything contained within that document. *See* Plea Tr. at 5. After Mr. Secular advised the Court of the actions he

had undertaken to ensure that Petitioner understood all the terms and conditions of the Plea Agreement, this Court advised Petitioner of the consequences of his pleading guilty to Counts One and Three of the Indictment. *See id.* at 5-7. The Government then placed the factual basis for the guilty plea on the record-the accuracy of which Petitioner expressly acknowledged. *See id.* at 8. This Court then specifically noted that, pursuant to the terms of his Plea Agreement, Petitioner was waiving his right to appeal any sentence of imprisonment of 180 months or less. *See id.* at 9. Since the record established that Petitioner was fully capable of knowingly and voluntarily entering his plea, this Court accepted his guilty plea to the First and Third Counts in the Indictment. *See id.* at 11-12.

On April 22, 2001, this Court signed a stipulation that permitted Mr. Secular to withdraw as Petitioner's counsel and that noted the appearance of Randel A. Scharf, Esq. ("Mr. Scharf" or "retained counsel") on Petitioner's behalf. *See* Action No. 00-CR-373, Dkt. No. 95.

On June 21, 2001, the Probation Office for the Northern District of New York prepared a Pre-Sentence Investigation Report relating to Petitioner, which, as revised on March 28, 2002, indicated that Petitioner's base offense level for his crimes was 30. *See* Action No. 03-CV-691, Dkt. No. 25 ("Revised PSR") at ¶ 22.[FN5] That report further noted that Petitioner's total offense level under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") should be reduced to 27 after crediting Petitioner with a two-point reduction for his acceptance of responsibility together with a one point reduction due to his timely notification to the authorities of his intention to plead guilty to the charges. *See* Revised PSR at ¶ 30. Since Petitioner's criminal history category was determined to be I, *see id.* at ¶ 40, that report noted that Petitioner was subject to a range of imprisonment under the Guidelines of between 70-87 months as to Count One, together with a consecutive 60-month term of imprisonment for his conviction on Count Three of the Indictment, *see id.* at ¶ 71.

> FN5. Petitioner had been incorrectly charged with-and pled guilty to-possessing with intent to distribute more than 50 grams of cocaine base/crack cocaine. *See* Indictment, Count One;

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

*see also* Plea Agreement at ¶ 7; Plea Tr. at 11. However, laboratory analysis of the crack cocaine that Petitioner had sold to the confidential informant ultimately revealed that the substance weighed only 45.4 grams. *See* Revised PSR at attached (unnumbered) 19. Therefore, the Probation Office revised the PSR so that it accurately reflected the quantity of crack cocaine attributable to Petitioner. *See* Revised PSR at ¶ 22.

By letter dated March 28, 2002, the Government filed a downward departure motion with the Court pursuant to U.S.S.G. § 5K1.1 based upon the substantial assistance that Petitioner had provided to law enforcement agents. *See* Action No. 00-CR-373, Dkt. No. 104. This Court thereafter sentenced Petitioner to a term of imprisonment of eighteen months on Count One, together with a consecutive, twenty-eight month term of imprisonment regarding his conviction on Count Three. *See* Transcript of Sentencing, dated June 4, 2002 ("Sentencing Tr."), Action No. 03-CV-691, Dkt. No. 24, at 14-15. This Court then suggested that Petitioner attempt to gain acceptance to and successfully complete the Comprehensive Residential Drug Treatment Program that the Bureau of Prisons ("BOP") offered. *See id.* at 15-16. Petitioner thereafter began serving his sentence at the Federal Medical Center in Devins, Massachusetts. *See* Action No. 00-CR-373, Dkt. No. 116.

**\*3** Petitioner filed a Motion to Vacate, Set Aside or Correct his sentence in this District on June 3, 2003. *See* Action No. 03-CV-691, Dkt. No. 1 ("Motion to Vacate"). Petitioner thereafter filed two motions to amend his Motion to Vacate, *see* Action No. 03-CV-691, Dkt. Nos. 3, 9; however, by Order dated October 7, 2003, this Court denied both of those applications without prejudice. *See* Action No. 03-CV-691, Dkt. No. 10.

On November 24, 2003, Petitioner filed a renewed motion to amend his petition, together with supporting exhibits and a memorandum of law in support of that application. *See* Action No. 03-CV-691, Dkt. Nos. 11-13. This Court granted that request, *see* Action No. 03-CV-691, Dkt. No. 14, after which Petitioner's Amended Motion to Vacate was filed in this civil action. *See* Action No. 03-CV-691,

Dkt. No. 15 ("Amended Motion to Vacate").

On June 21, 2004, the Government filed a response in opposition to Petitioner's Amended Motion to Vacate. *See* Action No. 03-CV-691, Dkt. No. 18 ("Resp.Mem."). On April 14, 2005, Petitioner filed a submission he entitled "Traverse to Government's Response, and Memorandum of Points and Authorities." *See* Action No. 03-CV-691, Dkt. No. 30 ("Traverse"). In that application, Petitioner raised numerous new claims, which he had not previously asserted in this action. *See id.* In response to that submission, the Government argued, among other things, that Petitioner's "Traverse" amounted to another motion to amend his previously amended § 2255 application and urged this Court to "exercise its discretion in this matter and put a halt to the incessant filings by [Petitioner]." *See* Action No. 03-CV-691, Dkt. No. 28.

## II. DISCUSSION

### A. Traverse / Motion to Amend

This Court first considers Respondent's claim that Petitioner's Traverse is, in fact, another application to amend his Amended Motion to Vacate.

Although Petitioner claims that his Traverse is "limited to responding to the Governments [*sic* ] brief," *see* Cover Sheet to Traverse, it is clear that in this submission Petitioner not only reiterates the arguments he previously asserted in support of his Amended Motion to Vacate but also raises numerous new legal theories in support of his petition. *See, generally,* Traverse. Since that portion of Petitioner's submission is properly viewed as a request to file another amended Motion to Vacate in this action, this Court considers, as a preliminary matter, whether it should grant that application.

Petitioner dated his original Motion to Vacate on May 30, 2003, just shy of one year from the date on which the judgment of conviction which Petitioner challenges in this action was entered. *Compare* (original) Motion to Vacate at 7 *with* Action No. 00-CR-373, Dkt. No. 107. In July,

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

2003, Petitioner filed a motion to amend that pleading. *See* Action No. 03-CV-691, Dkt. No. 3. On September 17, 2003, before this Court had ruled on Petitioner's original motion to amend, he filed a second motion to amend his motion to vacate. *See* Action No. 03-CV-691, Dkt. No. 9. On October 7, 2003, this Court denied both of Petitioner's pending motions to amend without prejudice to Petitioner submitting a single, renewed motion to amend in this action, together with a copy of a proposed amended pleading. *See* Action No. 03-CV-691, Dkt. No. 10, at 4.[FN6] In that Order, this Court specifically advised Petitioner that he was required to "include all the claims he wishe[d] this Court to consider as a basis for awarding relief herein in the proposed amended pleading submitted along with" any motion to amend filed in response to the Order. *See id.*

> FN6. In denying Petitioner's motions to amend without prejudice, this Court noted that neither of the motions to amend that Petitioner had filed had contained proposed amended pleadings and that he appeared to rely upon a proposed pleading attached to a motion to expand the record as the operative pleading in this civil action. *See* Action No. 03-CV-691, Dkt. No. 10, at 3-4.

**\*4** The following month, Petitioner filed his third motion to file an amended petition herein. *See* Action No. 03-CV-691, Dkt. No. 11. In an Order dated February 23, 2004, this Court granted that application, *see* Action No. 03-CV-691, Dkt. No. 14, after which Petitioner's Amended Motion to Vacate was filed in this action. Nearly *ten months after* the Government filed its opposition papers to Petitioner's Amended Motion to Vacate, *see* Resp. Mem., Petitioner submitted his Traverse. *See* Action No. 03-CV-691, Dkt No. 30. In that submission, Petitioner now seeks to assert the following additional claims in support of his request for habeas relief: (1) the Indictment was defective in several respects and failed to provide him with adequate notice of the charges against him, *see* Traverse at 2-5; (2) trial counsel's pretrial investigation concerning the drug evidence on which the Indictment was based was inadequate, *see id.* at 5, 23; (3) he was not aware of the sentencing consequences of his guilty plea, *see id.* at 7-8; (4) his plea was invalid because it was entered into under "mental coercion and ... duress" arising out of the "over stated

drug amount" alleged in the Indictment, *see id.* at 8; (5) the provision in the Plea Agreement that provided that he waived any appeal of a sentence of 180 months or less is "unconstitutional," *see id.* at 9-11; (6) Mr. Scharf rendered ineffective assistance by failing to petition the Court for a psychological examination of Petitioner pursuant to 18 U.S.C. § 4247(b), *see id.* at 25; (7) Mr. Scharf's untimely request for a downward departure in Petitioner's sentence precluded this Court from properly considering that application, *see id.* at 25-26; (8) assigned counsel's improper delay in filing a motion to withdraw as counsel prevented the Probation Department from timely providing a copy of the Revised PSR to Mr. Scharf, *see id.* at 26; (9) Mr. Scharf failed to review the contents of the Revised PSR with him, *see id.;* and (10) he was not advised of his *Miranda* [FN7] rights at the time of his arrest, after the Indictment was returned against him, or subsequent to his incarceration, *see id.* at 41-42.

> FN7. *Miranda v. Arizona,* 384 U.S. 436 (1966).

The Rules Governing § 2255 Proceedings for the United States District Courts provide, among other things, that "[t]he Federal Rules of Civil Procedure ... to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules." Rule 12 of the Rules Governing § 2255 Proceedings for the United States District Courts; *see also* 28 U.S.C. § 2242 at ¶ 3 (habeas petitions "may be amended or supplemented as provided in the rules of procedure applicable to civil actions"). Although Rule 15(a) of the Federal Rules of Civil Procedure requires that leave to amend be "freely given," the Second Circuit has specifically held that district courts

may deny that leave where necessary to thwart tactics that are dilatory, unfairly prejudicial or otherwise abusive. *Littlejohn,* 271 F.3d at 363; *see also Jones v. N.Y. State Div. of Military & Naval Affairs,* 166 F.3d 45, 50 (2d Cir.1999) (holding that district court may deny leave to amend on grounds of futility). *This discretion safeguards against the possibility that Rule 15's amendment procedures will be exploited by petitioners for the purpose of undermining the rules designed to prevent abuse of the writ, regardless of the procedural posture of the case at the time the motion to amend is brought.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

**\*5** *Ching v. United States,* 298 F.3d 174, 180 (2d Cir.2002) (emphasis added) (footnote omitted).

Additionally, the Supreme Court has determined that undue delay on the part of the movant in bringing a motion to amend is a proper basis for denying such an application. *See Foman v. Davis,* 371 U .S. 178, 182 (1962).

The chronology of the present action, as outlined above, reveals that Petitioner has unduly delayed the filing of what amounts to a *de facto* motion to amend. He waited more than twenty-two months after he commenced this action to file that application and nearly twenty-one months after he filed his original motion to amend before submitting such a request. Many of the ten claims that Petitioner now seeks to assert for the first time in this action are based on matters contained in the record. Furthermore, he could have raised all of the newly-asserted arguments in any of his prior motions to amend. Finally, as noted above, in October, 2003-eighteen months *before* Petitioner filed the present request to amend his Motion to Vacate again-this Court *specifically advised* Petitioner that he was to include *all* the claims he wished this Court to consider as a basis for awarding relief in this action in the proposed amended pleading submitted along with his (third) motion to amend. *See* Action No. 03-CV-691, Dkt. No. 10, at 4. Although Petitioner filed a motion to amend together with a proposed pleading and other supporting documents the following month, *see* No. 03-CV-691, Dkt. Nos. 11-13, nowhere in his proposed pleading did Petitioner assert any of the claims he now seeks to assert in this action through his Traverse.

The Second Circuit has sagely noted that "[c]ourts are not obliged to entertain needless or piecemeal litigation; nor should they adjudicate a motion or petition whose purpose is to vex, harass or delay." *Ching,* 298 F.3d at 179 (citing *McCleskey v. Zant,* 499 U.S. 467, 485, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991)). Therefore, for all of the above-stated reasons, this Court denies what appears to be Petitioner's newest request to file another amended motion to vacate in this action. Accordingly, this Court will not consider the claims that Petitioner raised for the first time in his Traverse as a basis for awarding him relief in this

action, and, therefore, the Amended Motion to Vacate which Petitioner filed on February 23, 2004, is the operative pleading in this matter.

**B. Substance of Amended Motion to Vacate**

*1. Ineffective Assistance of Counsel*

Respondent initially argues that, because Petitioner waived his right to appeal any sentence of 180 months or less as a condition of his plea agreement and because that waiver is valid and enforceable, this Court should dismiss the present action. *See* Resp. Mem. at 9-10. Alternatively, Respondent contends that the claims that Petitioner raises in the Amended Motion to Vacate are without merit. *See id.* at 14-33.

**\*6** "[A] plea agreement containing a waiver of the right to appeal is not enforceable where the defendant claims that the plea agreement was entered into without effective assistance of counsel." *United States v. Hernandez,* 242 F.3d 110, 113-14 (2d Cir.2001) (citations omitted). Thus, an appellate waiver does not bar collateral challenges concerning the propriety of the plea agreement itself or the effectiveness of counsel in advising a defendant to enter into that plea agreement. *See, e.g., Frederick v. Warden, Lewisburg Corr. Facility,* 308 F.3d 192, 196-97 & n. 6 (2d Cir.2002); *see also United States v. Monzon,* 359 F.3d 110, 118-19 (2d Cir.2004) (waiver of right to appeal is not enforceable when "the waiver was the result of ineffective assistance of counsel"); *Santana v. United States,* No. 04 Civ. 1111, 2005 WL 180932, \*3 (S.D.N.Y. Jan. 26, 2005) ("waivers [of appellate rights] are unenforceable where the asserted ground for challenging the sentence is ineffective assistance of counsel in connection with plea negotiations or the agreement itself." (citation omitted)). This Court must therefore consider Petitioner's claim that he received the ineffective assistance of counsel in conjunction with the underlying criminal matter despite his appellate waiver.

In determining whether a criminal defendant received ineffective assistance of counsel, federal district courts must consider (1) whether trial counsel's representation

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

fell below an objective standard of reasonableness measured by the prevailing professional norms and (2) whether the petitioner was prejudiced by counsel's performance, i.e., whether there is a reasonable probability that, but for counsel's performance, the outcome of the proceeding would have been different. *See Strickland v. Washington,* 466 U.S. 668, 688-90, 694 (1984); *United States v. Levy,* 377 F.3d 259, 264 (2d Cir.2004) (citations omitted); *United States v. Champion,* 234 F .3d 106, 109 (2d Cir.2000) (quotation omitted); *United States v. Gordon,* 156 F.3d 376, 379 (2d Cir.1998) (*per curiam* ) (citations omitted).

Petitioner asserts numerous theories in support of his claim that his counsel rendered ineffective assistance.[FN8] Specifically, he argues that assigned and/or retained counsel (1) failed to provide the Court with information concerning Petitioner's post-offense, pre-indictment rehabilitation, *see* Amended Motion to Vacate, Ground One; (2) improperly permitted Petitioner to plead guilty to a crime he did not commit without the benefit of a binding plea agreement, *see id.,* Ground Five; (3) neglected to present evidence of Petitioner's diminished mental capacity and history of mental illness to this Court, *see id.,* Ground Six; (4) failed to advise Petitioner of his right to appeal, *see id.,* Ground Seven; (5) admitted "both aggravating and false facts" in the sentencing memorandum he filed with the Court and "dehumanize[d]" Petitioner at his sentencing by referring to "derogatory information" and "false and inflammatory matters," *see id.,* Ground Eight; and (6) labored under a conflict of interest, *see id.,* Ground Nine.

FN8. In several of the claims that Petitioner asserted in his Amended Motion to Vacate, he failed to specify whether he was addressing his ineffective assistance claims to the performance of his assigned counsel or to the performance of his retained counsel. *See, e.g.,* Amended Motion to Vacate at Grounds One, Seven, and Eight. Construing Petitioner's *pro se* pleading liberally, this Court has considered that Petitioner is asserting all such claims against both his assigned counsel and his retained counsel.

*a. Petitioner's Post-offense, Pre-indictment Rehabilitation*

*7 Petitioner initially faults counsel for failing to advise the Court of Petitioner's post-offense, pre-indictment rehabilitation in support of a downward departure motion "under 5k1.9, 5k2.0"[*sic* ].[FN9] *See* Amended Motion to Vacate, Ground One.[FN10]

FN9. There is no Section 5K1.9 of the Guidelines. U.S.S.G. § 5K2.0 is the Policy Statement of the Sentencing Commission concerning Grounds for Upward and Downward Departures under the Guidelines.

FN10. Since this claim only challenges the sentence that this Court imposed on Petitioner, it appears to be addressed solely to the performance of his retained counsel.

However, because post-offense rehabilitation is not a factor specifically mentioned in the Guidelines, a downward departure in sentencing is warranted on that basis only if, "after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole," the court concludes that the individual's post-offense rehabilitation takes the case out of the "heartland" of typical cases. *United States v. Kim,* 313 F.Supp.2d 295, 301-02 (S.D.N.Y.2004) (citing *Koon,* 518 U.S. at 96, 116 S.Ct.2035) (footnote omitted). In determining whether aspects of a case fall outside the heartland of cases, a sentencing court " 'must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." ' *United States v. Thorn,* 317 F.3d 107, 125 (2d Cir.2003) (quoting *Koon v. United States,* 518 U.S. 81, 98, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)) (other citation omitted). Furthermore, "departures based on grounds not mentioned in the Guidelines [are] 'highly infrequent." ' *Koon v. United States,* 518 U.S. 81, 97 (1996) (quotation omitted); *see also United States v. Sentamu,* 212 F.3d 127, 136 (2d Cir.2000) (citations omitted); *Kim,* 313 F.Supp.2d at 302 (citations and footnote omitted).

To support his claim that his attorney rendered ineffective

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

assistance in failing to move for a downward departure due to Petitioner's post-offense rehabilitation, Petitioner argues that, after he committed the subject offenses, he obtained a Class A commercial driver's license. *See* Amended Motion to Vacate, Ground One. He argues that his procurement of that license has afforded him the possibility of a "strong economic future" and constitutes grounds for a downward departure application. *See id.*

Although attainment of that license may well be admirable and prove beneficial to Petitioner in the future, it was plainly insufficient to warrant his counsel filing an application for a downward departure based upon post-offense rehabilitation. *See, e.g., United States v. Middleton, 325 F.3d 386, 389-90 (2d Cir.2003)* (petitioner's successful participation in substance abuse program and continued gainful employment insufficient to warrant downward departure in sentence); *Soares v. United States, 66 F.Supp.2d 391, 411 (E.D.N.Y.1999)* (§ 2255 motion alleging ineffective assistance due to counsel's failure to seek downward departure in light of petitioner's "procurement of steady employment, his financial assistance to his parents, and his engagement to be married" denied; such post-offense conduct not so "extraordinary" as to warrant a downward departure in sentence).

**\*8** The record establishes that Petitioner's post-offense conduct did not warrant a downward departure motion on that basis at the time of his sentencing. Therefore, it was not objectively unreasonable for Mr. Scharf to have refrained from filing such an application. Moreover, since this Court would not have granted that request had Mr. Scharf filed one, retained counsel's failure to file that application clearly did not prejudice Petitioner.

*b. Propriety of Plea Agreement*

In his fifth ground for relief, Petitioner argues, among other things, that his guilty plea was "both involuntary and unknowingly made due to Counsel's misinformation" regarding the issue of whether Petitioner's conduct ran afoul of § 924(c). *See* Amended Motion to Vacate, Ground Five. Specifically, Petitioner contends that, because his attorney failed to "accurately and persistently

argue the lack of application of the 924(c) charge," he eventually pled guilty to that charge despite the fact that he did not violate that statute. *See id.* Included within this claim is Petitioner's argument that his attorney failed to secure a binding plea agreement in the underlying criminal case. *See id.*

Although not clearly stated in his Amended Motion to Vacate, Petitioner appears to argue that the selling of a firearm in conjunction with his sale of narcotics was insufficient to satisfy the "during and in relation to" requirement of § 924(c). *See* Amended Motion to Vacate at (attached) 6; *see also* Traverse at 11-20. However, in *Smith v. United States, 508 U.S. 223 (1993)*, the Supreme Court squarely held that using a firearm in a guns-for-drugs trade constitutes "using" a firearm within the meaning of § 924(c)(1) and that the use of a firearm is "in relation to" a drug trafficking offense where the gun is an integral part of the transaction. *Id.* at 237-38 (citations omitted); [FN11] *see also United States v. Cox, 324 F.3d 77, 83 (2d Cir.2003)* ("it is settled that one who *tenders* a firearm as barter for drugs is 'using' it within the meaning of Section 924(c)(1)")

> [FN11.] Subsequent to *Smith,* the Supreme Court decided *Bailey v. United States, 516 U.S. 137 (1995).* In that case, the Supreme Court held that the mere placement of a firearm for protection at or near the site of a drug crime or its proceeds was not sufficient to support a conviction for "use" under the active-employment reading of that word. *See Bailey, 516 U.S. at 144.* However, as then-Chief Judge Thomas J. McAvoy of this District observed, the Court's reasoning in *Bailey* did not overrule *Smith.* To the contrary, the *Bailey* Court explicitly noted that its interpretation " '[was] not inconsistent with *Smith.*' " *Bakic v. United States, 971 F.Supp. 697, 701 (N.D.N.Y.1997)* (quoting *Bailey, 516 U.S. at ___, 116 S.Ct. at 508).*

Petitioner admitted in his Plea Agreement that he met with a confidential informant in Dewitt, New York, on September 17, 1998, and that he, along with his co-defendant Matthew Sugamele, sold a .38 caliber revolver, ammunition and one-quarter pound of marijuana

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

to the confidential informant in exchange for $540.00 in U.S. currency. *See* Plea Agreement at 7; *see also* Plea Tr. at 8. Thus, it is clear that Petitioner could have properly been prosecuted on the § 924(c) charge. *See Cox,* 324 F.3d at 83; *see, e.g., United States v. Moore,* 54 F.3d 92, 101 (2d Cir.1995) (denying appellate claim challenging sufficiency of evidence as to § 924(c) conviction; "gun facilitated the drug distribution conspiracy because it was used as compensation for drug services rendered"); *Bakic,* 971 F.Supp. at 701 (denying § 2255 motion challenging § 924(c) conviction; agreement to trade twenty rifles, two cases of ammunition, and $2,250 cash in exchange for one-half pound of methamphetamine and one-half pound of cocaine supported that conviction); *see generally Smith,* 508 U.S. at 237-38.

**\*9** Moreover, as noted above, in negotiating the terms of the Plea Agreement with the Government, Mr. Secular fully explored the issue of whether the Government would abandon its request that Petitioner plead guilty to the § 924(c) count. *See* Action No. 03-CV-691, Dkt. No. 21. When AUSA Katko informed Mr. Secular that the Government insisted that a plea agreement include a guilty plea to the § 924(c) charge, *see* Action No. 03-CV-691, Dkt. No. 22, counsel conferred with Petitioner who ultimately agreed to plead guilty to the firearms charge. *See* Affidavit of David Secular, Esq., dated June 17, 2004, at ¶ 8 (reproduced as attachment to Resp. Mem.). Thus, the record clearly establishes that Mr. Secular pursued, albeit unsuccessfully, the possibility of Petitioner entering into a Plea Agreement concerning the Indictment without his client pleading guilty to the § 924(c) charge. Since Petitioner has not established that counsel's actions relating to those negotiations were objectively unreasonable, the Court denies this aspect of his Amended Motion to Vacate. *See Fernandez v. United States,* No. 05 Civ. 1843, 02CRIM47903, 2005 WL 700961, *1-*2 (S.D.N.Y. Mar. 28, 2005) (denying ineffective assistance claim asserted in § 2255 action; facts at plea colloquy established that the petitioner was guilty of committing 18 U.S.C. § 924(c) crime to which she pled guilty); *see, e.g., Hill v. Lockhart,* 474 U.S. 52, 56-58 (1985) (criminal defendant represented by counsel possesses right to make a reasonably informed decision to accept or reject a plea offer); *Boria v. Keane,* 99 F.3d 492, 496 (2d Cir.1996) (" '[a] defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable" ' (quotation omitted));

*Gordon,* 156 F.3d at 379-80 (criminal defendants have right to effective assistance of counsel during the course of plea negotiations).

As to Petitioner's claim that his attorney failed to negotiate a binding plea agreement with the Government in the underlying criminal matter, *see* Amended Motion to Vacate, Ground Five, the Court finds this claim to be specious in light of the fact that he pled guilty before this Court pursuant to an executed Plea Agreement that was binding on both him and the Government. *See* Action No. 00-CR-373, Dkt. No. 37; *see also* Plea Tr. at 4-5 (Court discussing with Petitioner the Plea Agreement he executed and pursuant to which he intended to enter guilty plea).

Accordingly, the Court concludes that this theory does not afford any basis for the relief he seeks herein.

*c. Diminished Capacity*

In a portion of his fifth ground for relief, as well as the sixth ground for relief, in his Amended Motion to Vacate, Petitioner argues that counsel improperly failed to present evidence of Petitioner's diminished capacity to the Court. *See* Amended Motion to Vacate, Grounds Five, Six.

Initially, this Court notes that it is not entirely clear whether Petitioner now claims that his alleged diminished capacity should invalidate his guilty plea in its entirety because his plea was not knowingly and intelligently made, *see* Amended Motion to Vacate, Ground Six, or whether Petitioner is alleging that his retained counsel failed to argue Petitioner's diminished capacity as a basis for a downward departure in Petitioner's sentence, *see* Amended Motion to Vacate, Ground Five. Therefore, this Court will construe this claim liberally as asserting both of these grounds.

*(1) Capacity to Plead Guilty to Charges in Indictment*

**\*10** In opposing this aspect of Petitioner's Amended Motion to Vacate, Respondent has provided the Court

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

with a second affidavit that Petitioner's assigned counsel executed in which he stated that "[a]t no point during [his] representation of [Petitioner] did [counsel] come to believe that [Petitioner] was operating under a mental disease or defect that rendered him incapable of understanding the allegations and to decide what was the best course of action to take." *See* Action No. 03-CV-691, Dkt. No. 29, Affidavit of David Secular, Esq., dated April 12, 2005, at ¶ 3. Mr. Secular further declared in that affidavit that he believed that Petitioner "was able to fully understand the nature and consequences of the proceedings against him and was able to assist [counsel] in evaluating any defenses that [Petitioner] may have [had]." *Id.*

Petitioner has not presented any evidence which disputes Mr. Secular's testimony regarding Petitioner's ability to understand the nature and consequences of the proceedings against him in the underlying criminal matter. Additionally, Petitioner's responses to this Court's questions throughout the hearing in which he pled guilty to the above-referenced charges did not suggest, in any way, that Petitioner labored under a diminished capacity. *See* Plea Tr. at 2-12. Since Petitioner has not established that at the time he pled guilty he suffered from any mental disease or defect which resulted in any diminished capacity, he has not demonstrated that his assigned counsel wrongfully failed to present evidence of Petitioner's diminished capacity to the Court during the criminal proceeding below.

*(2) Failure to Seek Downward Adjustment Due to Diminished Capacity*

Alternatively, if the Court considers this claim to allege that Petitioner's retained counsel wrongfully failed to seek a downward adjustment at sentencing due to Petitioner's diminished capacity, *see, e.g.,* Amended Motion to Vacate, Ground Five, the Court notes that Section 5K2.13, a Policy Statement of the Guidelines, provides, in pertinent part, that "[a] downward departure [under the Guidelines] may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense...." U.S .S.G. § 5K2.13. To

warrant a downward departure on this basis, a party must establish the following: (1) significantly reduced mental capacity that was not the result of the voluntary use of drugs and (2) a causal link between that reduced capacity and the party's actions in committing the charged offense. *See Simmons v. United States,* Nos. 5:04 CV 539, 5:05 CR 318, 2005 WL 2033473, *5 (N.D.N.Y. Aug. 22, 2005) (quotation and other citation omitted).

Petitioner has not established that at the time he committed the offenses to which he pled guilty he was suffering from a significantly reduced mental capacity. Therefore, it was not objectively unreasonable for his attorney to have refrained from filing a motion seeking a downward departure based upon that reason at the time of Petitioner's sentencing. Accordingly, the Court concludes that Petitioner is not entitled to the relief he seeks on this theory.

*d. Right to Appeal*

**\*11** Petitioner next faults counsel for failing to advise him of his purported right to file an appeal with the Second Circuit.[FN12] *See* Amended Motion to Vacate, Ground Seven. However, this argument appears to overlook the fact that Petitioner waived his right to appeal any sentence of imprisonment of 180 months or less. *See* Plea Agreement at ¶ 14. As noted above, this Court specifically referenced that appellate waiver during the plea colloquy, *see* Plea Tr. at 9, as did Petitioner's retained counsel at Petitioner's sentencing. *See* Sentencing Tr. at 18. Since that appellate waiver was valid, Petitioner is precluded from now claiming that counsel was ineffective in failing to advise him of any purported right to pursue an appeal. *See Colon v. United States,* Nos. 05 Civ. 2690, 04 CRIM. 0014, 2005 WL 2088412, *2 (S.D .N.Y. Aug. 29, 2005) ("Petitioner's claim that counsel's assistance was ineffective because he failed to file an appeal notwithstanding a valid waiver of the right to appeal is frivolous and is rejected"); *see also Pianello v. United States,* Nos. 05CIV5686, 04CRIM0014, 2005 WL 1773681, *3 (S.D.N.Y. July 26, 2005); *Defex v. United States,* No. 97-CV-1891, 1998 WL 812572, *4 (E.D.N.Y. May 19, 1998) (claim that attorney wrongfully failed to advise the petitioner of his right to appeal "baseless" where he waived any appellate rights and where the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

petitioner was reminded during plea allocution that he was foregoing his right to appeal under terms of plea agreement); *see, e.g., Murgas v. United States,* No. 99-CV-1723, 2002 WL 553462, *4 (N.D.N.Y. Apr. 10, 2002) (failure to file a notice of appeal cannot be seen as objectively unreasonable in light of the petitioner's express agreement to waive his right to appeal (citation omitted)).

FN12. Petitioner appears to assert this claim against both his assigned and his retained counsel.

Thus, neither assigned nor retained counsel acted in an objectively unreasonable manner in failing to advise Petitioner of his claimed right to appeal because he had explicitly waived that right. Furthermore, because his appellate waiver was fully enforceable, Petitioner could not demonstrate any prejudice attributable to counsels' allegedly wrongful conduct. Accordingly, the Court concludes that this theory does not afford Petitioner any basis for the relief he seeks herein.

*e. Sentencing Memorandum and Hearing*

In his eighth ground for relief, Petitioner argues that his retained counsel did not adequately represent him at sentencing. Specifically, he contends that the sentencing memorandum that Mr. Scharf filed contained "aggravating and false facts," and that, at sentencing, counsel "managed to further Dehumanize the Petitioner, through both derogatory information [and] with false and inflammatory facts pertinent to the Petitioner and his Family." *See* Amended Motion to Vacate at (attached) 7 (typeface in original).

Respondent argues that this aspect of Petitioner's Amended Motion to Vacate "is devoid of specific facts to support the claim," thereby rendering it "difficult to ascertain the actual basis for the claim and how he was harmed by it." *See* Resp. Mem. at 31. Alternatively, Respondent contends that the claim is without substance. *See id.* at 31-32.

*12 Rule 2(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts, provides, in pertinent part, that motions to vacate shall "specify all the grounds for relief available to the moving party; state the facts supporting each ground...." Rule 2(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts. Petitioner has clearly failed to comply with the foregoing Rule. For example, although he alleges that retained counsel presented "false facts" in his sentencing memorandum, *see* Amended Motion to Vacate at (attached) 7, Petitioner has wholly failed to specify which of the numerous statements contained in that memorandum were false or misleading in any way. Nor does Petitioner provide the factual basis for this claim in his Traverse.

A petitioner bears the burden of proving that he is entitled to relief under § 2255. *See Mittal v. United States,* Nos. 02 Civ. 8449, 98 CR. 1302, 2005 WL 2036023, *7 (S.D.N.Y. Aug. 24, 2005) (citation omitted); *Parsons v. United States,* 919 F.Supp. 86, 88-89 (N.D.N.Y.1996) (citation omitted). Petitioner's failure to provide specific facts supporting this aspect of his Amended Motion to Vacate represents a failure on his part to satisfy this burden. Thus, this Court could deny this portion of Petitioner's application on this basis alone. *See, e.g., Barnett v. United States,* 870 F.Supp. 1197, 1201 (S.D.N.Y.1994) (court should deny motion to vacate where the petitioner failed to state ground on which he sought relief and failed to state facts substantiating such claim). However, in light of Petitioner's *pro se* status, this Court has reviewed both the sentencing memorandum that retained counsel prepared in the underlying criminal matter, together with the sentencing transcript, in an attempt to ascertain whether Petitioner might be entitled to habeas relief on this theory.

Retained counsel sought to have this Court reduce Petitioner's sentence based upon a finding that there existed "aggravating or mitigating circumstance[s] of a kind, or to a degree, not adequately taken into consideration" in the formulation of the Guidelines. *See* Action No. 00-CR-373, Dkt. No. 105 ("Sentencing Mem."), at (unnumbered) 4-5. In support of that claim, Mr. Scharf included a detailed discussion regarding Petitioner's history of sexual abuse, mental illness, and alcohol and drug abuse. *See id.* at (unnumbered) 6-10. At sentencing, counsel briefly reiterated some of those same

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

arguments in offering a possible explanation for Petitioner's criminal conduct. *See* Sentencing Tr. at 6-8.

Since counsel sought a downward departure for Petitioner based upon the difficulties he had experienced in his life, it was not objectively unreasonable for counsel to provide such information to this Court in support of the requested departure. *See, e.g., United States v. Ruff*, 998 F.Supp. 1351, 1361-62 (M.D.Ala.1998) (recognizing authority to grant downward departure in defendant's sentence due to his history of being victim of sexual abuse (citation omitted)); *United States v. Artim*, 944 F.Supp. 363, 366-68 (D.N.J.1996) (discussing factors, including prior sexual abuse of perpetrator, that district courts may consider when determining whether to grant downward departure motion).

**\*13** Moreover, since the "false and inflammatory facts" concerning Petitioner and his family that Mr. Scharf presented to the Court in conjunction with Petitioner's sentencing did not adversely affect the sentence that this Court imposed on him, Petitioner was not prejudiced, in any way, by the disclosures that retained counsel made to this Court regarding the foregoing. Accordingly, the Court concludes that this theory does not afford Petitioner any basis for the relief he seeks herein.

*f. Conflict of Interest*

Petitioner's final theory upon which he relies to support his claim of ineffective assistance appears to assert a claim that his retained counsel labored under a conflict of interest; however, this claim is nearly incomprehensible. In support of this claim, Petitioner states that

[c]ounsels [sic] conflict of interest is based on counsels [sic] own personal motivation, to as Mr. Scharf put it, "To Help Me, Help My Self". Counsels [sic] intention was to use my opportunity to cooperate, By [sic] having me introduced to a previous client's former associates who have criminal involvement with a Presiding Judge. Who [sic] counsel had a personal grievance with. The Governments [sic] lack of interest in my cooperation regarding this offer to assist the Government, was based

on my previous failed efforts. Therefor [sic] lead to a lack of devotion towards the interests of the Petitioner by, Randy Scharf.

*See* Amended Motion to Vacate at (attached) 8.

Petitioner's reply memorandum does not clarify the substance of this claim in any way. *See, generally,* Traverse.

In opposing the present application, the Government filed Mr. Scharf's affidavit in which he addressed Petitioner's claim of ineffective assistance. *See* Action No. 03-CV-691, Dkt. No. 26, Affidavit of Randy Scharf, dated May 24, 2004 ("Scharf Aff."). In that affidavit, Mr. Scharf shed some light on the apparent factual basis for this aspect of Petitioner's ineffectiveness claim. Specifically, Mr. Scharf stated that

[w]ith respect to the substance of the supporting facts, I can only surmise that [Petitioner] is referring to the meeting we had with AUSA Katko and the agents in which we brainstormed on various ways in which [Petitioner] might be able to continue to cooperate with the government. Many different options and possibilities were discussed at that meeting, but no concrete plan was able to be reached, largely because the government did not believe that [Petitioner] had the desire to cooperate further with the government. Reference to a possibly corrupt judge was made in passing as one of the possible ways in which [Petitioner] might be able to help himself, but it was quickly realized by all parties present that it was too vague and speculative an idea to pursue further.

*See* Scharf Aff. at ¶ 13.

There are three levels of conflicts of interest that a court must consider in evaluating a Sixth Amendment claim alleging such a conflict: "(1) a *per se* conflict requiring automatic reversal without a showing of prejudice; (2) an actual conflict of interest that carries a presumption of prejudice; and (3) a potential conflict of interest that requires a finding of both deficient performance by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

counsel and prejudice...." *United States v. John Doe No. 1, 272 F.3d 116, 125 (2d Cir.2001)* (citation omitted).

**\*14** In conjunction with this action, Petitioner has not presented any evidence to support his claim that his retained counsel suffered from a *per se*, actual or potential conflict of interest. Rather, the only evidence that addresses this issue is Mr. Scharf's sworn declaration to the effect that he undertook the conduct on which this aspect of Petitioner's claim is based in an attempt to ensure that the Government filed a downward departure motion prior to sentencing.[FN13] *See* Scharf Aff. at ¶ 13 (noting that he and the Government undertook the actions to which Petitioner referred in an effort to "do[ne] everything that we could to get [Petitioner] to help himself by cooperating further in this matter"). Petitioner has not contested the substance of Mr. Scharf's affidavit in any way or otherwise presented evidence to support his claim that his retained counsel labored under a *per se*, actual or potential conflict of interest at the time that he represented Petitioner. Accordingly, the Court rejects this final theory upon which Petitioner bases his claim of ineffective assistance of counsel.

> [FN13.] As noted above, AUSA Katko ultimately filed that application, which this Court granted at the time of Petitioner's sentencing. *See* Action No. 00-CR-373, Dkt. No. 104; Sentencing Tr. at 14-15.

*2. Disparity in Sentencing*

In his second ground for relief, Petitioner argues that he and his co-defendants were found "guilty of similar conduct" and notes that his criminal history category was lower than that of his co-defendant, *see* Amended Motion to Vacate at (attached) 5; *see also* Traverse at 27-35. He contends that, in conjunction with his sentencing, the prosecutor improperly diminished his level of cooperation with the Government thereby exposing him to a longer term of imprisonment. *See* Amended Motion to Vacate at (attached) 5. He argues that, as a result of the foregoing, he was wrongfully denied a downward departure identical to the one that his co-defendant received.[FN14] *See* Amended Motion to Vacate at (attached) 5. Petitioner

contends that, if his counsel had made that downward departure application, the length of his sentence would have been reduced by twenty-four months. *See id.; see also* Traverse at 27-35.

> [FN14.] Petitioner did not specify whether this aspect of his Amended Motion to Vacate challenges his sentence compared with the sentence that the Court imposed on his co-Defendant Sugamele or the one that the Court imposed on his co-Defendant Kenneth Suressi, the third individual named in the Indictment along with Petitioner. *See* Amended Motion to Vacate, Ground Two. However, in his Traverse, Petitioner appears to argue that this claim relates to his co-Defendant Sugamele. *See* Traverse at 27-30. Additionally, the Government did not file any downward departure motion as to Defendant Suressi, *see* Action No. 00-CR-373, Dkt. No. 111, and this Court eventually sentenced Defendant Suressi to a prison term of 87 months, *see* Action No. 00-CR-373, Dkt. No. 113, a period of time substantially longer than the combined sentence of 46 months that Petitioner received. Thus, this Court has considered this ground as one alleging an improper sentencing disparity between Petitioner and his co-Defendant Sugamele.

Initially, this Court finds that, because Petitioner waived his right to appeal the sentence that this Court ultimately imposed on him and that appellate waiver is valid, that waiver bars his second ground for relief. However, the Court also concludes that this ground is substantively without merit.

In the underlying criminal matter, the Government moved for a three-level downward departure as to Defendant Sugamele based upon his substantial assistance to the Government, *see* Action No. 00-CR-373, Dkt. No. 97, yet it only sought a two-level downward departure based upon Petitioner's assistance to the Government. *See* Action No. 00-CR-373, Dkt. No. 104. Contrary to Petitioner's claims, however, the record establishes that there was no improper disparity between the sentence that this Court imposed on his co-Defendant Sugamele and the one that this Court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

imposed on him. Rather, the record reflects that Defendant Sugamele began cooperating with law enforcement agents well before Petitioner began providing such assistance to the authorities. Specifically, in its sentencing memorandum regarding Defendant Sugamele, the Government noted that Defendant Sugamele had admitted his criminal involvement in the matter from the "outset," that he was the first individual named in the Indictment who cooperated with the Government, and that he "began cooperating with the authorities soon after his arrest." *See* Action No. 00-CR-373, Dkt. No. 97, at 3.

**\*15** In sharp contrast to Defendant Sugamele's efforts, the Government noted at Petitioner's change of plea that it might not file *any* downward departure motion regarding Petitioner; in fact, AUSA Katko noted on the record at that proceeding that

at this time ... it's not clear whether [Petitioner's] done enough to have a substantial assistance [motion filed] but we're-it's my fervent hope that he pulls through and gets something to help himself and to help his sentence and so the cooperation's there-the cooperation agreement's there but it's not clear whether he's going to get it yet or not. [To Petitioner:] Do you understand that?

*See* Plea Tr. at 9.

Petitioner then acknowledged that he understood AUSA Katko's statement regarding the fact that the Government might not file a substantial assistance motion on Petitioner's behalf due to his lack of cooperation. *See id.* AUSA Katko also mentioned Petitioner's lack of cooperation with the Government at Petitioner's sentencing hearing. Specifically, the prosecutor noted at that time that, although Petitioner had been afforded "every opportunity in the world to cooperate," his cooperation with the Government had not "pan[ned] out." *See* Sentencing Tr. at 12.[FN15] Thus, it is clear that the "sentencing disparity" about which Petitioner now complains was not improper in any way. *See, e.g.* United States v. Featherstone, No. 86 CR. 861, 1988 WL 142472, \*3 (S.D.N.Y. Dec. 27, 1988) (noting that "extent, nature and timing" of criminal defendant's cooperation properly resulted in the petitioner receiving sentence

higher than that of co-defendants in Indictment).

FN15. AUSA Katko opined that Petitioner's lack of cooperation through that point in time appeared to the Government to be "a pattern of [Petitioner's]. He doesn't realize the severity of the problems until it is too late...." *See* Sentencing Tr. at 12.

Petitioner has not offered any evidence, in either his Amended Motion to Vacate or in his Traverse, to establish that his level of cooperation was not adequately reflected in the downward departure motion that Respondent filed. Accordingly, the Court denies Petitioner's second ground for relief on the merits.

*3. Failure to Take Mitigating Factors Into Consideration*

Petitioner next argues that this Court failed to consider the "unique constellation of mitigating factors" that existed with respect to him in fashioning his sentence. *See* Amended Motion to Vacate, Ground Three. In support of this claim, Petitioner contends that (1) his criminal conduct was "aberrant," (2) he possessed a defense of "imperfect/progressive entrapment" to the charges, and (3) he played a "mitigating role" in the offense. *See id.*

This Court finds that not only does Petitioner's appellate waiver bar his third ground in support of his Amended Motion to Vacate but also this ground for relief is without merit.

In the Sentencing Memorandum that he filed on behalf of Petitioner, retained counsel argued that "the unique constellation of mitigating factors," including Petitioner's diminished capacity, the fact that Petitioner's criminal conduct was "truly aberrant when viewed in the context of his entire life," and his physical vulnerability should he be sent to prison warranted a downward departure in Petitioner's sentence. *See* Sentencing Mem. at (unnumbered) 5-11. This Court reviewed that submission prior to pronouncing its sentence on Petitioner. *See, e.g.,* Sentencing Tr. at 3. Thus, the portion of Petitioner's third

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

ground for relief that argues that this Court did not consider the aberrant nature of his crime is fundamentally flawed.

**\*16** Next, although it appears that district courts in this Circuit may properly consider an "imperfect entrapment" argument as a basis for a downward departure motion, *see United States v. Bala*, 236 F.3d 87, 91-93 (2d Cir.2000), a departure on such a ground is only warranted where the defendant establishes that his criminal conduct was the result of "aggressive encouragement of wrongdoing" on the part of the Government sufficient to "remove [the defendant's] case from the 'heartland of the applicable Guideline.' " *Bala*, 236 F.3d at 92 (quoting *United States v. Bonnet-Grullon* 212 F.3d 692, 700 (2d Cir.2000)). Neither the factual basis for the plea discussed in Petitioner's Plea Agreement nor the basis for the plea placed on the record on the date that he pled guilty to Counts One and Three in the Indictment, afforded any basis for this Court to properly consider-much less grant-a downward departure in Petitioner's sentence based upon an imperfect entrapment defense. *See, e.g.,* Plea Agreement at 6-8; Plea Tr. at 8.

With respect to Petitioner's claim that this Court improperly failed to downwardly depart in his sentence pursuant to U.S.S.G. § 3B1.2 due to the minor role he purportedly played in the subject offenses,[FN16] the Court finds that the facts that Petitioner admitted in his Plea Agreement reveal that a downward adjustment in his sentence under this provision of the Guidelines would have been inappropriate. Specifically, under his Plea Agreement, Petitioner admitted that on September 17, 1998, he drove himself and co-Defendant Sugamele to a local restaurant to sell marijuana and a handgun to an individual who proved to be a confidential informant. *See* Plea Agreement at 6-7. Additionally, Petitioner admitted that, after co-Defendant Sugamele sold the confidential informant $350.00 worth of marijuana on September 25, 1998, Petitioner placed a call to that individual and encouraged him to "call [Petitioner] if he need[ed] anything else." *See id.* at 7-8. Finally, Petitioner and his co-Defendant Sugamele met with the confidential informant on October 9, 2000, and again on October 22, 2000, and sold him illegal narcotics worth approximately $3,000.00. *See id.* at 8.

FN16. Under U.S.S.G. § 3B1.2, entitled "Mitigating Role," a district court may, based upon a defendant's role in the offense, decrease his offense level by four levels where the defendant was a minimal participant in any criminal activity, *see* U.S.S.G. § 3B1 .2(a); by two levels if the defendant was a minor participant in the criminal activity, *see* U.S.S.G. § 3B1.2(b); or by three levels "[i]n cases falling between" the foregoing categories. *See* U.S.S.G. § 3B1.2; *see also United States v. Carpenter,* 252 F.3d 230, 234-35 (2d Cir.2001) (citations omitted).

Courts have applied a "minor role" adjustment under the Guidelines to "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, cmt. n. 3. In addition, courts have found such an adjustment appropriate if the defendant is "substantially less culpable than the average participant." *Id.; Carpenter,* 252 F.3d at 234-35. In this vein, the Second Circuit "ha[s] held that a defendant may not receive a minor role adjustment solely because [he] 'played a lesser role than h[is] co-conspirators[;] to be eligible for a reduction, the defendant's conduct must be "minor" ... as compared to the average participant in such a crime.' " *United States v. Castano,* 234 F.3d 111, 113 (2d Cir.2000) (quotation omitted).

**\*17** Petitioner's role in the subject criminal offenses, as he admitted in his Plea Agreement, establishes that it would have been inappropriate for this Court to reduce his offense level based on his alleged mitigating role in the offense. Accordingly, in light of the foregoing, the Court denies Petitioner's third ground for relief.

*4. Petitioner's Participation in the BOP's Drug Treatment Program*

In his fourth ground for relief, Petitioner claims that the Court should correct his sentence because, at the time of sentencing, it was under the mistaken impression that he would be eligible for early release upon his successful completion of the BOP's Drug Treatment Program. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

Amended Motion to Vacate at (attached) 6. Petitioner argues that, because the BOP subsequently informed him that he was not eligible to participate in that program due to his firearms conviction, this Court should correct his sentence because of its "apparent misunderstanding" concerning BOP regulations relating to its Drug Treatment Program. *See id.*

Respondent argues that the Court's statements regarding the BOP's Drug Treatment Program at the time of Petitioner's sentencing constituted a mere recommendation that Petitioner participate in that program. *See* Resp. Mem. at 23. Moreover, Respondent contends that, because this Court did not rely upon the statement it made regarding Petitioner's participation in that program in fashioning Petitioner's sentence, the Court should deny this aspect of Petitioner's Amended Motion to Vacate. *See id.* In support of its position, Respondent relies principally upon the Supreme Court's decision in *United States v. Addonizio, 442 U.S. 178 (1979)*. *See* Resp. Mem. at 23-26.[FN17]

> FN17. In *Addonizio,* the Supreme Court held that a party may not properly bring an action pursuant to 28 U.S.C. § 2255 if the claimed sentencing error was "based not on any objectively ascertainable error but on the frustration of the subjective intent of the sentencing judge." *Addonizio,* 442 U.S. at 187.

Although Petitioner's waiver of his right to appeal bars this ground for the relief he seeks, the Court notes that this ground is also without substance. Specifically, the record reflects that, *after* imposing sentence on Petitioner, this Court stated that it was

going to recommend that [Petitioner] be allowed to participate in the Bureau of Prisons Comprehensive Residential Drug Treatment Program.

If you are accepted into that program, and if you complete it successfully, you will be able to reduce your time further in prison, but more importantly, you will be developing some lifelong skills to deal with substance and alcohol and other types of drug abuse as well as some skills to deal

with making good choices in life.

*See* Sentencing Tr. at 15-16.

This Court is well aware that the ultimate decision as to whether an inmate will be accepted into the BOP's Drug Treatment Program rests with the BOP. Although the Court encouraged Petitioner to apply for admission into that program, it is clear that the Court merely *recommended* that Petitioner *be allowed* to participate in that program, *after* it imposed sentence on Petitioner.[FN18] *See* Sentencing Tr. at 15. Thus, this Court clearly indicated at Petitioner's sentencing that his successful completion of the BOP's program-and any potential reduction in his prison term related to same-was neither guaranteed nor a condition of his sentence. To the contrary, this Court merely recommended that Petitioner consider applying for admission into the BOP's Drug Treatment Program primarily because of the life skills he might obtain as a result of his successful completion of that program. *See id.*

> FN18. The Court notes that the sentence that it imposed on Petitioner reflected a substantial downward departure from the imprisonment range of 130 months to 147 months to which Petitioner was subject in light of his convictions. *Compare* Sentencing Tr. at 14 *with* Revised PSR at ¶ 71.

**\*18** The Court clearly did not base Petitioner's sentence, in any way, on an assumption that he would be accepted into the BOP's Drug Treatment Program or that he would necessarily successfully complete that program and thereby reduce his sentence. Thus, even considering the substance of Petitioner's fourth ground for relief, the Court finds it to be without merit. *See, e.g., Alvarez v. Scully, No. 91 CIV. 6651, 1993 WL 15455, \*8 (S.D.N.Y. Jan. 11, 1993)* (habeas relief unavailable where "there is no indication that [court] relied on misinformation in the sentencing procedure"), *aff'd without op.,* 23 F.3d 397 (2d Cir.1994); *Cf. Moore v. Scully,* 956 F.Supp. 1139, 1149 (S.D.N.Y.1997) (court's mistaken belief at sentencing regarding the defendant's involvement in prior crime did not entitle the petitioner to habeas relief, the information

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))

"clearly was not material, and the Court's mention of it was harmless"). Accordingly, the Court denies Petitioner's fourth ground for relief

*5. Validity of Plea*

In his fifth ground for relief, Petitioner argues that his guilty plea was both involuntary and not knowingly made. *See* Amended Motion to Vacate at (attached) 6. Specifically, he contends that his plea is invalid because (1) it was based upon "Counsel's misinformation" and because (2) he did not violate § 924(c). *See id.* Although this claim appears to be rooted in the ineffective assistance claim already discussed, the Second Circuit has emphasized that courts within this Circuit are to construe a *pro se* litigant's papers liberally. *See Marmolejo v. United States,* 196 F.3d 377, 378 (2d Cir.1999) (per curiam) (construing application for certificate of appealability filed in § 2255 application as a notice of appeal); *Fleming v. United States,* 146 F.3d 88, 90 (2d Cir.1998) ("Just as *pro se* complaints 'must be liberally construed' ... a district court must review a *pro se* petition for collateral relief 'with a lenient eye, allowing borderline cases to proceed' " (internal quotations and other citations and footnote omitted)); *see Parke v. United States,* Nos. 5:97-CV-526, 92 CR 035, 2004 WL 437464, *2 (N.D.N.Y. Feb. 17, 2004)* ("this court must afford [petitioner], as a *pro se* litigant, a liberal reading of his papers, and interpret them 'to raise the strongest arguments that they suggest' " (quotation omitted)). Therefore, in addition to considering this claim as an argument in support of his ground alleging ineffective assistance, this Court will also construe this claim for relief as one challenging the validity of Petitioner's guilty plea.

To the extent that Petitioner's appellate waiver and/or his failure to assert this claim in a direct appeal of his conviction do not procedurally bar this ground, the Court finds that the transcript of Petitioner's change of plea belies any claim that he did not knowingly, voluntarily and intelligently enter his guilty plea to Counts One and Three of the Indictment. *See* Plea Tr. at 2-11. At that hearing, Petitioner stated that he (1) had thoroughly reviewed the Plea Agreement with his attorney, (2) understood everything contained in that agreement, and (3) had no

questions whatsoever about anything contained in the Plea Agreement. *See* Plea Tr. at 5. The answers that Petitioner provided to the Court at that proceeding did not suggest, in any way, that his guilty plea was anything other than one "made voluntarily after proper advice and with full understanding of the consequences." *E.g., Kercheval v. United States,* 274 U.S. 220, 223 (1927); *see also Pujols v. United States,* No. 03 Civ. 1474, 2004 WL 1418024, *2 (S.D.N.Y. June 23, 2004) (quotation and other citation omitted).

**\*19** Since Petitioner has not presented any evidence to support his claim challenging the validity of his guilty plea, this Court concludes that such a claim is without substance. Accordingly, the Court also denies this portion of Petitioner's fifth ground on the merits.

### III. CONCLUSION

After carefully reviewing the file in this matter, the parties' submissions, the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that the Clerk of the Court amend the Court's Docket in this case to reflect Petitioner's new address: Syracuse Pavilion, 701 Erie Boulevard East, Syracuse, New York 13210; and the Court further

ORDERS that Petitioner's request to amend his Amended Motion to Vacate, *see* Action No. 03-CV-691, Dkt. No. 30, is DENIED; and the Court further

ORDERS that Petitioner's Amended Motion to Vacate, *see* Action No. 03-CV-691, Dkt. No. 15, is DENIED in its entirety; and the Court further

ORDERS that the Clerk of the Court serve a copy of this Order on the parties by electronic or regular mail.

IT IS SO ORDERED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3159657 (N.D.N.Y.)
(Cite as: 2005 WL 3159657 (N.D.N.Y.))


N.D.N.Y.,2005.
Simpson v. U.S.
Not Reported in F.Supp.2d, 2005 WL 3159657
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.